Erik Grafe
Carole A. Holley
Hannah M. Payne *(application pending)*
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: egrafe@earthjustice.org
E: cholley@earthjustice.org
E: hpayne@earthjustice.org

*Attorneys for Plaintiffs Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, and Kachemak Bay Conservation Society.*

Kristen Monsell *(pro hac vice application forthcoming)*
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, St. #800
Oakland, CA 94612
T: 510.844.7100
E: kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity.*

Julia Forgie *(pro hac vice application forthcoming)*
Irene Gutierrez *(pro hac vice application forthcoming)*
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second Street
Santa Monica, CA 90401
T: 310.434.2300
E: jforgie@nrdc.org
E: igutierrez@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER; ALASKA COMMUNITY ACTION ON TOXICS; CENTER FOR BIOLOGICAL DIVERSITY; KACHEMAK BAY CONSERVATION SOCIETY; and NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; AMANDA LEFTON, in her official capacity as Director of Bureau of Ocean Energy Management; DEB HAALAND, in her official capacity as Secretary of the Interior; and LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals, <br><br> *Defendants*. | Case No. 3:22-cv-00279-HRH |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 702-706, 42 U.S.C. § 4321 *et seq.*)**

**INTRODUCTION**

1.      In this case, Plaintiffs Cook Inletkeeper, Alaska Community Action on
Toxics, Center for Biological Diversity, Kachemak Bay Conservation Society, and
Natural Resources Defense Council, Inc. (Plaintiffs) challenge the Bureau of Ocean
Energy Management's (Bureau) Final Environmental Impact Statement (EIS) and the
Department of the Interior's Record of Decision to hold offshore Oil and Gas Lease Sale
258 in the federal waters of Cook Inlet, Alaska. The Final EIS and Record of Decision
violate the National Environmental Policy Act (NEPA) and the Administrative Procedure
Act (APA).

2.      Cook Inlet, Alaska provides important habitat for magnificent aquatic,
terrestrial, and avian wildlife, including the endangered Cook Inlet beluga whale, fin and
humpback whales, wild Pacific salmon, halibut, the northern sea otter, brown and black
bears, moose, caribou, Steller's eider, and migratory birds, among others. The Cook Inlet
watershed is also home to almost two-thirds of Alaska's residents and many Alaska
Native communities that depend on the region's waters for subsistence, employment, and
the continuation of long-standing cultural practices.

3.      Oil and gas leasing in Cook Inlet threatens the survival of its wildlife and
the livelihoods of its residents. Oil and gas exploration and development brings with it
countless risks, including oil spills, safety hazards, seismic airgun blasting, ship traffic,
and air and water pollution. It also results in enormous emissions of carbon dioxide and

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                    1

other greenhouse gases that fuel the climate crisis. Indeed, the main human activity that emits carbon dioxide is the combustion of fossil fuels, including oil and gas, for energy and transportation. Cook Inlet is already experiencing severe effects of climate change, and new oil and gas leasing will only magnify those harms.

4. In the face of these harms, the Biden Administration has moved forward with Lease Sale 258 in Cook Inlet. Initially proposed as part of the 2017-2022 National Outer Continental Shelf Oil and Gas Leasing Program, plans for Lease Sale 258 were canceled this spring. But in August 2022, President Biden signed the Inflation Reduction Act of 2022 (IRA), which mandated that the Bureau hold the lease sale by the end of 2022. Pub. L. No. 117-169, § 50264, 136 Stat. 1818, 2059-60 (2022). Consequently, the Bureau issued its Final EIS for the lease sale on October 20, 2022. 87 Fed. Reg. 65,247 (Oct. 28, 2022).

5. The Final EIS failed to adequately evaluate the environmental impacts of Lease Sale 258. Its analysis of greenhouse gas emissions was based on flawed modeling and failed to provide a meaningful assessment of the significance of the emissions in the context of the global climate crisis. It failed to adequately analyze the impacts of the lease sale on federal Endangered Species Act-listed species, including the highly imperiled Cook Inlet beluga whale, as well as fin and humpback whales. It also presented an incomplete and misleading picture of oil spill impacts and risks based on flawed modeling. And it failed to present a coherent and balanced assessment of the economic

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                                2

costs and benefits of the lease sale.

6.     Despite the expected harm to Cook Inlet, the Final EIS also summarily rejected alternatives that would have caused significantly less wildlife harm and environmental damage to the region. Instead, the Final EIS evaluated only alternatives that it presumed would entail the same amount of oil and gas activity, and failed to explain or justify that presumption, particularly given the record evidence showing that future oil demand will decline as conservation provisions like those in the IRA take effect. As a result, the Final EIS arbitrarily failed to examine alternatives that would, for instance, significantly shrink the area available for leasing or place limits on the extent of oil production within the leased area.

7.     Plaintiffs pointed out this shortcoming in their comments on the Draft EIS. The Final EIS acknowledged these comments. But it did not explain the basis for the decision to examine only alternatives that will result in similar levels of oil production and effects on most resources or explain why such a decision is appropriate and consistent with the Bureau's obligations under NEPA and the Outer Continental Shelf Lands Act (OCSLA).

8.     On November 26, 2022, the Department of the Interior signed a Record of Decision to hold Lease Sale 258 on December 30, 2022, and to offer for lease nearly one million acres of federal waters in Cook Inlet. 87 Fed. Reg. 73,322 (Nov. 29, 2022).

9.     Defendants' arbitrary and capricious analysis in their Final EIS violated

NEPA and resulted in the Department of the Interior making its lease sale decision

without an adequate understanding of the environmental effects and consideration of

alternatives.

10.　　Plaintiffs therefore ask this Court to declare that Defendants' Final EIS and

Record of Decision to hold Lease Sale 258 violate NEPA and the APA, to vacate the

Final EIS and Record of Decision to hold Lease Sale 258, and to vacate or enjoin any

leases issued pursuant to the unlawful Lease Sale 258.

## JURISDICTION AND VENUE

11.　　This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question) and 5 U.S.C. §§ 702-706 (APA).

12.　　Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1) because a

substantial part of the events and omissions giving rise to this action occurred in this

District.

13.　　This Court has authority to grant the requested relief in this case pursuant to

5 U.S.C. §§ 702, 706 (APA), and 28 U.S.C. §§ 2201-2202 (the Declaratory Judgment

Act).

## PARTIES

**I.　　Plaintiffs**

14.　　Plaintiff COOK INLETKEEPER is a private nonprofit organization

dedicated to protecting the vast Cook Inlet watershed and the life it sustains. Since its

inception in 1995, Cook Inletkeeper has relied on research, education, and advocacy to

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH　　　　　　　　　　　　　　　　　　　　　　　4

become a leader in watershed-based protections in the rich but threatened streams, lakes, and estuaries of the Cook Inlet watershed. Among other things, Cook Inletkeeper was lead petitioner in the effort to list the Cook Inlet beluga whale as endangered under the Endangered Species Act, and it has led and supported citizen-based science efforts to count, identify, and better understand the Cook Inlet beluga whale. Additionally, Cook Inletkeeper focuses a considerable amount of its work on protecting wild salmon habitat to ensure beluga whales and other marine mammals in the Cook Inlet have sufficient food sources. For example, one Cook Inletkeeper member lives in Homer, Alaska, and has dedicated much of his life to observing and researching Cook Inlet beluga whales, humpback whales, and other marine mammals on the north Gulf Coast of Alaska, and would be harmed by Lease Sale 258's threats to these and other species in Cook Inlet.

15.     Plaintiff ALASKA COMMUNITY ACTION ON TOXICS (ACAT) is a statewide non-profit environmental health and justice organization founded in 1997. ACAT's mission is to ensure environmental health and justice in Alaska. ACAT empowers communities to eliminate exposure to toxics through collaborative research, shared science, education, organizing, and advocacy. ACAT protects the rights to clean air, clean water, and toxic-free food; supports the rights of indigenous peoples; and works to eliminate the release of toxic chemicals, including chemical dispersants, that may harm human health or the environment. ACAT holds the precautionary principle as a core value and believes that where chemicals are suspected to cause health problems, action

should be taken to limit and avoid unnecessary exposures. ACAT conducts public education programs, including presentations, to educate Alaskans about the risks of chemical dispersants.

16.     ACAT has over 450 supporters from across Alaska with whom it interacts and whose interests it represents. ACAT works primarily with Alaska Native communities that depend on the land and ocean for subsistence hunting, fishing, and gathering. These include Alaska Natives who reside on Saint Lawrence Island in the Bering Strait and in communities along the coast of the Cook Inlet. These Alaska Native communities are almost entirely dependent on traditional fishing and hunting for their food security. Some of the subsistence fishers represented by ACAT also fish commercially and are economically dependent on the health of Alaska's oceans and coastal waters, including Cook Inlet and the Gulf of Alaska.

17.     ACAT's members are concerned about the devastating impacts that they would suffer from pollution, noise and other disturbance of fish and other wildlife, and potential oil spills from federal offshore oil and gas development in Cook Inlet. Lease Sale 258 leaves ACAT supporters, and the marine ecosystem on which they depend, at risk of exposure to these threats and harms them in concrete and imminent ways.

18.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit corporation headquartered in Tucson, Arizona, with offices across the country and in Baja California Sur, Mexico. The Center has more than 89,000 members

throughout the United States, including Alaska. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats both in the United States and abroad. The Center has been actively involved in protecting Alaska's wildlife since the early 1990s. The Center's Oceans Program focuses specifically on conserving marine wildlife and habitat. In pursuit of this mission, the Center has been actively engaged in longstanding efforts to protect Cook Inlet beluga whales and other Alaska-dwelling species from water and noise pollution, disturbance from vessels, oil spills and other adverse impacts of offshore oil and gas activities. The Center has members who appreciate and benefit from these animals and their habitat for viewing, photography, recreation, research, and personal enjoyment. For example, one Center member lives in Anchorage and regularly walks, runs, bikes, and skis along the Coastal Trail where she enjoys the Cook Inlet environment, looking for beluga whales, sandhill cranes, bald eagles, and other wildlife. She also regularly observes and enjoys seeing Cook Inlet beluga whales from the Seward Highway along Turnagain Arm. The Center brings this action for itself and as representative of its members.

19. Founded in 1983, Plaintiff KACHEMAK BAY CONSERVATION SOCIETY's mission is to protect the environment of the Kachemak Bay region and greater Alaska by encouraging sustainable use and stewardship of natural resources through advocacy, education, information, and collaboration. Kachemak Bay

Conservation Society's members rely on it to advocate on their behalf, and they provide

support for its advocacy. Kachemak Bay Conservation Society members are concerned

about Lease Sale 258's potential to harm Kachemak Bay. They are concerned about

impacts of spills, about impacts to beluga whales and the Lower Cook Inlet salmon

fisheries, and the impacts of greenhouse gases and warming climate.

20.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL (NRDC) is a

nationwide not-for-profit, tax-exempt membership organization organized under New

York law. NRDC's mission is to safeguard the earth—its people, its plants and animals,

and the natural systems on which all life depends. NRDC has over 345,000 members

nationwide, nearly 1,000 of them in Alaska. NRDC is working to solve the most pressing

environmental issues we face today, including environmental injustice, air pollution, and

climate change. NRDC's advocacy to protect regions, including Alaska, from the harms

of oil production dates back decades.

21.     NRDC members have economic, recreational, aesthetic, and other interests

in areas threatened by the lease sale. For example, one NRDC member lives in Alaska

every summer and operates a wilderness tour service, guiding camping and sea kayaking

trips in the Kenai Peninsula and Kachemak Bay. His guests enjoy traveling through a

wild Alaskan landscape and observing wildlife, like beluga and grey whales, sea otters,

and black and brown bears. New oil and gas development in Cook Inlet would diminish

the quality of his wilderness tours and injure his business. A different NRDC member

regularly sea kayaks, goes camping and bicycling, fishes to stock his pantry, and observes wildlife along the shores of Cook Inlet. He worries that an oil spill in Cook Inlet would be catastrophic to the local ecosystem and to folks like him who depend on its health. Another NRDC member enjoys recreational fishing in Cook Inlet, as well as observing wildlife like puffins, whales, and porpoises, and fears that additional oil and gas development in Cook Inlet would cause these species to decline and inhibit his ability to fish and view wildlife.

22. Plaintiffs and Plaintiffs' members and staff regularly use, enjoy, and benefit from the marine and coastal environments of Cook Inlet. Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit from the presence of healthy marine, terrestrial, and avian life within those environments for recreational, aesthetic, commercial, cultural, scientific, and environmental purposes, including whale watching, bird watching, bear viewing tours, scientific study, boat touring, underwater diving, fishing, and photography. Lease Sale 258 will threaten the health of the ecosystem in Cook Inlet. Defendants action enables widespread oil and gas activity without fully analyzing the impacts of Lease Sale 258 or evaluating less harmful alternatives. As a result, Defendants are enabling new oil and gas activities to negatively impact the environment in which Plaintiffs and Plaintiffs' members and staff have an interest. These interests have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. An adequate NEPA analysis could result in a lease sale

that causes less harm to Plaintiffs' interests in Cook Inlet. Were Defendants required to comply with NEPA and the APA, Plaintiffs' injuries would be redressed, as that relief would undo or reduce the causes of Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law.

23.     Defendants' failure to comply with NEPA also deprives Plaintiffs and their members and staff of procedural rights and information guaranteed by the statute. Plaintiffs and their members and staff have advocated and will continue to advocate regarding Cook Inlet oil and gas leasing and its environmental impacts; seek to discuss the issue with relevant decisionmakers to encourage consideration of alternatives that would avoid, minimize, or mitigate environmental harm; and seek to provide information to the public and the media regarding Lease Sale 258 and its impact on the sensitive resources of Cook Inlet. If Defendants had complied with NEPA, the process would have generated additional information on the lease sale's impacts to the species, climate, and other environmental resources in which Plaintiffs and their members have an interest. Plaintiffs and their members would have access to this information and be better informed about the lease sale and its impacts, improving their ability to participate in decisionmaking and to suggest potential mitigation. Defendants' failure deprives Plaintiffs and their members and staff of this information. If the Bureau is required to redo its NEPA analysis, these informational and procedural injuries would be redressed.

Case 3:22-cv-00279-SLG   Document 1   Filed 12/21/22   Page 11 of 40

## II.    Defendants

24.    Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department with authority, through the Secretary of the Interior, under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Department of the Interior issued the Record of Decision challenged here, and is required to comply with NEPA when taking any action affecting the environment.

25.    Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is an agency within the Department of the Interior. The Bureau is responsible for managing oil, gas, and mineral natural resources on the Outer Continental Shelf, and is the agency to which the Secretary has delegated authority under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Bureau issued the Final EIS challenged here, and is responsible for ensuring compliance with NEPA and all other federal laws.

26.    Defendant AMANDA LEFTON is the Director of the Bureau and is the official ultimately responsible for all Bureau activities. She is sued in her official capacity.

27.    Defendant DEB HAALAND, Secretary of the Department of the Interior, is the highest-ranking official within the Department, and, in that capacity, has ultimate responsibility for the administration and implementation of NEPA and all other applicable federal laws with respect to activities of the Bureau and the Department of the

Interior. She is sued in her official capacity.

28.     Defendant LAURA DANIEL-DAVIS is sued in her official capacity as the

Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management.

The Principal Deputy Assistant Secretary for Land and Minerals Management is the

official to whom the Secretary has delegated authority to sign records of decision to hold

lease sales under OCSLA. The Principal Deputy Assistant Secretary for Land and

Minerals Management is required to comply with NEPA when taking any action

affecting the environment.

## STATUTORY BACKGROUND

29.     To hold Lease Sale 258, Defendants must comply with several federal

statutes, including NEPA, OCSLA, and the APA, among others.

## I.     National Environmental Policy Act

30.     NEPA is this country's "basic national charter for protection of the

environment." 40 C.F.R. § 1500.1 (2019)[1]; *see* 42 U.S.C. § 4321 *et seq*. Its purpose is to

"promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C.

§ 4321. The Council on Environmental Quality has promulgated regulations

---

[1] The Bureau noted in its notice of availability of the Draft EIS for Lease Sale 258 that
"[b]ecause the NEPA process for this action began prior to September 14, 2020, the
D[raft] EIS was prepared in conformance with the NEPA regulations in effect
immediately prior to September 14, 2020." 86 Fed. Reg. 60,068, 60,068 n.1 (Oct. 29,
2021); *see also* Final EIS at ES-1 (same). This complaint therefore references the NEPA
regulations in effect prior to September 14, 2020, unless otherwise noted.

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                              12

implementing NEPA, which are "binding on all federal agencies." 40 C.F.R. § 1500.3; *see id.* §§ 1500.1-1508.28; 43 C.F.R. §§ 46.10, 46.20 (Department of the Interior regulations implementing NEPA).

31.     Congress enacted NEPA to ensure that federal agencies incorporate environmental concerns into the decisionmaking process. 42 U.S.C. § 4331(a)-(b). To that end, NEPA has two principal purposes: (1) to ensure agencies evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize; and (2) to give the public a meaningful opportunity to participate in the decisionmaking process. NEPA ensures that detailed information concerning significant environmental impacts "will be made available to the larger [public] audience that may [] play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

32.     NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an EIS, must describe: (1) the "environmental impact of the proposed action"; (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) "alternatives to the proposed action"; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) "any irreversible and irretrievable commitments of resources which would be

Case 3:22-cv-00279-SLG   Document 1   Filed 12/21/22   Page 14 of 40

involved in the proposed action should it be implemented." *Id.*; *see also* 40 C.F.R. § 1502.1.

33.     Major federal actions requiring preparation of an EIS include those "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

34.     The decision to hold Lease Sale 258 is a major federal action subject to the requirements of NEPA. The Bureau is required to ensure it complies with the requirements of NEPA before holding the Lease Sale.

35.     Under NEPA, agencies must "take a 'hard look' at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quoting *Robertson*, 490 U.S. at 350). The EIS must fully consider and disclose the potential environmental impacts of proposed actions and alternatives to that action to take the "hard look" NEPA requires. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.1.

36.     NEPA requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of their analyses. 40 C.F.R. §§ 1500.1(b), 1502.24.

37.     To comply with NEPA, an EIS must analyze the direct, indirect, and cumulative effects of the proposed action and any identified alternatives thereto. *Id.* § 1508.25. Direct effects are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects are those effects "which are

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                                                    14

caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

38.     Greenhouse gas emissions are effects that the agency must quantify and analyze.

39.     The alternatives analysis is the "heart of the environmental impact statement." *Id.* § 1502.14. NEPA requires agencies to include a rigorous and full analysis of reasonable alternatives. *Id.* §§ 1502.1, 1502.14; 43 C.F.R. § 46.420(c).

40.     Agencies must address submitted comments in final EISs. 40 C.F.R. § 1503.4(a); *see id.* § 1502.9(b); 43 C.F.R. § 46.435. In response to comments, the agency may modify its analysis, such as by changing alternatives, adding new alternatives, supplementing its analysis, or correcting facts. 40 C.F.R. § 1503.4(a).

41.     NEPA requires that an agency incorporate its environmental analysis into its decisionmaking process. "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." *Id.* § 1500.1(c); *see also id.*

("Ultimately . . . it is not better documents but better decisions that count."); *id.* § 1502.1 ("primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.").

## II. Outer Continental Shelf Lands Act

42. OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters—typically three nautical miles from shore—to the outer boundary of the United States' exclusive economic zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar. 14, 1983).

43. In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards." Pub. L. No. 95-372, § 202, 92 Stat. 629, 634-35 (1978) (codified as amended at 43 U.S.C. § 1332(3)).

44. OCSLA charges the Secretary of the Interior with managing oil and gas activities on the Outer Continental Shelf. 43 U.S.C. §§ 1334(a), 1344(a). In doing so, the Secretary must ensure offshore oil and gas activity is balanced with "protection of the

human, marine, and coastal environments." *Id.* § 1802(2).

45.    OCSLA prescribes four tiered stages for the Secretary to sell and allow development of offshore oil and gas deposits: 1) five-year leasing programs; 2) lease sales; 3) exploration plans; and 4) development and production plans. *Id.* §§ 1337, 1340, 1344, 1351.

46.    At the five-year leasing program stage, the Secretary identifies planning areas open for future lease sales and a schedule for lease sales within those areas. *See id.* § 1344(a).

47.    At the lease sale stage, the Secretary identifies blocks within the five-year leasing program's designated planning areas in which to offer for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id.* § 1337(b)(4).

48.    The Bureau is the federal agency within the Department of the Interior to which the Secretary has delegated authority to manage leasing, exploration, development, and production of oil and gas resources on the Outer Continental Shelf under OCSLA. 30 C.F.R. § 550.101.

49.    The Bureau begins the lease sale process by issuing a call for information and nominations (Call), which solicits information on the area proposed for lease in the five-year leasing program. *Id.* § 556.301. The Bureau recommends some or all of the proposed area to offer for lease, based on information received from the Call and any

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                                 17

other relevant information. *Id.* § 556.302(a).

50.    After the Secretary approves the Bureau's recommended area to offer for lease, *id.*, the Bureau prepares and publishes a proposed notice of lease sale, *id.* § 556.304. The Bureau develops measures, such as lease stipulations, "to mitigate adverse impacts on the environment," and includes these measures in the proposed notice of sale. *Id.* § 556.304(a).

51.    The Bureau publishes a final notice of sale at least 30 days before holding the lease sale. *Id.* § 556.308(a).

52.    The Bureau awards and executes leases once the winning bidder files the necessary paperwork and fees. *Id.* § 556.520. A lease becomes effective on the first day of the month after the Bureau executes the lease. *Id.* § 556.521.

## III.    Inflation Reduction Act of 2022

53.    Enacted on August 16, 2022, the IRA establishes various measures to invest in clean energy, cut U.S. carbon emissions, and reduce the national deficit to curb inflation. Pub. L. No. 117-169, 136 Stat. 1818 (2022).

54.    The IRA directs the Secretary of the Interior to conduct or reinstate four oil and gas lease sales that had been scheduled under the 2017-2022 Outer Continental Shelf Leasing Program. *Id.* § 50264.

55.    The Secretary is required to "conduct Lease Sale 258" no later than December 31, 2022, in accordance with the record of decision adopting the 2017-2022

five-year program that identified the Cook Inlet planning area available for a future lease sale decision. *See id.* § 50264(c).

## IV.    Administrative Procedure Act

56.    The APA grants a right of federal judicial review to any person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

57.    The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of procedure required by law." *Id*. § 706(2)(A), (D).

58.    The adequacy of an agency's NEPA analysis and its compliance with NEPA's requirements are reviewed under the APA.

## FACTUAL BACKGROUND

## I.    Cook Inlet, Alaska

59.    Cook Inlet is a semi-enclosed tidal estuary in southcentral Alaska bounded by the Kenai Peninsula. It is fed by three major rivers: the Susitna; the Matanuska; and the Kenai. Cook Inlet's watershed includes nine terrestrial ecosystems, seven national parks and wildlife refuges, and four state parks. The watershed includes the alpine tundra of the Denali Wilderness, coastal rainforests of the southern Kenai Peninsula, and wetlands of the Susitna, Matanuska, and Kenai river deltas.

60.    The Cook Inlet watershed is a sensitive and unique environment that

Case 3:22-cv-00279-SLG    Document 1    Filed 12/21/22    Page 20 of 40

provides habitat for magnificent wildlife, including all five species of wild Pacific salmon, herring, scallops, halibut, and several other species of bottom fish, brown and black bears, moose, caribou, migratory birds, wolves, and sea lions.

61.     In particular, Cook Inlet provides important habitat for species that have been listed as endangered or threatened under the Endangered Species Act, including the Cook Inlet beluga whale, fin and humpback whales, the northern sea otter, and Steller's eider, a seaduck of the high Arctic. The Cook Inlet beluga whale is especially vulnerable—according to the most recent population estimate, just 279 individuals remain, and their numbers continue to decline each year.

62.     The Cook Inlet watershed is also home to almost two-thirds of Alaska's residents. The city of Anchorage is located near the head of Cook Inlet, which receives the Susitna River, and the cities of Kenai and Homer are also located along the inlet. Alaska Native villages of the Cook Inlet region include Eklutna, Knik, Salamatof, Tyonek, Chickaloon, Ninilchik, Nanwalek, and Seldovia. Alaska Native communities around Cook Inlet depend on its waters for subsistence, employment, and the continuation of long-standing cultural practices.

## II.     Oil and Gas Production in Cook Inlet

63.     Although there has been oil and gas development in the state waters of Cook Inlet since the 1950s, to date there has been no development in federal waters.

64.     In 2017, Hilcorp bought fourteen new federal leases covering about 76,600

acres in Cook Inlet. This was the first time since 1997 that a company had invested in federal oil and gas leases in Cook Inlet. All other existing federal leases in Cook Inlet expired several years ago, with no oil or gas fields ever developed on them. Hilcorp is therefore the only oil and gas company currently holding leases in federal waters in the Cook Inlet Outer Continental Shelf Planning Area, and the primary oil and gas company still operating in any of Cook Inlet's waters.

65.     Hilcorp's history in Cook Inlet has been rocky. The company has had numerous safety violations and received multiple fines from the Alaska Oil and Gas Conservation Commission for noncompliant activities. In addition, Hilcorp has had multiple leaks and spills in its current drilling operations in Alaska. One pipeline leak resulted in the release of up to 325,000 cubic feet of natural gas per day over the four months it took Hilcorp to investigate and repair the leak.

66.     New oil and gas leasing in Cook Inlet threatens the survival of its wildlife and the livelihoods of its human inhabitants. Oil and gas development creates myriad risks that cannot be fully mitigated, including oil spills, which threaten crucial habitat and species health. Ocean noise and ship traffic from prospecting for oil and gas also disrupt the feeding and breeding behavior of marine mammals, birds, and other sea life.

## III.    Climate Impacts of Oil and Gas Production

67.     Federal oil and gas leasing also fuels the climate crisis by creating emissions of carbon dioxide and other harmful greenhouse gases. The exploration,

Case 3:22-cv-00279-SLG   Document 1   Filed 12/21/22   Page 22 of 40

development, and production of oil and gas releases greenhouse gases from the use of combustion engines, construction drilling, and through the deliberate or accidental release of methane. In addition to direct emissions, oil and gas production will result in downstream emissions of greenhouse gases from the processing of oil and gas products. Indeed, the main human activity that emits carbon dioxide is the combustion of fossil fuels (including oil and gas) for energy and transportation.

68.     Extensive research demonstrates the urgent need to reduce greenhouse gas emissions to levels that will maintain global average temperatures at well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels.

69.     In 2015, parties to the United Nations Framework Convention on Climate Change adopted the "Paris Agreement," which established the 1.5°C temperature increase limit in light of evidence that 2°C of warming would lead to catastrophic climate harms. Individual countries, including the United States, made carbon-reduction commitments to help stay within the 1.5°C warming limit.

70.     Limiting warming to 1.5°C, or even 2°C, above pre-industrial levels will require substantial reductions in net global carbon dioxide emissions prior to 2030 and net carbon dioxide emissions of at least zero later in the century.

71.     In 2018, the Intergovernmental Panel on Climate Change (IPCC) issued a special report on global warming of 1.5°C that estimated the global carbon budget—the

amount of carbon dioxide equivalent that can be emitted without exceeding the Paris Agreement limits. At the current rate of global emissions, the entire global carbon budget will be spent in the next decade. When that carbon budget is apportioned across countries, most estimates of the remaining U.S. carbon budget are negative or near zero.

72.     Recent studies have shown that the carbon emissions from already leased fossil fuel resources in the United States would exceed any remaining U.S. carbon budget for a 1.5°C warming limit.

73.     Cook Inlet and the rest of Alaska are already experiencing severe effects of climate change. Alaska is on the front lines of this global environmental cataclysm and, according to the U.S. Global Change Research Program's Fourth National Climate Assessment, is warming faster than any other state in the United States. The state is also experiencing more extreme weather events and changes in patterns of precipitation and the melting of sea ice and permafrost—shifts that are already having profound effects on local ecosystems. The Pacific cod fishery, for instance, has been closed for the past few seasons because the changing climate has harmed the health of these valuable stocks. Iconic species like salmon and grizzly bears, which are essential for a healthy and balanced ecosystem and help support a vibrant tourism and recreation economy, have also been harmed by climate change.

74.     New oil and gas leasing will amplify climate harms in Cook Inlet and throughout the nation. The greenhouse gas emissions resulting from the extraction and

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                    23

burning of these fossil fuels would add carbon to the atmosphere and contribute to warming the atmosphere. As the IPCC has noted, every metric ton of greenhouse gas emissions adds to global warming.

## IV. Energy Transitions and Reduced Need for Oil and Gas Production

75.     Just as there is an urgent need to reduce emissions of greenhouse gases and therefore production of oil and gas, there is also less and less need to produce that oil or gas. Unprecedented conservation requirements will be implemented at the national level and by many states. Nationwide, there is increasing capacity of solar and wind energy that can substitute for fossil fuels. Several solar technologies and wind power are now cheaper than the cheapest fossil fuel generation, and renewable energy sources in general are achieving cost parity with fossil fuels. Our transportation systems are becoming increasingly electrified, with electric vehicle sales on a steeply inclining trajectory. Finally, the Biden Administration has pledged to reach a 100 percent carbon pollution-free power sector by 2035 and a net-zero economy by 2050.

## V. Lease Sale 258 under the Bureau's 2017-2022 Five-Year Offshore Oil and Gas Leasing Program

76.     Despite the harms from oil and gas production and the reduced need for it, the Bureau included Cook Inlet Lease Sale 258 among the proposed lease sales in its 2017-2022 National Outer Continental Shelf Oil and Gas Leasing Program, which was in effect until June 2022.

77.     In September 2020, the Bureau announced its intent to prepare an EIS for

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                        24

Lease Sale 258. 85 Fed. Reg. 55,861 (Sept. 10, 2020).

78.     On January 13, 2021, days before the beginning of the Biden Administration, the Bureau issued a draft EIS for Lease Sale 258.

79.     Shortly after President Biden came into office, the Bureau withdrew the public review period for the lease sale and suspended work on the sale.

80.     Following *Louisiana v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021), in which the court preliminarily enjoined the Administration's pause on new offshore oil and gas leasing, in October 2021, the Bureau issued a new Draft EIS for Lease Sale 258. 86 Fed. Reg. 60,068 (Oct. 29, 2021). The Bureau initiated a 45-day comment period that ended December 13, 2021.

81.     The Draft EIS presented a proposed action that would offer for lease over one million acres in the northern portion of the Cook Inlet federal waters. The Draft EIS examined multiple alternatives and noted that it presumed the same amount of oil and gas activity under all alternatives except the no action alternative. Draft EIS at 29.

82.     In comments on the Draft EIS, the Environmental Protection Agency (EPA) expressed its concerns that, except for commercial fishing, the overall impacts did not differ among action alternatives. EPA recommended that the Bureau analyze an alternative or a mitigation measure that is more directly protective of salmon fisheries and include more protections to avoid Cook Inlet beluga whale and sea otter habitat.

83.     Plaintiffs submitted timely comments opposing Lease Sale 258 and urging

*Cook Inletkeeper et al. v. U.S. Dep't of the Interior et al.,*
Case No. 3:22-cv-00279-HRH                                                          25

the Administration to select the no action alternative. Plaintiffs raised concerns about numerous deficiencies in the Draft EIS, including the Bureau's failure to fully analyze impacts to protected species, contributions to climate change, and detrimental effects on the local economy. Plaintiffs and other commenters stated that the Bureau should consider alternatives that would limit the scope of development activities, reduce impacts to critically endangered Cook Inlet beluga whales, and minimize harm to the environment. These alternatives included excluding different areas from leasing, such as important beluga habitat, and offering a smaller area for leasing. Plaintiffs also commented on the Bureau's failure to consider alternatives that would result in less oil and gas production and its failure to explain its presumption, Draft EIS at 29, that "all action alternatives are presumed to entail the same amount of oil and gas activity."

84. On May 11, 2022, the Department of the Interior announced the cancellation of Lease Sale 258 "due to lack of industry interest in leasing in the area."

85. The 2017-2022 National Outer Continental Shelf Oil and Gas Leasing Program expired on June 30, 2022.

## VI. Final Environmental Documentation and Decision to Hold Lease Sale 258

86. On August 16, 2022, President Biden signed the IRA, which established various measures to cut U.S. carbon emissions. Pub. L. No. 117-169, 136 Stat. 1818 (2022). It also mandated that the Bureau hold Lease Sale 258 by December 31, 2022. *Id.* § 50264(c).

87.     In response, on September 21, 2022, the Bureau published a Proposed

Notice of Sale for Lease Sale 258. The Bureau also released a list of proposed lease

stipulations that the Bureau might apply to the sale.

88.     The Bureau issued its Final EIS on October 20, 2022. 87 Fed. Reg. 65,247

(Oct. 28, 2022).

89.     The Final EIS examined the proposed action and a handful of alternatives,

including exclusion of certain Cook Inlet beluga whale critical habitat, seasonal

limitations on seismic surveys to better protect beluga whales, exclusion of certain

northern sea otter critical habitat, mitigation of harmful activities near that critical habitat,

and limitations on seismic surveys during drift gillnetting season. The Final EIS

examined the "no action" alternative but explained that the IRA required the Bureau to

hold Lease Sale 258. The Final EIS also developed a "Preferred Alternative" that

combined the critical habitat exclusions for beluga whales and northern sea otters with

the seasonal seismic surveying limitations and mitigation intended to help protect these

species.

90.     Under its Preferred Alternative, the Bureau would offer nearly one million

acres for leasing in the lease sale. The Bureau also estimated that Lease Sale 258 could

lead to the production of 192.3 million barrels of oil and 301.9 billion cubic feet of

natural gas. Final EIS at 35.

91.     Despite the many expected harms to Cook Inlet and the Bureau's duty to

ensure offshore oil and gas activity is balanced with "protection of the human, marine, and coastal environments," 43 U.S.C. § 1802(2); *see also id.* § 1332(3), Defendants rejected and failed to analyze alternatives that would have caused significantly less environmental harm to the region. The Final EIS acknowledged Plaintiffs' concerns that Defendants had impermissibly and illogically examined only alternatives that were presumed to entail the same amount of oil and gas activity. But instead of expanding the range of alternatives or justifying this presumption, the Final EIS stated only that the lease sale area was selected based on a targeted leasing model. Final EIS at B-24–B-25.

      92.    The Final EIS also failed to adequately evaluate the environmental impacts of Lease Sale 258. For instance, the Bureau's analysis of the effects of greenhouse gas emissions did not provide a meaningful assessment of the significance of those emissions in the context of the global climate crisis. The Final EIS summarily discounted the significance of the lease sale's emissions on the grounds they were small compared to the remaining carbon budget, and concluded "the potential production of oil and gas from Lease Sale 258 is compatible with national policies and current as well as future energy demands." Final EIS at B-6. But in doing so, the Bureau failed to factor in other emissions sources or the scientific literature, cited in comments on the Draft EIS, that concludes these other sources already exceed any remaining carbon budget. The Bureau thus failed to support its conclusion that the production of oil and gas from Lease Sale 258 "would not appreciably contribute to climate change." Final EIS at B-8.

93.     The Final EIS also relied on a flawed greenhouse gas emissions model—the MarketSim model—that erroneously assumed constant trends in energy demand and greenhouse gas emissions despite transportation and energy efficiency policies that will reduce demand over the coming decades. This model also contained misleading assumptions about the substitution of energy supplies and used outdated information about elasticities and out-of-date methane modeling. As a result, the Final EIS presented a misleading assessment of greenhouse gas emissions resulting from the lease sale.

94.     The Final EIS did not adequately analyze impacts of the lease sale on federal Endangered Species Act-listed species, including Cook Inlet beluga whales, fin whales, humpback whales, northern sea otters, and Steller's eiders. Oil production operations will harm these species in multiple ways. But the Final EIS failed to adequately discuss the harmful impacts of noise pollution, increased vessel traffic, displacement of prey, and oil spills on these species. Instead, the Final EIS acknowledged that marine mammals could face impacts from noise associated with seismic airguns and pile-driving, habitat alteration, and vessel strikes, but concluded that any such impacts would be "negligible to minor." Final EIS at ES-4, tbl. ES-2. The Bureau failed to support this conclusion with a robust analysis.

95.     In its Final EIS, the Bureau also failed to adequately analyze the effects of oil spills resulting from Lease Sale 258. These effects could be devastating to Cook Inlet and the wildlife and people who rely on it. In comments on the Draft EIS, Plaintiffs

identified multiple flaws in the Bureau's oil spill analysis, including an erroneous focus on surface oil trajectories, methodological flaws in spill modeling, failure to use relevant oil spill data from Cook Inlet, and an overly narrow focus only on the effects of crude oil, among others. The Final EIS did not fix these flaws. *See* Final EIS at 14-21; *id.* at App. A; *id.* at B-28 to B-43. As a result, the Final EIS presented an incomplete and misleading picture of oil spill impacts and risks.

96.     The Final EIS also failed to adequately disclose the costs and benefits of Lease Sale 258. The Final EIS acknowledged that its social cost of carbon analysis did not "constitute a complete cost-benefit analysis," or "present a direct comparison with the other impacts analyzed in" the Final EIS. Final EIS at 59. Rather than presenting a comprehensive cost-benefit analysis and true comparison of the economic benefits of the lease sale against the economic costs to other industries or to the climate and environment, the Final EIS instead distributed the incomplete discussion of costs and benefits throughout the document. In doing so, the Bureau created a misleading picture of the economic costs and benefits of the lease sale. Agencies that have elected to conduct a cost-benefit analysis may not selectively discuss the benefits of action in an EIS without also discussing the costs. The Bureau failed to satisfy this requirement or justify why it need not.

97.     Because the Final EIS did not consider options that would better protect the Cook Inlet ecosystem, a number of the Plaintiffs submitted letters to the Bureau on

November 9, 2022, and November 22, 2022, presenting multiple ways to reduce any harms from Lease Sale 258.

98.    On November 26, 2022, Defendant Daniel-Davis signed the Record of Decision to hold Lease Sale 258 on December 30, 2022, and to offer for lease 193 Outer Continental Shelf blocks in the lease sale area, subject to certain exclusions and lease stipulations. 87 Fed. Reg. 73,322 (Nov. 29, 2022). In the Record of Decision, Defendants adopted the Preferred Alternative identified in the Final EIS. Defendants acknowledged Plaintiffs' November 9, 2022, and November 22, 2022, letters, but then summarily rejected most of their recommendations.

99.    On November 29, 2022, the Bureau published in the Federal Register the Final Notice of Sale and a Notice of Availability of the Record of Decision.

100.    Lease Sale 258 is scheduled to be held on December 30, 2022, at 10 a.m. Alaska Time.

**FIRST CLAIM FOR RELIEF:**

**Violation of NEPA and APA—Failure to Take a Hard Look at the Effects of the Lease Sale**
**(All Plaintiffs, Against All Defendants)**

101.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 100.

102.    The Record of Decision for Lease Sale 258 is a final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

103.    Lease Sale 258 is a major federal action significantly affecting the environment for which NEPA requires an EIS. *See* 42 U.S.C. § 4332(2)(C).

104.    The Bureau was required to complete an EIS prior to reaching its decision to hold Lease Sale 258. *See id.*

105.    NEPA requires that the Bureau take a "hard look" at the environmental consequences of its actions in its EIS before action is taken. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (internal quotation marks omitted). NEPA and its implementing regulations require the Bureau to assess in its EIS the environmental impacts of the proposed action, including direct, indirect, and cumulative effects, which are reasonably foreseeable. 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. §§ 1502.1, 1508.7, 1508.8, 1508.25. NEPA and its implementing regulations further require the Bureau to use high quality, accurate scientific information in its EIS and to ensure the scientific integrity of this analysis. *See* 40 C.F.R §§ 1500.1(b), 1502.24.

106.    The presentation of incomplete or misleading information in an EIS violates NEPA.

107.    The Bureau failed to take a hard look at greenhouse gas emissions resulting from Lease Sale 258. The Bureau failed to meaningfully assess how the projected greenhouse gas emissions from Lease Sale 258 affect the ability to limit global warming to 1.5°C, and failed to support its conclusions that "the potential production of oil and gas from Lease Sale 258 is compatible with national policies" or "would not appreciably

contribute to climate change." Final EIS at B-6, B-8. The EIS also erroneously relied on the flawed MarketSim emission model, which resulted in a misleading assessment of the greenhouse gas emissions from the lease sale.

108.    The Bureau also failed to take a hard look at the effects of Lease Sale 258 on Endangered Species Act-listed species, including Cook Inlet beluga, humpback, fin whales, northern sea otters, and Steller's eiders. And the Bureau failed to support its conclusion that the impacts from Lease Sale 258 to marine mammals would be minor or negligible.

109.    The Bureau failed to adequately analyze the potentially devastating effects of oil spills resulting from Lease Sale 258. The Bureau's methodology for assessing oil spill risks had several flaws, which created an incomplete and misleading picture of oil spill impacts and risks in the EIS.

110.    The Bureau created a misleading picture of the economic costs and benefits of Lease Sale 258 by distributing the discussion of costs and benefits throughout the Final EIS rather than providing a true comparison of them. As a result, the Bureau failed to take a hard look at the costs and benefits of the lease sale.

111.    The Defendants' failures to take a hard look at emissions of greenhouse gases, at future demand for the oil and gas produced from new lease sales, at impacts to marine mammals, at risks of oil spills, and at costs, were arbitrary and capricious and contrary to NEPA and the APA.

112.    These actions have harmed Plaintiffs, and Plaintiffs have no other adequate

remedy at law.

**SECOND CLAIM FOR RELIEF:**

**Violation of NEPA and APA—Failure to Consider a Reasonable Range of
Alternatives
(All Plaintiffs, Against All Defendants)**

113.    Plaintiffs incorporate Paragraphs 1 through 112.

114.    NEPA requires agencies to study a reasonable range of alternatives to their

proposed actions. 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); *see also* 40 C.F.R. § 1502.14.

An agency's consideration of alternatives serves the twin purposes of fostering informed

decisionmaking and informed public participation.

115.    In an EIS, an agency must "[r]igorously explore and objectively evaluate all

reasonable alternatives . . . ." 40 C.F.R. § 1502.14(a). These must, to the fullest extent

possible, include "reasonable alternatives to proposed actions that will avoid or minimize

adverse effects of these actions upon the quality of the human environment." 40 C.F.R.

§ 1500.2(e).

116.    The existence of reasonable but unexamined alternatives renders an EIS

inadequate.

117.    The Bureau was required by NEPA to meaningfully examine a range of

alternatives in its EIS for Lease Sale 258.

118.    The Bureau did not consider a reasonable range of alternatives for Lease

Sale 258 in its Final EIS. Other than the No Action alternative, the Bureau only considered alternatives that would have varied the lease sale area by less than 10 percent.

119.    The Bureau only considered alternatives that offered for lease more than 90 percent of the area open for leasing in the five-year program, that had identical impact ratings in every category except commercial fishing, and that would result in the same amount of exploration, development, and production.

120.    Plaintiffs and other commenters proposed alternatives that would have reduced the affected area and/or the amount of oil and gas activity and would have limited the harmful effects of the lease sale.

121.    Alternatives that would have resulted in significantly less area open for lease and/or less oil and gas activity in Cook Inlet as a result of Lease Sale 258 are reasonable, including because they would have still met the nation's future energy needs. But the Bureau did not examine them.

122.    By failing to consider a reasonable range of alternatives for the lease sale, including an alternative that would have resulted in avoidance or minimization of adverse effects by, for example, offering less area for sale and/or reducing the level of oil and gas activities, Defendants violated NEPA, its implementing regulations, and the APA.

123.    Defendants' failure to consider a reasonable range of alternatives was arbitrary and capricious and contrary to NEPA and the APA.

124.    These actions have harmed Plaintiffs, and Plaintiffs have no other adequate

remedy at law.

## THIRD CLAIM FOR RELIEF:

### Violation of NEPA and APA—Failure to Respond Adequately to Comments
### (All Plaintiffs, Against All Defendants)

125.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 124.

126.    Informed public participation is a cornerstone of the NEPA process. "The informational role of an EIS is to give the public assurance that the agency has indeed considered environmental concerns in its decisionmaking process and, perhaps more significantly, provide a springboard for public comment in the agency decisionmaking process itself. The purpose here is to ensure that the larger audience can provide input as necessary to the agency making the relevant decisions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (cleaned up). NEPA thus requires Defendants to solicit and respond to substantive comments on their work. *See* 43 C.F.R. § 46.435; 40 C.F.R. §§ 1502.9(a)-(c), 1503.4.

127.    Plaintiffs stated in their comments that the Draft EIS failed to consider a reasonable range of alternatives because "all action alternatives are presumed to entail the same amount of oil and gas activity." Draft EIS at 29. Plaintiffs commented that the Bureau's presumption was illogical and violated NEPA's obligation to consider a reasonable range of alternatives. The Bureau should have considered alternatives that would reduce the overall scope of activity, such as an alternative that limited the number

of wells to be drilled; an alternative that limited the quantity of oil and gas that could be extracted; an alternative that would prohibit the use of particularly dangerous drilling activities such as offshore fracking and acidizing; or an alternative that involved leasing a smaller amount of acreage and thus reduce the overall harmful environmental impacts.

128. In its response to comments, the Bureau noted that Plaintiffs had raised concerns about this presumption and the Bureau's decision not to consider alternatives limiting the scope of activity. Final EIS at B-24–B-25. However, the Bureau never explained the basis for its decision to examine only alternatives that will result in similar levels of oil and gas production. Nor did the Bureau explain why such a decision is appropriate and consistent with the Bureau's obligations under NEPA and OCSLA.

129. Defendants' failure to reasonably respond to significant comments was arbitrary and capricious and contrary to NEPA and the APA.

130. These actions have harmed Plaintiffs, and Plaintiffs have no other adequate remedy at law.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1. Declare that the Department of the Interior's Record of Decision to hold Lease Sale 258 violates NEPA, its implementing regulations, and the APA;

2. Declare that the Final EIS the Bureau issued in connection with holding Lease Sale 258 is unlawful, in violation of NEPA, its implementing regulations, and the

APA;

3.       Vacate the Final EIS for Lease Sale 258;

4.       Vacate the Record of Decision to hold Lease Sale 258;

5.       Vacate or enjoin any leases executed pursuant to Lease Sale 258;

6.       Enter any other appropriate injunctive relief to ensure that Defendants comply with NEPA and the APA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

7.       Award eligible Plaintiffs their litigation costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412; and

8.       Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 21st day of December, 2022,

*s/ Erik Grafe*

*s/ Carole A. Holley*

*s/ Hannah M. Payne*
Erik Grafe (Alaska Bar No. 0804010)
Carole A. Holley (Alaska Bar No. 0611076)
Hannah M. Payne (Alaska Bar No. 2105045)
EARTHJUSTICE

*Attorneys for Plaintiffs Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, and Kachemak Bay Conservation Society.*

*s/ Kristen Monsell*
Kristen Monsell (*pro hac vice application forthcoming*)
CENTER FOR BIOLGICAL DIVERSITY

*Attorney for Plaintiff Center for Biological Diversity.*

s/ Julia Forgie
_____

s/ Irene Gutierrez
_____
Julia Forgie (*pro hac vice application forthcoming*)
Irene Gutierrez (*pro hac vice application forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiff Natural Resources Defense
Council.*