TREG TAYLOR
ATTORNEY GENERAL

Hugh P. Dowell (Alaska Bar No. 2205034)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: *hugh.dowell@alaska.gov*

Attorney for the State of Alaska

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| COOK INLETKEEPER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | Case No.: 3:22-cv-00279-SLG |

**STATE OF ALASKA'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO INTERVENE**

**BACKGROUND**

This case arises from the lease sale of submerged federal lands for oil and gas development. In January 2021 the Bureau of Ocean Energy Management ("BOEM") published a Draft Environmental Impact Statement ("EIS") for the lease sale of about one

million acres located in Alaska's Cook Inlet ("Lease Sale 258").[1] BOEM also invited public comments on the draft EIS.[2] Less than two weeks later, however, President Biden issued an executive order pausing "all oil and gas leases on public lands or in offshore waters" pending review of federal oil and gas leasing practices.[3] And so BOEM formally cancelled the public comment period for Lease Sale 258.[4] This state of affairs continued until June 2021, when the U.S. District Court for the Western District of Louisiana enjoined the Biden administration's pause of new federal oil and gas leasing activity.[5] BOEM once again published a draft EIS and held a public comment period for Lease Sale 258, which ended in December 2021.[6] Yet, the following spring, BOEM announced that it would not hold the lease sale because of a lack of industry interest.[7]

Alaska was an active participant throughout this first stage of Lease Sale 258's administrative process. In October 2021, Alaska provided BOEM with comments and

---

1 *See* Draft Environmental Impact Statement on the Cook Inlet Lease Sale 258, 86 Fed. Reg. 4117 (Jan. 15, 2021).

2 *Id.*

3 Exec. Order No. 14008, 86 Fed. Reg. 7619, 7624–7625 (Feb. 1, 2021).

4 Withdrawal of the Public Review Period for Cook Inlet Lease Sale 258, 86 Fed. Reg. 10994 (Feb. 23, 2021).

5 *Louisiana v. Biden*, 543 F. Supp. 3d 388, 419 (W.D. La. 2021), *vacated and remanded sub nom. State of Louisiana v. Biden*, 45 F.4th 841 (5th Cir. 2022). *See also Louisiana v. Biden,* No. 2:21-CV-00778, 2022 WL 3570933 (W.D. La. Aug. 18, 2022) (granting, on remand, a permanent injunction against enforcement of Exec. Order 14008's "pause" on new oil and gas activities on public land).

6 Draft Environmental Impact Statement on the Cook Inlet Lease Sale 258, 86 Fed. Reg. 60068, 60068–60069 (Oct. 29, 2021); Press Release, Bureau of Ocean Energy Mgmt., BOEM Publishes Draft EIS for Proposed Cook Inlet Lease Sale (Oct. 22, 2021), https://www.boem.gov/newsroom/press-releases/boem-publishes-draft-eis-proposed-cook-inlet-lease-sale.

7 U.S. Dep't of the Interior, *Lease Sale 258*, Bureau of Ocean Energy Mgmt., https://www.boem.gov/oil-gas-energy/leasing/lease-sale-258.

technical information supporting the completion of Lease Sale 258.[8] In particular, Alaska noted that lease sales in federal lands within the Cook Inlet would encourage exploratory programs that included both state and federal lands.[9] Alaska joined the litigation seeking an end to the Biden administration's pause of federal oil and gas leasing.[10] Then after the Western District of Louisiana enjoined the Biden administration's pause of federal oil and gas leasing, Alaska commented on Lease Sale 258's draft EIS. In its comments, Alaska requested BOEM move forward with the lease sale because "[r]esponsible natural gas and oil development in Cook Inlet" is essential to Alaska's "post-pandemic recovery, long-term economic growth, and energy security."[11]

The passage and enactment of the Inflation Reduction Act of 2022 resurrected Lease Sale 258, by requiring BOEM to hold the lease sale before December 31, 2022.[12] Between September and November 2022, BOEM published a proposed notice of sale, a final EIS, a final notice of sale, and a final record of decision.[13] A lease sale was held in

---

8 Ashlee Adoko, Assoc. Dir. Office of Project Mgmt. & Permitting, State of Alaska Dep't. of Nat. Res., Comment Letter on the Call for Information and Nominations and Notice of Intent to Prepare an Environmental Impact Statement for Cook Inlet Lease Sale 258 (October 13, 2020), https://www.regulations.gov/comment/BOEM-2020-0018-0030.

9 *Id.* at 1.

10 Complaint ¶ 10, *Louisiana v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021) (No. 2:21-cv-00778-TAD-KK).

11 Ashlee Adoko, Assoc. Dir. Office of Project Mgmt. & Permitting, State of Alaska Dep't. of Nat. Res., Comment Letter on Draft Environmental Impact Statement on Cook Inlet Lease Sale 258, BOEM-2020-0018 (December 13, 2021), https://www.regulations.gov/comment/BOEM-2020-0018-0158.

12 Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 50264(c), 136 Stat. 1818, 2060 (2022).

13 *See* Notice of Availability of the Proposed Notice of Sale for Cook Inlet Lease Sale 258, 87 Fed. Reg. 58130 (Sept. 23, 2022); Final Environmental Impact Statement on the Cook Inlet Lease Sale 258, 87 Fed. Reg. 65247, 65247–65248 (Oct. 28, 2022); Cook Inlet Planning Area Outer Continental Shelf Oil and Gas Lease Sale 258, 87 Fed. Reg. 73323, 73323–73327 (Nov. 29,


Case 3:22-cv-00279-SLG Document 20-1 Filed 04/26/23 Page 3 of 16

November and December of that year, with BOEM opening bids on December 30, 2022.[14] Hilcorp Alaska LLC was the successful bidder for one tract.[15] After review for fair-market value and antitrust considerations, BOEM awarded Hilcorp Alaska LLC one lease for its successful bid in Lease Sale 258.[16]

Before the lease sale concluded, however, Cook Inletkeeper and the other plaintiffs sued the Department of the Interior, BOEM, and several officers of the United States in their official capacity, alleging that Lease Sale 258 violated federal law.[17] The plaintiffs ask this Court to vacate the final EIS and record of decision for Lease Sale 258, and seek rescission of any leases resulting from the sale.[18] Alaska seeks to intervene here to protect its economic interests in federal oil and gas development within the state, its sovereignty interests in promoting development of neighboring state land in the Cook Inlet, and its socio-economic interests in ensuring energy security for its citizens. For the reasons following, this Court should grant Alaska's request.

---

2022); *and* Alaska Outer Continental Shelf, Cook Inlet Planning Area, Oil and Gas Lease Sale 258, 87 Fed. Reg. 73322, 73322–73323 (Nov. 29, 2022)

14 *See* U.S. Dep't of the Interior, *supra.*

15 Press Release, Bureau of Ocean Energy Mgmt., BOEM Statement on Cook Inlet Oil & Gas Lease Sale 258 (Dec. 30, 2022), https://www.boem.gov/newsroom/press-releases/boem-statement-cook-inlet-oil-gas-lease-sale-258.

16 U.S. Dep't of the Interior, *supra.*

17 *See, e.g.*, Compl. ¶ 1–10, 24–28 ECF No. 1.

18 Compl. Request for Relief 3–5.

## ARGUMENT

Both the Federal Rules of Civil Procedure and binding caselaw interpreting those rules support Alaska's application to intervene. Federal Rule of Civil Procedure 24 permits an interested party to intervene in a matter either as a matter of right or by permission of the court.[19] Though a party need satisfy only one of the standards for intervention, Alaska meets both standards. As a result, the Court should grant Alaska's motion to intervene.

### I. Alaska may intervene as a matter of right.

Under Federal Rule of Civil Procedure 24(a)(2) a court must allow intervention by a party "who . . . claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the [party's] ability to protect its interest, unless existing parties adequately represent that interest." In interpreting this rule, the Ninth Circuit has adopted a four-part test for determining whether a party may intervene as a matter of right.[20] First, the party's motion must be timely.[21] Second, the party must assert a "significantly protectable interest" relating to the transaction or property that is the subject of the action.[22] Third, the party must show "disposition of the action may, as a practical matter,

---

19 Fed. R. Civ. P. 24(a) (discussing intervention as a matter of right) and (b) (discussing permissive intervention).

20 *E.g.*, *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (*quoting Prete v. Bradbury*, 438 F.3d. 949, 954 (9th Cir. 2006)).

21 *Id.*

22 *Id.* (*quoting Prete*, 438 F.3d. at 954) (quotation marks omitted).

impair or impede [its] ability to protect its interest . . . ."[23] Four, the party must show none of the existing parties in the matter adequately represent the party's interests.[24] While the party seeking intervention must show it meets all four elements, courts are to interpret the requirements in a manner that favors intervention.[25] Alaska meets all four elements of the Ninth Circuit's test.

**A. Alaska's motion is timely.**

This Court should consider Alaska's motion to intervene as timely. Courts look to three factors when determining whether a motion to intervene is timely: (1) the stage of the proceedings; (2) the possibility of prejudice to the parties; and (3) the reason for any delay in requesting intervention.[26] Here, Alaska seeks to intervene at the earliest opportunity. The plaintiffs filed their complaint on December 22, 2022, making the defendants' answer due on or before February 22, 2023.[27] Under its February 15, 2023 scheduling order, the Court granted the plaintiffs an extension to file an amended complaint and extended the deadline for the defendants to file their answer.[28] At the time of Alaska's filing of this motion, the plaintiffs have not filed their amended complaint, the defendants have not filed their answer, nor has any party filed dispositive motions. In short, the case has barely begun. Alaska's intervention at this stage would not prejudice

---

23 *Id.* (*quoting Prete*, 438 F.3d. at 954) (quotation marks omitted).

24 *Id.* (*quoting Prete*, 438 F.3d. at 954).

25 *Id.* (*citing Prete*, 438 F.3d. at 954).

26 *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996), *as amended on denial of reh'g* (May 30, 1996) (citing *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990)).

27 *See* Fed R. Civ. P. 15 (allowing the federal government 60 days to file an answer in cases in which the government is a defendant); *see also* ECF No. (granting the federal government an additional 30 days to file its answer).

28 ECF No. 17.

any party. Nor has Alaska delayed in seeking intervention. In short, Alaska's motion to intervene is timely.

**B. Alaska has a significantly protectable interest in this action.**

Alaska's interests in the validity and outcome of Lease Sale 258 are clear, weighty, and many. To intervene as a matter of right, a party must show it has a "significantly protectable interest" in the action at issue.[29] A party need not establish a specific legal or equitable interest. Rather, "[t]o demonstrate a significant protectable interest" the party seeking intervention "must establish that the interest is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue."[30] A relationship between the asserted interest and the claims at issue exists when "the resolution of the plaintiff's claims actually will affect" the party seeking intervention.[31] Various interests can satisfy this requirement, including a party's economic interest that is "concrete and related to the underlying subject matter of the action."[32] Last, courts are to accept as true non-conclusory allegations made in support of a motion to intervene.[33]

The outcome here poses a direct and substantial threat to Alaska's economic interests. The responsible development of oil and natural gas activities is crucial to Alaska's economy. Royalties from the state's oil and gas leases provide more than $1

---

29 *Citizens for Balanced Use*, 647 F.3d at 897.
30 *Id.* (*citing Nw. Forest Res. Council*, 82 F.3d at 837).
31 *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998).
32 *United States v. Alisal Water Corp.*, 370 F.3d 915, 919–920 (9th Cir. 2004).
33 *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001) (adopting this standard).

billion in revenue to the state annually, while other oil and gas projects provide the state with further revenue—regardless of subsurface owners—through production, property, and corporate income taxes.[34] Robust oil and gas development also gives job opportunities to Alaska's citizens in the oil and gas and support industries.[35] Oil and gas developers are more likely to invest in those markets in which they can seize on economies of scale and, in Alaska, pursue development on both state and federal lands.[36]

Development of oil and gas activities on federal land under Lease Sale 258 will affect Alaska's oil and gas market.[37] In its *Revised Exploration and Development Scenario* for Lease Sale 258's final EIS, BOEM estimated that exploration and development of Lease 258 could yield 192 billion barrels of oil and between 229 and 301 billion cubic feet of natural gas.[38] Development of oil and gas activities under Lease Sale 258 would result in direct revenue to Alaska in the form of federal revenue-sharing of proceeds from oil and gas production, property taxes for the infrastructure required to support the oil and gas development, and corporate income tax from ancillary and support services.[39] Similarly, development of the parcels included in Lease Sale 258 would also

---

34 Declaration of Director Derek Nottingham, ¶ 3 (attached as Exhibit A to this motion).

35 Nottingham Declaration ¶ 5.

36 *Id.* ¶ 6.

37 *Id.* ¶ 7.

38 Bureau of Ocean Energy Mgmt., *E&D Scenario for LS 258, Cook Inlet, Alaska*, 6–7.

39 *See* 43 U.S.C. § 1337(g) (permitting the sharing with Alaska of a percentage of revenue from leases whose areas fall partially within three nautical miles of Alaska's seaward boundary); AS 43.20.144 (apportioning to Alaska business income arising from a taxpayer's production or transportation of gas or unrefined oil from a lease within Alaska); AS 43.56.010(b) and 43.56.060 (assessing an annual tax on property used for the production or pipeline transportation of gas or unrefined oil).


Case 3:22-cv-00279-SLG Document 20-1 Filed 04/26/23 Page 8 of 16

benefit Alaska indirectly through employment opportunities for Alaskans and the cultivation of an advantageous market for oil and gas investment.[40]

The outcome here will also shape the energy security of Alaska's citizens. Oil and gas produced in the Cook Inlet is vital to meeting the energy needs of Southcentral Alaska—the state's most populated region.[41] Natural gas from the Cook Inlet generates 70% of the electricity used in Southcentral Alaska; it heats over 140,000 homes and business; and it provides fuel to industrial users.[42] This energy production relies on an aged infrastructure, a high cost of production, and a limited and declining energy source.[43] Under current production levels, oil and gas produced in the Cook Inlet will meet the region's energy needs until 2030.[44] To counter this trajectory. additional oil and gas projects in the Cook Inlet are critical to augmenting these production levels and providing continued energy security to Alaska's citizens.[45] Thus, finding and developing new sources of energy, including natural gas from federal lands in the Cook Inlet, is vital to maintaining the quality of life of residents in Southcentral Alaska who rely on the Cook Inlet basin to meet their energy needs, as well the economic stability and security of the region.[46]

---

40 Nottingham Declaration, ¶ 6–8.

41 *Id.* ¶ 4.

42 Michael Redlinger, John Burdick, and Laura Gregersen, *Cook Inlet Natural Gas Availability* 6, 9, 35 (March 2018), https://dog.dnr.alaska.gov/documents/resource evaluation/CI_Natural_Gas_Availability_Study_2018.pdf.

43 Nottingham Declaration, ¶ 4.

44 Redlinger, Burdick & Gregersen at 27–28.

45 *Id.* at 27–30.

46 Nottingham Declaration, ¶ 4.

Because the plaintiffs here seek an order vacating the final EIS and record of decision for Lease Sale 258 and rescinding the resulting leases,[47] this case directly threatens Alaska's economic and energy-security interests in the development of oil and gas resources in the Cook Inlet. On that basis Alaska possesses a concrete interest related to underlying subject matter of this case—the validation of Lease Sale 258. This Court should find Alaska's interest supports the latter's intervention here as a matter of right.

**C. Alaska's ability to protect its interest will be impaired or impeded by the disposition of this action.**

Because Alaska has substantial interests in the validity of Lease Sale 258, it naturally follows that the disposition of this case will affect that interest.[48] Indeed, a prospective party "has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation."[49] When reviewing this element, courts look to the practical consequences of denying intervention.[50] And if a court's determination of an action would "substantially affect[]" an absent party, then that party should "be entitled to intervene."[51]

The outcome here will affect Alaska's interests. If this Court determines that the administrative procedures or environmental analysis underpinning Lease Sale 258 were

---

47 Compl. Request for Relief 3–5.

48 *See Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978) ("[T]he question of impairment is not separate from the question of the existence of an interest.").

49 *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (*quoting California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)) (quotation marks omitted).

50 *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977).

51 *Citizens for Balanced Use*, 647 F.3d at 898 (*quoting* Fed. R. Civ. P. 24 advisory committee's notes) (quotation marks omitted).

deficient and rescinds the sale, Alaska's economic interest in the regulated development of oil and gas projects in the state will be impaired. Similarly, the result here will affect the energy and economic security of Alaska's citizens. Disposition of this action may impair or impede Alaska's ability to protect its interests. And, on that basis, the third element supports allowing Alaska to intervene as a matter of right.

### D. Alaska's interests are not adequately represented by the existing parties.

None of the current parties here adequately represent Alaska's interests that would be affected through disposition of this case. A party's burden under this element is "minimal" and the party need only show "that representation of its interests '*may* be' inadequate."[52] Under Ninth Circuit precedent, courts analyze three factors when making this determination. First, whether the interests of a present party are such that it will make all the arguments of the prospective intervenor. [53] Second, whether that present party is "capable and willing" to make those arguments.[54] And, third, whether the prospective intervenor "would offer any necessary elements to the proceeding that other parties would neglect."[55] Of the three factors considered, the most important is the comparison of the intervening party's interest with those of the existing parties.[56] The Outer Continental Shelf Land Act, the statute that governs the Department of Interior's leasing activities here, anticipates and recognizes that federal and state sovereigns might have

---

52 *Id.* (*quoting Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)) (emphasis supplied).
53 *Id.* (*quoting Arakaki*, 324 F.3d at 1086).
54 *Id.* (*quoting Arakaki*, 324 F.3d at 1086) (quotation marks omitted).
55 *Id.* (*quoting Arakaki*, 324 F.3d at 1086) (quotation marks omitted).
56 *Id.* (*citing Arakaki*, 324 F.3d at 1086).

differing interests in implementing lease sales under the Act.[57] For example, 43 U.S.C. § 1345 foresees coordination and consultation between the Department of the Interior and state and local governments affected by Outer Continental Shelf lease sales administered by the Department.

Here, Alaska has broader interests than those of the existing parties and represents, in particular, its citizens. Development of oil and gas projects in the Cook Inlet will generate significant revenue for Alaska through revenue sharing, property tax, and corporate income tax, all of which will benefit the state and its citizens. Likewise, Alaska's citizens will benefit from the encouragement of oil and gas investment in the state, as producers are more likely to invest when they can manage multiple projects on both state and federal land. Last, Alaska and its citizens will benefit from the "spin off economic" activity connected with oil and gas projects, including increased employment and increased contracting for labor, materials and equipment.

What is more, Alaska's interest in seeing robust development of oil and gas projects in the Cook Inlet appears to conflict with the federal government's policy preferences on that issue. In a recently leaked internal memo discussing Lease Sale 258,[58] former BOEM Director Amanda Lefton provided recommendations for the royalty fees the federal government should charge producers under the leases subject to the sale. In her analysis, Lefton acknowledged that Southcentral Alaska relied on the oil and gas

---

57 43 U.S.C. §§ 1331, *et seq.*

58 *See, e.g.*, Thomas Catenacci, *Biden admin makes stunning admission on climate agenda in leaked internal memo*, Fox News (March 3, 2023, 3:04 PM), https://www. foxnews.com/politics/biden-admin-makes-stunning-admission-climate-agenda-leaked-internal-memo.


Case 3:22-cv-00279-SLG Document 20-1 Filed 04/26/23 Page 12 of 16

produced in the Cook Inlet and that the new projects in the Cook Inlet "would help provide energy security for" Alaska.[59] And Lefton admitted a lower royalty rate would "facilitate [the] expeditious and orderly development" of oil and gas projects in the Cook Inlet by motivating bids for leases and increasing the chances of oil and gas discoveries being developed.[60] In turn, the increased development would provide "additional government revenues and greater energy security" to Alaska.[61] Despite these advantages to the state, Lefton still recommended against the lower royalty rate, asserting that the challenges of climate change and greenhouse gases resulting from fossil fuels required a higher royalty rate so that producers would consider these social costs when making development-decisions.[62] Thus, even though the federal sovereign and Alaska both desire the development of oil and gas in the Cook Inlet, considering the BOEM's stated policy preferences, Alaska's interests and priorities weigh more heavily in favor of development than even those of the federal sovereign.

In sum, Alaska shares an interest with the federal sovereign in seeing the final EIS and record of decision for Lease Sale 258, and the resulting leases, upheld. But Alaska's interests are also broader than, and possibly contrary to, those of the current parties to the litigation. With that in mind, it is unlikely that the current defendants will advance the

---

59 Memorandum from Amanda Lefton, Dir., Bureau of Ocean Energy Mgmt., to Laura Daniel-Davis, Principal Deputy Sec'y, Land & Minerals Mgmt. 11 (Nov. 25, 2022) (attached as Exhibit B to this motion).

60 *Id.* at 15.

61 *Id.*

62 *Id.* at 14–15.

same arguments as Alaska. Thus, representation of Alaska's interests by another party in the litigation would be inadequate, thereby supporting intervention as a matter of right.

* * *

Because all four elements support intervention, this Court should grant Alaska's request to intervene here as a matter of right under Federal Rule of Civil Procedure 24(a).

## II. Alaska satisfies the requirements for permissive intervention.

If this Court does not permit Alaska to intervene as a matter of right, it should still allow Alaska to permissively intervene here. Under Federal Rule of Civil Procedure 24(b)(1)(B), a court may permit intervention by a party who "has a claim or defense that shares with the main action a common question of law or fact." When exercising this discretion, courts "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."[63] A party seeking permissive intervention must show "(1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common."[64]

Alaska meets all three requirements for permissive intervention. First, because the plaintiffs' claims and Alaska's proposed defenses involve federal law and arise from the right of review contained in the Administrative Procedure Act,[65] this Court has subject-

---

63 Fed. R. Civ. P. 24(b)(3).

64 *United States v. City of Los Angeles, Cal.*, 288 F.3d 391, 403 (9th Cir. 2002) (*quoting Nw. Forest Res. Council*, 82 F.3d at 839).

65 5 U.S.C. § 702. *See also* Compl. ¶ 11, 101–130.

matter jurisdiction over the claims under the federal question doctrine.[66] Second, Alaska's request to intervene is timely. Alaska has requested to intervene before any substantive briefing has occurred and even before the pleading stage of the litigation is complete. Thus, the Court allowing Alaska to intervene would not delay or prejudice adjudication of the original parties' claims. Third, Alaska's claims share common questions of law and fact with the original claims here. In their complaint, the plaintiffs allege that the administrative process prompting Lease Sale 258 violates federal law, including the National Environmental Policy Act and the Administrative Procedure Act.[67] In its answer in intervention, Alaska asserts that the final EIS, record of decision, and ensuing lease sale satisfy the requirements of the federal law.[68] Alaska's defenses of BOEM's actions in Lease Sale 258 arise from the same facts and involves the same legal principles and authorities as the claims made by the plaintiffs.

Alaska meets all three requirements for permissive intervention. Accordingly, if this Court determines Alaska cannot intervene here as of right, it nevertheless should exercise its discretion and grant Alaska's request for permissive intervention.

## CONCLUSION

The State of Alaska meets the requirements for both intervention as a matter of right and permissive intervention under Federal Rule of Civil Procedure 24. Thus, this Court should grant Alaska's motion to intervene.

---

[66] 28 U.S.C. § 1331.
[67] Compl. ¶ 101–130.
[68] Proposed Ans. ¶ 101–130 (filed concurrently with Alaska's motion to intervene).

DATED: April 26, 2023.

TREG TAYLOR
ATTORNEY GENERAL

By: */s/Hugh P. Dowell*
Hugh P. Dowell
Assistant Attorney General
Alaska Bar No. 2205034
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: hugh.dowell@alaska.gov
Attorney for the State of Alaska