Memorandum

To: Principal Deputy Assistant Secretary - Land and Minerals Management

From: Amanda Lefton
Director

AMANDA LEFTON Digitally signed by AMANDA LEFTON Date: 2022.11.25 16:41:54 -05'00'

Subject: Recommendations for Decisions on the Final Notice of Sale (Final NOS) for the Cook Inlet Planning Area Outer Continental Shelf (OCS) Oil and Gas Lease Sale 258 (scheduled for December 30, 2022)

The Bureau of Ocean Energy Management (BOEM) requests your decision regarding Cook Inlet Planning Area Lease Sale 258 (Cook Inlet Sale 258). This decision includes the size, timing, and location of the proposed sale; the proposed economic terms and conditions; the mitigation measures (i.e., lease stipulations) designed to reduce potential conflicts with other ocean uses and to protect the environment; and the Information to Lessees (ITL) clauses. Your decision will be noted by the choice of the options and your signature below. BOEM must publish the Final NOS in the *Federal Register* no later than Tuesday, November 29, 2022, at least 30 days prior to the date of sale.

## I. LEASE SALE AREA AND RESOURCES

Cook Inlet Sale 258 is the only Alaska lease sale scheduled in the 2017-2022 National Outer Continental Shelf (OCS) Oil and Gas Leasing Program, which became effective on July 1, 2017. While it was announced by the Department in May 2022 that Cook Inlet Sale 258 would not move forward due to lack of industry interest, the Inflation Reduction Act of 2022 (IRA, Pub. L. No. 117-169), signed into law on August 16, 2022, directs BOEM to hold the sale on or before December 31, 2022.

The Cook Inlet Planning Area currently holds 14 active Federal leases, and these active leases encompass 31,005 hectares (ha) (76,615 acres (ac)). All 14 leases were issued as a result of the last Cook Inlet lease sale (Cook Inlet Sale 244) held on June 21, 2017, which generated total bids of $3,034,815. In the two decades prior to Lease Sale 244, two other Cook Inlet sales were held: Sale 149 in 1997, which received bids on two tracts; and Sale 191 in 2004, which resulted in no bids. Cook Inlet Sale 211 in 2009 and Cook Inlet Sale 219 in 2011 were canceled due to a lack of industry interest.

### Sale Area

BOEM identified 224 OCS blocks in the Cook Inlet Sale 258 Area Identification (Area ID), 210 of which are unleased. The Area ID Notice of Availability (NOA) published in the *Federal Register* (86 FR 4116) on January 15, 2021. The blocks are located 3 to 21 nautical miles (nm) offshore of the coast of Alaska in water depths of approximately 33 to 260 feet (10 to 80 meters). **Figure 1**, below, shows the sale area.




**Figure 1. Final Sale Area**

**Resources**

BOEM's 2021 National Assessment of Undiscovered Oil and Gas Resources of the U.S. Outer Continental Shelf (2021 National Assessment) estimates the entire Cook Inlet Planning Area to have an undiscovered, technically recoverable mean resource potential of approximately 1.04

billion barrels (Bbbl) of oil and 1.18 trillion cubic feet (Tcf) of gas.[1] To estimate a net economic value (NEV) for Cook Inlet Sale 258, BOEM used the 2021 National Assessment results to develop estimates of production anticipated from the sale area at three activity levels: low, mid, and high. For the low-activity level, BOEM estimates a gas-only production scenario of 228.9 billion cubic feet (Bcf). For the mid-activity level, BOEM estimates 192.3 million barrels (MMbbl) of oil with 72.4 Bcf of associated gas. For the high-activity level, BOEM estimates a volume of 192.3 MMbbl and 301.92 Bcf. BOEM applies three different price levels to the three activity levels. At the low-activity level, the prices are $60/barrel (bbl) for oil and $2.14/thousand cubic feet (Mcf) for gas.[2] At the mid-activity level, the prices are $100/bbl for oil and $5.34/Mcf for gas. At the high-activity level, the prices are $160/bbl for oil and $8.54/Mcf for gas. Prices are assumed flat for the duration of production to allow for comparison within a range of values. Assuming real prices remain between the price assumptions for the low-activity and mid-activity levels, the anticipated production would yield a NEV of $100 million to $4.69 billion.

## II. RANGE OF OPTIONS FOR THE FINAL NOS

BOEM has identified four key components of the Cook Inlet Sale 258 and analyzed a recommended course of action and alternative approaches for each. Some of the key components also include subcomponents. The four key components are: (A) lease sale timing and size; (B) mitigation measures; (C) ITL clauses; and (D) lease terms and conditions. Below, for each component of the lease sale, BOEM provides a discussion of the issues followed by a set of options for your decision. BOEM's recommended option **is signified in bold text.**

### A. LEASE SALE TIMING AND SIZE

As noted above, the IRA directs BOEM to hold Cook Inlet Sale 258 "not later than December 31, 2022, . . . in accordance with the Record of Decision approved by the Secretary on January 17, 2017, described in the notice of availability entitled 'Record of Decision for the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000' issued on January 17, 2017." (Pub. L. No. 117-169, § 50264(c)). BOEM has met its obligations under applicable laws and regulations, including 43 U.S.C. § 1345(a)-(c) and 30 CFR 556.307(b) to consider and weigh the recommendations made by "[a]ny Governor of any affected State or the executive of any affected local government in such State . . . to the Secretary regarding the size, timing, or location of a proposed lease sale . . ." (43 U.S.C. § 1345(a)). Section III of this memorandum contains a discussion of BOEM's consultation with the Governor of Alaska for this sale. In addition, BOEM's hurdle-price

[1] The 2021 National Assessment of Undiscovered Oil and Gas Resources of the U.S. Outer Continental Shelf, OCS Report BOEM 2021-071, can be found here: https://www.boem.gov/2021-assessment-undiscovered-oil-and-gas-resources-nations-outer

[2] While BOEM uses standard oil/gas price relationships for all OCS Regions and Planning Areas to estimate undiscovered economically recoverable resources, the Alaska natural gas market is localized which results in higher natural gas prices. While the Cook Inlet oil price correlates strongly with ANS (Alaska North Slope) crude prices, natural gas prices are dependent on the Anchorage area market. Over the last several years Cook Inlet natural gas prices have ranged between $7.00 and $9.00 per Mcf which is typically 2X to 3X prevailing United States (Henry Hub) natural gas prices.

screening analysis, described below, found that holding Cook Inlet Sale 258 at this time will generate economic value to the Nation. The analysis yielding this determination was published in the Proposed Final Program decision document for the 2017–2022 National OCS Program.

**Hurdle Price Analysis**

While the hurdle price screening cannot be a factor considered in deciding whether to hold this sale (given the directive in the IRA to hold this sale), BOEM has retained the hurdle price analysis in this memorandum for informational purposes.

BOEM conducts a review of prices for each lease sale, called a hurdle price screening analysis, designed to assess whether oil and gas price trends are high enough to support the assertion that holding a lease sale will provide society greater economic value than not holding a sale. As part of the National OCS Program development process, BOEM determines a hurdle price for each of several OCS program areas. When prevailing oil and gas price forecasts at the time of each sale are above the National OCS Program hurdle price, immediate leasing and timely exploration of at least one undiscovered prospect in the sale is anticipated to generate greater economic value to the Nation than delaying these activities.[3]

The hurdle price screening analysis identifies a hurdle price for the Cook Inlet Program Area. BOEM estimated the hurdle price for Cook Inlet sales in the 2017–2022 Program to be $20 per barrel of oil equivalent (BOE).[4] Once calculated, BOEM compares the hurdle price to the Energy Information Administration (EIA) Annual Energy Outlook (AEO) 2022 price forecasts for 2023 to determine whether leasing now will provide greater economic value than not holding a sale.

The EIA-projected 2023 oil and gas prices from the 2022 AEO are $60.56/bbl of oil (Brent spot price) and $3.62/Mcf of gas (Henry Hub spot price).[5] These oil and gas prices lead to an equivalent of $53.72 per BOE in the Cook Inlet Program Area, where approximately 83% of a field's BOE is oil (($60.56 * 83%) + ($3.62 * 17% * 5.62)).[6]

BOEM prefers to conduct the hurdle price screening analysis using the EIA's Annual Energy Outlook (AEO), although those price forecasts were published in early 2022. Prices in 2022 have been higher than the AEO's price forecasts, therefore it is prudent to conduct the hurdle price screening analysis using the EIA's most recent price forecasts, the Short-Term Energy

---

[3] Additional information on the creation and implications of the National OCS Program hurdle price can be found in BOEM's *Economic Analysis Methodology for the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program*, available at https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/Economic-Analysis-Methodology.pdf.

[4] Additional information on BOEM's hurdle price analysis can be found in section 10.1.2 Hurdle Prices (pp. 169-172), of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program, available at: https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-OCS-Oil-and-Gas-Leasing-PFP.pdf.

[5] The 2022 AEO price forecast for 2023 for natural gas is $3.49 per million British thermal units (Btu). When converted to thousand cubic feet (assuming heat content of 1.037 million Btu per thousand cubic feet), this is equivalent to a $3.62 price per thousand cubic feet.

[6] The conversion factor for natural gas in thousand cubic feet (mcf) to BOE is 5.62. The BOEM hurdle price analysis is conducted on a price per BOE basis; therefore, the price forecasts are converted to a BOE basis for comparison purposes.

Outlook (STEO). Using the same calculations as above, 2023 price forecasts from the August 2022 STEO result in a price of $84.01 per BOE.

The current hurdle price screening analysis shows that the market price estimates for 2023 are higher than the 2017–2022 Program's Cook Inlet Program Area hurdle price, indicating that there is greater economic value from leasing now than not holding a sale.

**Sale Size Options for Consideration**

Under Option A.1, BOEM would offer all available unleased acreage identified in the Cook Inlet Sale 258 Planning Area. Option A.1. is based on the Area ID that BOEM published on January 15, 2021 (86 FR 4116) and would offer up to 224 OCS blocks (approximately 442,537 ha or 1.09 million ac) in the northern portion of the Cook Inlet Planning Area. This option was analyzed as Alternative 1 in the Cook Inlet Sale 258 Final Environmental Impact Statement (Cook Inlet Sale 258 Final EIS). BOEM is not recommending Option A.1 because it is recommending Option A.3, described below, which offers largely the same area as Option A.1 but defers specific OCS blocks from leasing to provide additional protection to designated critical habitat.

Under Option A.2, the lease sale would be cancelled, as analyzed in Alternative 2, the "No Action" Alternative, in the Cook Inlet Sale 258 Final EIS. Revenue would not be collected by the Federal Government nor subsequently disbursed to the State of Alaska, a portion of which supports national conservation and coastal resiliency programs. BOEM is not recommending Option A.2, as the IRA requires Cook Inlet Sale 258 to be held by December 31, 2022.

Under Option A.3,[7] BOEM would offer largely the same area as Option A.1, but would defer certain OCS blocks:

- 10 unleased whole or partial blocks (approximately 11,878 ha or 29,350 ac) that contain designated critical habitat for the Cook Inlet Distinct Population Segment (DPS) of the beluga whale, as analyzed in Alternative 3A, Beluga Whale Critical Habitat Exclusion, in the Cook Inlet Sale 258 Final EIS; and
- 7 unleased whole or partial blocks (approximately 11,884 ha or 29,365 ac) that contain designated critical habitat for the southwest Alaska DPS of the northern sea otter, as analyzed in Alternative 4A, Northern Sea Otter Critical Habitat Exclusion, in the Cook Inlet Sale 258 Final EIS.

Under Option B.1, BOEM also recommends adopting Stipulation No. 7 (described below and analyzed as Alternative 4B in the Cook Inlet Sale 258 Final EIS), which affects seven additional blocks by restricting certain activities from occurring within 1,000 meters of the designated critical habitat. BOEM recommends Option A.3 for the reasons explained below.

## SALE SIZE OPTIONS AND BOEM'S RECOMMENDATION

Option A.1.

[7] Option A.3 was originally presented as two separate options in the Proposed NOS decision memorandum for your consideration (originally presented there as Options A.3 and A.4). As BOEM is recommending excluding both areas, the Bureau has consolidated them into a single Option here.

Offer all available unleased acreage consisting of up to 224 blocks, approximately 442,537 ha (1.09 million ac), in the northern portion of the Cook Inlet Planning Area. BOEM is not recommending Option A.1 because it is recommending Option A.3, which offers largely the same area as Option A.1 but defers specific OCS blocks from leasing to provide additional protection to designated critical habitat.

Option A.2.
Cancel the lease sale, consistent with Alternative 2, the "No Action" Alternative, in the Cook Inlet Sale 258 Final EIS. This option is not consistent with the requirements of the IRA.

**Option A.3. (Recommended)**
**Same as Option A.1. but defer a total of 17 OCS blocks, including 10 unleased whole or partial blocks that contain critical habitat for the Cook Inlet DPS of the beluga whale (Alternative 3A in the Cook Inlet Sale 258 Final EIS) and 7 unleased whole or partial blocks that contain critical habitat for the southwest DPS of the northern sea otter (Alternative 4A in the Cook Inlet Sale 258 Final EIS). For the Final NOS, Option A.3 best implements the requirements of the IRA, meets the purposes of OCSLA, and supports development of domestic energy resources in a responsible manner by protecting designated habitat for two listed species. BOEM's recommendation would make available for sale 193 unleased OCS blocks totaling 387,771 hectares (958,202 acres), as identified in the "List of Available Blocks for Leasing" accompanying the Final NOS package.**

## B. LEASE STIPULATIONS

BOEM developed lease stipulations for Cook Inlet Sale 258, which are provided for your consideration. A brief discussion of each stipulation is provided below; the full text of each stipulation is provided in the Final NOS package. Stipulations No. 1 through 8 are similar to those used for Cook Inlet Sale 244 held on June 21, 2017. Stipulation No. 9 was developed by BOEM's Alaska Regional Office in response to the inclusion of the Alaska Conflict Management Plan in the Record of Decision and Approval of the 2017-2022 National OCS Program. Stipulation No. 10 is new and was included pursuant to section 50263 of the IRA, Pub. L. No. 117-169. For additional information, please refer to the map entitled "Cook Inlet Planning Area, Lease Sale 258, December 30, 2022, Final Notice of Sale, Stipulation Blocks" in the Final NOS package.

If Option A.1 is chosen, BOEM recommends adoption of the stipulation entitled "Protection of Beluga Whale Critical Habitat," which was included in the Proposed NOS package. BOEM implemented this stipulation for the first time in Cook Inlet Sale 244 in 2017. It applies mitigation measures on the 10 OCS blocks that overlap beluga whale critical habitat at the northern end of the Cook Inlet Planning Area. The lessee would not be allowed to conduct on-lease seismic surveys or exploration drilling between November 1 and April 30 when beluga whales are most likely to be present, unless a waiver is obtained. If Option A.3 is adopted, it renders the stipulation unnecessary, as none of the blocks to which it would have applied would be offered for sale.

**Stipulation No. 1 – Protection of Fisheries – A stipulation to require exploration and development and production activities to be conducted in a manner that minimizes conflicts with subsistence, sport, and commercial fisheries and gear**.

BOEM has used this stipulation in past Cook Inlet lease sales starting with Sale 149 in 1997, and there is a similar provision in annual State of Alaska Cook Inlet Areawide Sales. BOEM has designed this stipulation to minimize spatial conflicts between OCS activities and commercial, sport, and subsistence fishing activities. The stipulation requires the lessee to review planned exploration and development activities (including plans for seismic surveys, drilling rig transportation, or other vessel traffic) with potentially affected fishing organizations, subsistence communities, and port authorities to prevent fishing gear conflicts.

**Stipulation No. 2 – Protection of Biological Resources – A stipulation to protect sensitive biological resources and habitats.**

BOEM has used this stipulation for all Cook Inlet lease sales starting with Sale 60 in 1981. BOEM has developed it as a means of protecting biological populations or habitats that may be identified in the leased area. This stipulation provides for identifying and protecting previously unknown important or unique biological populations or habitats that may occur in a lease area. If previously unknown sensitive biological resources are identified during the conduct of any operations on the lease, the lessee may be required to modify operations to ensure that significant biological populations or habitats deserving protection are not adversely affected.

**Stipulation No. 3 – Orientation Program – A stipulation to require that each lessee develop an orientation program highlighting specific environmental, safety, social, and cultural concerns of the area that could be affected by persons working on OCS oil and gas projects.**

BOEM has used this stipulation for all Cook Inlet lease sales starting with Sale 60 in 1981. BOEM has developed it to increase the lessee's and its employees' awareness of the environmental values of the area as a means of reducing potential effects. The lessee must develop and implement an orientation program designed in sufficient detail to inform individuals working on OCS projects of specific environmental, safety, social, and cultural concerns in the area. The orientation program must provide information to lessee and operator employees, agents, contractors, and subcontractors on the following: protected species; biological resources used for commercial, sport, and subsistence purposes; archaeological resources in the area and appropriate ways to protect them; and reducing industrial noise and disturbance effects on marine mammals and marine and coastal birds. The program must also include information about avoiding conflicts with subsistence activities. BOEM reviews the Orientation Program as part of an Exploration Plan or Development and Production Plan to determine if the plan can be approved.

**Stipulation No. 4 – Transportation of Hydrocarbons – A stipulation informing lessees that BOEM may require the use of pipelines to transport hydrocarbons to shore.**

BOEM has developed this stipulation and has included it in all Cook Inlet Planning Area lease sales starting with Sale 60 in 1981 as means of mitigating risks associated with transporting hydrocarbons in a safe, environmentally sound, and practicable way.

**Stipulation No. 5 – Protection of Beluga Whale Nearshore Feeding Areas.**
BOEM implemented this stipulation for the first time in Cook Inlet Sale 244 in 2017. It applies mitigation measures to the 129 OCS blocks located wholly or partially within 10 miles of major anadromous streams. On blocks within 10 miles of major anadromous streams, the lessee may not conduct on-lease seismic surveys between July 1 and September 30 (when beluga whales are migrating to and from their summer feeding areas), unless a waiver is obtained. BOEM analyzed this stipulation as a means of reducing potential environmental impacts as Alternative 3C in the Cook Inlet Sale 258 Final EIS.

**Stipulation No. 6 – Protection of Beluga Whales.**
Implemented for the first time in Cook Inlet Sale 244 in 2017, this stipulation would apply to all leases. Lessees and operators may not conduct on-lease seismic surveys between November 1 and April 1 when beluga whales are most likely to be present and distributed across the Lease sale area, unless a waiver is obtained. BOEM analyzed this stipulation as a means of reducing potential environmental impacts as Alternative 3C in the Cook Inlet Sale 258 Final EIS.

**Stipulation No. 7 – Protection of Northern Sea Otter Critical Habitat.**
BOEM implemented this stipulation for the first time in Cook Inlet Sale 244 in 2017. It would apply mitigation measures to the seven OCS blocks located within 1,000 meters (m) of, but not directly overlapping with, northern sea otter critical habitat. On these seven OCS blocks, this stipulation prohibits lessees and operators from discharging drilling fluids and cuttings and engaging in seafloor-disturbing activities (including anchoring and placement of bottom-founded structures), unless a waiver is obtained. BOEM analyzed this stipulation as a means of reducing potential environmental impacts as Alternative 4B in the Cook Inlet Sale 258 Final EIS.

**Stipulation No. 8 – Protection of Gillnet Fishery.**
BOEM implemented this stipulation for the first time in Cook Inlet Sale 244 in June 2017. It applies additional mitigation measures to all OCS blocks north of Anchor Point to reduce the potential for conflicts with the Cook Inlet drift gillnet fishery. The following two mitigation measures would be applied to the 100 whole or partial OCS blocks: (1) the lessee may not conduct on-lease seismic surveys during the drift gillnetting season as designated by the Alaska Department of Fish and Game (ADF&G) (approximately mid-June to mid-August), and (2) the lessee must notify the United Cook Inlet Drift Association of any temporary or permanent structures planned during the drift gillnetting season. The lessee may obtain a waiver at the discretion of the Regional Supervisor of Leasing and Plans. BOEM analyzed this stipulation as a means of reducing potential environmental impacts as Alternative 5 in the Cook Inlet Sale 258 Final EIS.

**Stipulation No. 9 – Alaska Conflict Mitigation Plan.**
BOEM developed this stipulation in alignment with the Record of Decision and Approval of the 2017-2022 National OCS Oil and Gas Leasing Program, which requires its use. The stipulation requires the lessee or operator to consult with Alaska Native communities in the lease sale area to identify potential conflicts between planned oil and gas activities and subsistence or other cultural activities. Under this stipulation, lessees or operators must submit to the Regional Supervisor of Leasing and Plans a Conflict Management Plan documenting consultation with

participating communities to determine best practices to prevent unreasonable conflicts with subsistence or other cultural activities, and outline specific mitigation measures the operator will implement.

**Stipulation No. 10 – Royalties on All Produced Gas.**

BOEM developed this stipulation pursuant to section 50263 of the IRA (Pub. L. No. 117-169). It requires all lessee(s) or operator(s) for leases located on the OCS to pay royalties on all gas produced, including any gas that may be consumed or lost by venting, flaring, or negligent releases via any equipment during upstream operations. Exceptions from this stipulation, as provided in the IRA, include emergency situations that may pose a danger to human health, safety, or the environment as well as for any gas used or consumed within the lease area, or for gas that may be unavoidably lost.

**Additional Discussion on Restrictions to On-Lease Seismic Surveys**

As shown in **Table 1** below, and as similarly adopted in Cook Inlet Sale 244, Stipulations No. 5, 6, and 8 restrict when the lessee, operators, and subcontractors may conduct on-lease seismic surveys, unless the lessee requests a waiver upon filing an ancillary activities notice or proposed plan and the waiver is granted at the Regional Supervisor's discretion. If all stipulations are adopted (as BOEM recommends), the lessee can still conduct on-lease seismic surveys on all 207 blocks, but with certain exceptions, as outlined in **Table 1**.

Although the temporal restrictions imposed by the stipulations will reduce the window of opportunity available to the operator for conducting on-lease seismic surveys, BOEM believes that the restrictions, even if collectively applied, still provide sufficient time for the lessees, operators, and subcontractors to properly plan and execute on-lease seismic surveys as described herein and analyzed in the Cook Inlet Sale 258 Final EIS. BOEM assumes that the lessee, operator, and subcontractor could conduct one deep-penetrating seismic survey during the first year following the sale. Seismic vessels operate day and night, and the duration of a survey will depend on its size, data acquisition capabilities of the vessel, and weather conditions. Generally, surveys conducted on-lease are collecting data in a concentrated area, and sufficient time and acceptable weather should be available during the spring (April through mid-June) or in the fall (October) for these surveys to be completed.

**Table 1. Restrictions to On-Lease Seismic Surveys**

| Stipulation | Period of Prohibition | Area |
|---|---|---|
| No.5- Protection of Beluga Whale Nearshore Feeding Areas | July 1 to September 30 | 125 OCS blocks within 10 statute miles of major anadromous streams |
| No.6- Protection of Beluga Whales | November 1 to April 1 | All 193 OCS blocks |
| No.8- Protection of Gillnet Fishery | During drift gillnet fishing season (mid-June to mid-August) | 97 OCS blocks north of Anchor Point |

## MITIGATION MEASURES OPTIONS AND BOEM'S RECOMMENDATION

**Option B.1. (Recommended)**

**BOEM recommends adopting Lease Stipulations No. 1-10, summarized above. The full text of each is provided in the "Stipulations" document included in the Final NOS Package.**

Option B.2

Adopt fewer than all lease stipulations above. Delete the following stipulations [to be filled in by decision maker]:

______________________________________________________________________

Option B.3

Adopt additional lease stipulations. The decision maker should include the additional stipulation(s) on an attachment to this document.

### C. INFORMATION TO LESSEES

Information to Lessees (ITL) clauses provide information on a range of matters that BOEM deems important to potential bidders. The full text of these ITL clauses is provided in the "Information to Lessees" document included in the Final NOS Package. BOEM developed these ITLs to provide additional information to potential bidders regarding terms and conditions of the lease sale, other programs, and ongoing Alaska Region activities. Some of the ITLs were developed in consultation with other Federal and State agencies. ITL No. 11 is new for this sale and advises bidders of certain requirements related to the IRA. BOEM recommends including the following 11 ITLs in the Final NOS package.

(1) Seismic Surveys: Environmental and Regulatory Review and Coordination Requirements
(2) Archaeological and Geological Hazards Reports and Surveys
(3) Discharge Restrictions and Prohibitions
(4) Trash and Debris Awareness and Elimination
(5) Navigation Safety
(6) Notice of Arrival on the Outer Continental Shelf
(7) Bidder/Lessee Notice of Obligations Related to Criminal/Civil Charges and Offenses, Suspension, or Debarment; Disqualification Due to a Conviction under the Clean Air Act or the Clean Water Act
(8) Oil Spill Response Preparedness
(9) Bureau of Safety and Environmental Enforcement (BSEE) Inspection and Enforcement of Certain U.S. Coast Guard (USCG) Regulations
(10) Air Quality Permit/Plan Approvals
(11) Inflation Reduction Act of 2022

## ITL OPTIONS AND BOEM'S RECOMMENDATION

**Option C.1. (Recommended)**
**Adopt all 11 ITL clauses identified above.**

Option C.2.
Adopt fewer than all ITLs. Delete the following ITLs [to be filled in by decision maker]:

______________________________________________________________________

Option C.3.
Adopt additional ITLs. The decision maker should describe the additional ITL(s) on an attachment to this document.

### D. LEASE TERMS AND ECONOMIC CONDITIONS

BOEM analyzes lease and fiscal terms for oil and gas lease sales and produces a report from these findings. BOEM's report entitled "Lease Term Reassessment Report for Sale 258" memorializes the analysis used to inform the lease term options, recommendations, and decisions. The report provides a record of relevant analyses including industry trends, recent bidding results, and lease term options presented in this Decision Memo.

BOEM is closely monitoring recent oil and gas price volatility. The low prices realized by oil and gas operators during 2020 led to reduced exploration and development activity worldwide. This reduction in activity, coupled with a rebound in global oil and gas demand, has led to higher prices in 2021 and 2022.

BOEM's lease term analysis of fiscal terms for Cook Inlet Sale 258 focuses on receipt of fair market value for OCS resources in a frontier basin. While there is currently no production from existing OCS Cook Inlet leases, all oil and gas produced from Cook Inlet State of Alaska (SOA) leases is consumed within the region.[8] Without new regional supplies, oil and gas will need to be imported into the region. A State of Alaska study from 2017 estimated that natural gas produced from the Cook Inlet can meet demand levels of about 80 Bcf/year until approximately 2030.[9] New oil and gas production from the Cook Inlet OCS would help provide energy security for the State of Alaska.

BOEM has carefully considered the importance of local oil and gas production for Alaska and the Anchorage metropolitan area. The Cook Inlet Program Area has limited infrastructure for importing oil and gas from global markets. The frontier nature of the Cook Inlet Program Area and the obstacles operators face suggest BOEM should offer lease terms commensurate with the risk and challenges associated with exploration and development in the area. BOEM has also, where appropriate, considered mechanisms to incorporate the social costs of greenhouse gas emissions that are generated during upstream oil and gas activities.

Below, BOEM provides several lease and fiscal term options for Cook Inlet Sale 258. Each lease term is individually discussed, and each section provides information on the recommended

[8] https://digital.akbizmag.com/issue/may-2021/whats-cookin-in-the-inlet/
[9] https://dog.dnr.alaska.gov/Documents/ResourceEvaluation/CI_Natural_Gas_Availability_Study_2018.pdf

option and alternative lease term options.  Terms requiring a decision for this Proposed NOS include:

Option D.1 – Primary Terms
Option D.2 – Minimum Bid
Option D.3 – Rental Rates
Option D.4 – Royalty Rates and Minimum Royalty
Option D.5 – Royalty Suspensions

I. Option D.1 Primary Terms

The primary term is the length of time a lease can be held for exploration before drilling or production begins.  OCSLA provides that the primary term for conventional energy leases will be set at five years, or up to 10 years "where the Secretary finds that such longer period is necessary to encourage exploration and development in areas because of unusually deep water or other unusually adverse conditions."  (43 U.S.C. § 1337(b)(2)).  When developing recommendations on the appropriate length of time for leases' primary terms, BOEM ensures compliance with this statutory requirement and also considers and balances important policy considerations consistent with the requirements of OCSLA.

In establishing primary terms, BOEM seeks to allow the oil and gas industry to assess the widest possible set of prospects before deciding where to commit to exploratory drilling, and thereafter possibly to commit to development operations.  BOEM recognizes that private companies have a profit motive to promptly explore and develop the best geologic prospects while sequencing less favorable opportunities for drilling later in the primary term, or perhaps not drilling them at all depending on emerging geologic knowledge and market conditions.

- **Option D.1.a:  10-Year Primary Term (Recommended)**

Consistent with 43 U.S.C. § 1337(b)(2), BOEM recognizes that a longer period is required for planning and drilling in the Cook Inlet Program Area because it remains an undeveloped, frontier area, and exploration and development in frontier areas typically require at least 10 years. BOEM has determined that the Cook Inlet Program Area meets the OCSLA "unusually adverse conditions" criteria due to the operational and scheduling challenges, environmental mitigations, and the relative lack of existing infrastructure when compared to the Gulf of Mexico.  Although the Cook Inlet has considerably fewer environmental constraints caused by sea ice than areas in northern Alaska, severe weather conditions and seasonal restrictions may limit seismic surveys and exploration drilling in any one year.  Thus, BOEM recommends Cook Inlet Sale 258 leases be issued with a 10-year primary term, the same as those leases issued in Cook Inlet Sale 244. This recommendation is consistent with BOEM's primary terms for leases issued in other planning areas with these or other similar challenges, as well as recent oil and gas leases issued by the State of Alaska in Cook Inlet.

- Option D.1.b:  Other Primary Terms

As an alternative to the recommended 10-year primary term, BOEM could issue leases with an initial 8-year primary term and an option to earn an additional 2 years with a drilling obligation to extend the primary term to 10 years.  BOEM is not recommending this or other alternative options since a 10-year primary term provides a proper balance between promoting diligent exploration and development activities while safeguarding the public's interest in receiving fair

market value.

II. Option D.2 Minimum Bids

The minimum bonus bid is the lowest acceptable price for which BOEM would accept a bid to lease a block (subject to BOEM's determination of bid adequacy).

- **Option D.2.a: Minimum Bid of $25 per Hectare (Recommended)**

BOEM recommends a minimum bid of $25 per hectare (~$10/ac) or fraction thereof. The recommended minimum bid for Cook Inlet Sale 258 remains unchanged from Cook Inlet Sale 244. Blocks that are passed over remain available for leasing in a future sale and could attract a minimum bid, or better, if new technology is developed, a nearby discovery is made, or if future price expectations increase.

- Option D.2.b: Other Minimum Bid Levels

Alternatively, BOEM could increase or reduce the minimum bid levels from $25 per hectare. A minimum bid below $25 per hectare may not have the effect of increasing the number of blocks leased and could lead to the same number of blocks being leased, but for less money. A minimum bid above $25 per hectare could lead to fewer blocks being leased and thus would potentially lead to less leasing revenue and less acreage being leased. In a frontier basin, such as the Cook Inlet OCS, the public benefits most when companies acquire acreage sufficient for effective exploration. A healthy portfolio of leased acreage permits lessees to assess improved geologic information derived from exploration and determine the best development prospects. When the geologic knowledge of a basin is better understood, the public may benefit more from the targeted leasing that can be achieved with higher minimum bid levels. For these reasons, the recommended minimum bid levels appropriately balance investment attractiveness to industry, encourage diligence, and assure the public's interest in receiving fair market value.

III. Option D.3 Rental Rates

During the primary term of a lease and before the commencement of production, the lessee pays annual rentals which generally are either fixed or escalating. Rental rates are designed to encourage diligent exploration and development and contribute to the receipt of fair market value for OCS resources. An escalating rental is designed to encourage lessee diligence in exploration and development decisions. It also provides the public with greater compensation later in the primary term if the lessee has not initiated development.

- **Option D.3.a: Adjust Rental Rates for Inflation (Recommended)**

BOEM recommends a rental rate of $16 per hectare (~$6.50/ac) or fraction thereof, until the start of year eight of the primary term or the discovery of oil or gas, whichever occurs first, then at a rate of $24 per hectare ($9.70/ac) or fraction thereof. At the time of the sale, the U.S. economy will have experienced over 5 years of inflation at approximately 3 percent per year since BOEM's previous Cook Inlet Sale 244; thus, the real (inflation-adjusted) cost of holding OCS acreage has declined.[10] For Cook Inlet Sale 258, adjusting rental rates for inflation would contribute to receipt of a fair market value for the right to explore and produce OCS hydrocarbons.

---

[10] Rental rate inflation adjustment was calculated using the Bureau of Economic Analysis' Implicit Price Deflator for Gross Domestic Product

**Table 2. Inflation Adjusted Rental Rates**

| | Years 1–7 | Years 8-10 |
|---|---|---|
| Lease Sale 244 | $13 | $20 |
| Lease Sale 258 (Recommended) | $16 | $24 |

Annual rentals comprise a relatively small percentage of total leasing revenues paid to the U.S. Treasury. As BOEM increases the lease's holding cost with higher rental rates, it slightly decreases the potential profitability of lease blocks. This rental increase is expected to cause a small reduction in leasing interest. Once leased, the higher rental rate is marginally more likely to encourage prompt exploration and development of the lease.

- Option D.3.b: Other Rental Rates

Alternatively, other rental rates could be implemented for this sale. For example, BOEM could increase the rental rates to provide an additional financial incentive for prompt exploration and production. BOEM could also grant leases at the rental rates utilized in Cook Inlet Sale 244, which were $13 per hectare initially and then $20 per hectare starting in year eight or the discovery of oil or gas, whichever occurs first. BOEM does not recommend alternative rental rates, since the recommended rental rates are expected to balance the goals outlined earlier in this memo.

IV. Option D.4 Royalty Rates and Minimum Royalties

The government reserves a royalty interest in OCS oil and gas leases, which is a share of the value of production if the lease begins production. Royalty rates can have a significant impact on bidder interest and are a key fiscal parameter in the calculation of the underlying economic value for an OCS block. Royalties are the primary fiscal term in which the public shares in the project risk and receives compensation for the extraction of nonrenewable resources. For comparison, the Cook Inlet Sale 244, all previous Arctic OCS lease sales, and all State of Alaska lease sales feature a royalty rate of 12 ½ percent.

The minimum royalty replaces the rental rate once production begins to ensure leases are not held at "no cost," and is offset by royalties paid on production. Thus, the minimum royalty is applicable only if the production royalty paid is less than the minimum royalty at the expiration of each lease year. If the production royalty paid exceeds the minimum royalty requirement, then only production royalty is applicable.

- **Option D.4.a: Royalty Rate of 18 ¾ Percent; Minimum Royalty Rate of $24 per Hectare (Recommended)**

*Royalty Rate*: For this sale, BOEM recommends a royalty rate of 18 ¾ percent, which is the maximum royalty rate allowed by § 50261 the Inflation Reduction Act of 2022 for OCS leases.

**Royalty Rate Recommendation Rationale**

BOEM's recommended royalty rate of 18 ¾ percent accounts for the social costs of greenhouse gas emissions (SC-GHG) during upstream oil and gas activities, as encouraged by section 208 of

Executive Order (E.O.) 14008.[11] The recommended royalty rate of 18 ¾ percent is equivalent to the sum of the minimum royalty rate of 16 ⅔ percent established by the IRA, plus a royalty rate surcharge of 2 1/12 percent. BOEM estimates that a royalty rate surcharge of 2 ¼ percentage points would account for the social cost of upstream greenhouse gas emissions from production. This estimate is described in BOEM's draft paper entitled "Options for Incorporating the Social Cost of Greenhouse Gas Emissions," which analyzes options to incorporate the upstream SC-GHG into royalty rates in accordance with E.O. 14008. This draft paper finds that a 2 ¼ percent royalty rate surcharge would meet the administration's objectives stated in E.O. 14008. A 2 ¼ percentage surcharge plus 16 ⅔ percent would equal 18 11/12 percent and exceed the statutory maximum royalty allowed by the IRA; thus, BOEM is recommending the maximum-allowed royalty of 18 ¾ percent.

The purpose of incorporating the SC-GHG into the royalty rate is to provide a mechanism that factors the social cost of greenhouse gas emissions into operators' decision-making process. As lessees internalize the costs associated with carbon emissions, OCS activity and corresponding production could move toward a lower, but more socially optimal level.

While a 16 ⅔ percent royalty may be more likely to facilitate expeditious and orderly development of OCS resources and potentially offer greater energy security to residents of the State of Alaska, a reasonable balancing of the environmental and economic factors for the American public favors the maximum 18 ¾ percent royalty for Cook Inlet leases.

*Minimum Royalty Rate*: BOEM recommends a minimum royalty rate of $24 per hectare or fraction thereof, which is an inflation-adjusted minimum royalty rate from the rate offered in Cook Inlet Sale 244.

- Option D.4.b: Royalty Rate of 16 ⅔ Percent

As an alternative to the recommended option, BOEM could offer leases with a royalty rate of 16 ⅔ percent, the minimum royalty allowed by the IRA. When compared with the recommended option, a 16 ⅔ percent royalty would favorably affect project economics and increase the potential for exploration of leases issued in this sale. A lower royalty of 16 ⅔ would also be expected to incentivize additional blocks receiving bids, increase bonus bids, and increase the chances of a discovery being developed. If a Cook Inlet prospect would be developed, there would be additional government revenues and greater energy security for the State of Alaska, especially if development of natural gas resources in the Cook Inlet ameliorated the long-term supply challenges facing the Anchorage area. Nevertheless, because of the serious challenges facing the Nation from climate change and the impact of GHGs from fossil fuels, BOEM is not recommending this option since it would not include an appropriate surcharge to account for those impacts.

- Option D.4.c: Other Royalty Rates

Other royalty rates and minimum royalty rates could be implemented for this sale. The royalty rate is limited to between 16 ⅔ and 18 ¾ percent in accordance with the IRA. While both ends

[11] Executive Order 14008, of January 27, 2021, Tackling the Climate Crisis at Home and Abroad, section 208, Oil and Natural Gas Development on Public Lands and in Offshore Waters.

of that range are discussed as options above, BOEM could also choose a royalty elsewhere within that range but does not recommend doing so for the reasons outlined above.

V. Option D.5 Royalty Suspensions

Royalty Suspensions: BOEM could offer a wide variety of royalty suspension for this sale, including by volume or value. BOEM analyzed a 16 ⅔ percent royalty rate with a value of suspended royalty of between $7.5 million and $20 million per lease for the Cook Inlet sale area. This is not recommended given the narrow royalty range allowed by the IRA and environmental consequences of GHG emissions on climate change.

- **Option D.5.a: Do Not Offer Royalty Suspensions (Recommended)**

Given the recommended lease term and fiscal options identified in this memorandum, BOEM does not recommend offering leases with royalty suspensions.

- Option D.5.b: Offer Royalty Suspensions

BOEM could offer royalty suspensions with the goal of making resources available for expeditious and orderly development. However, BOEM does not recommend royalty suspensions as the recommended lease term options are expected to balance the goals outlined earlier in this memo.

## LEASE FISCAL TERMS AND CONDITIONS OPTIONS AND BOEM'S RECOMMENDATION

**Option D.1.a (Recommended)**
**Length of Primary Terms: A 10-year primary term.**

Option D.1.b
Change the lease primary terms. The decision maker should specify any changes in an attachment to this document.

**Option D.2.a (Recommended)**

**Minimum Bonus Bid Amounts: A minimum bonus bid amount of $25 per hectare or fraction thereof.**

Option D.2.b

Change the minimum bid. The decision maker should specify any changes in an attachment to this document.

**Option D.3.a (Recommended)**

**A rental rate of $16 per hectare or fraction thereof, until the start of year eight of the initial period or discovery of oil or gas, whichever occurs first, then at a rate of $24 per hectare or fraction thereof.**

Option D.3.b

Change the rental rate. The decision maker should specify any changes in an attachment to this document.

**Option D.4.a (Recommended)**
**Royalty Rate: A royalty rate of 18 ¾ percent in accordance with the maximum rate set by the IRA.**
**Minimum Royalty Rate: A minimum royalty rate of $24 per hectare or fraction thereof.**

Option D.4.b
A royalty rate of 16 ⅔ percent.

Option D.4.c
Change the royalty rate or the minimum royalty. The decision maker should specify any changes in an attachment to this document.

**Option D.5.a (Recommended)**
**Royalty Suspension: Do not offer any royalty suspension.**

Option D.5.b
Offer a royalty suspension. The decision maker should specify any changes in an attachment to this document.

## III. CONSULTATIONS RELATED TO COOK INLET SALE 258

### Outer Continental Shelf Lands Act – Section 19

Section 19 of OCSLA (43 U.S.C. § 1345) requires BOEM to solicit input on the size, timing, and location of a proposed lease sale from governors of affected States. On September 21, 2022, in accordance with section 19 of OCSLA and BOEM's regulations at 30 CFR 556.304(c), BOEM sent the Proposed NOS to the Governor of Alaska, who had 60 days to make recommendations on the size, timing, and location of the proposed lease sale. Under section 19(c) of OCSLA, the Secretary of the Interior will accept the recommendations of the governors of affected States and could accept the recommendations of executives of local governments, regarding the size, timing, and location of the lease sale, if it is determined "after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State[s]." Section 19 of OCSLA and BOEM's regulations at 30 CFR 556.307(c) require BOEM to send the governor of an affected State written reasons for its determination to accept or reject that governor's recommendation.

On November 22, 2022, BOEM received recommendations in a letter from the Governor of Alaska on the size and location of Cook Inlet Sale 258. The letter stated that "the State [of Alaska] recommends that . . . [10 blocks that overlap with beluga whale designated critical habitat areas and 7 blocks that overlap with northern sea otter designated critical habitat] remain available for leasing and exploration in Lease Sale 258." The State also mentioned that the inclusion of three stipulations--the Protection of Beluga Whale Nearshore Feeding Areas stipulation, Protection of Beluga Whales stipulation, and the Protection of Gillnet Fishery stipulation--is a "limitation on the size of Lease Sale 258 and unnecessarily impairs the ability to explore and develop these tracts should they be awarded." The State of Alaska also suggested a clarifying edit on the Protection of Gillnet Fishery stipulation. In addition to recommendations

outlined in the letter, the State of Alaska requested an opportunity for further consultation with BOEM on the size of the proposed lease sale area.

On November 23, 2022, BOEM completed the additional consultation requested by the State of Alaska in its letter dated November 22, 2022. During consultation, BOEM acknowledged the IRA requirement to hold Cook Inlet Sale 258 on or before December 31, 2022, while the State of Alaska reiterated its position that BOEM should include the 17 blocks overlapping designated critical habitat for beluga whales and northern sea otters in the sale area, modify several proposed lease stipulations, and remove restrictions on seismic surveys in areas adjacent to state waters. While the State maintained its position asserting potential constraints under these stipulations on lessees and operators, BOEM noted that industry did not submit any comments regarding any perceived hardship as a result of these stipulations.

After consideration of the State's comments in its letter and during consultation, BOEM is not recommending adoption of the State of Alaska's proposal to make available for lease the 17 blocks containing critical habitat areas for the beluga whale and northern sea otter listed under the Endangered Species Act (ESA). As outlined earlier in this decision memo, these deferral areas provide additional protection to designated critical habitat areas for these two ESA-listed species. While the State asserts, without support, that there is "uncertainty about the regularity and patterns of use by those animals," the State provides no evidence to indicate that the inclusion of the 17 lease blocks would not undermine protections for the two endangered species. BOEM's analysis in the Final EIS, in addition to the comments from the U.S. Fish and Wildlife Service, National Marine Fisheries Service, and other commenters on the Draft EIS, indicate that exclusion of these 17 lease blocks would benefit these two ESA-protected species. Accordingly, this exclusion constitutes the kind of "environmental safeguard" highlighted in OCSLA's Congressional Declaration of Policy (43 U.S.C. § 1332(3)). While the 17 blocks will not be offered in Cook Inlet Sale 258, the lease sale area will include a total of 193 available blocks (958,202 acres), providing ample opportunity for potential exploration, development, and production of oil and gas resources. BOEM has determined that offering these 193 lease blocks for sale and excluding the 10 blocks that overlap with beluga whale critical habitat and the 7 blocks that overlap with northern sea otter critical habitat provide effective environmental protection while maintaining a reasonable balance between the national interest and the well-being of citizens of Alaska; accordingly, BOEM has determined that the State's recommendation would undermine that balance.

Additionally, BOEM is not recommending adoption of the State of Alaska's recommendations to remove the three lease stipulations for protection of Beluga whales and their nearshore feeding areas and protection of the gillnet fishery. As outlined earlier in this decision memo, although the temporal restrictions imposed by the stipulations will reduce the window of opportunity available to the lessee and operator for conducting on-lease seismic surveys, BOEM has concluded that the restrictions, even if collectively applied, provide sufficient time for lessees, operators, and subcontractors to properly plan and execute on-lease seismic surveys as described herein and analyzed in the Cook Inlet Sale 258 Final EIS. These restrictions, which were analyzed as Alternatives 3C and 5 in the Final EIS, enhance the important national and local interests in the protection of listed beluga whales under the ESA and the safeguarding of the drift gillnet fishery. Accordingly, BOEM has determined that the removal of these lease stipulations

would preclude a reasonable balance between the national interest and the well-being of the citizens of Alaska.

Finally, BOEM is not recommending adoption of the State of Alaska's suggested edit to the Protection of Gillnet Fishery Stipulation. BOEM disagrees with the State of Alaska that the stipulation requires additional clarification, as the stipulation already requires notification to the United Cook Inlet Drift Association of any temporary or permanent structures in place or planned during the drift gillnet fishing season. In previous Cook Inlet lease sales, BOEM adopted the Protection of Fisheries stipulation, which requires the lessee and operator to review planned exploration or development activities with directly affected fishing organizations, subsistence communities, and port authorities. This requirement encompasses plans for on-lease surveys, offshore drilling unit mobilization and location, service vessel routes, and other vessel traffic. BOEM recommends adoption of this stipulation in this lease sale. Accordingly, if both stipulations are adopted as recommended here, the State's proposed revision to the Gillnet Fishery stipulation would not actually alter lessees' obligations under the lease to refrain from erecting permanent structures that could impact future gillnet fishing seasons, and the revision to the stipulation is therefore unnecessary.

Pursuant to section 19 of OCSLA and BOEM's regulations at 30 CFR 556.307(c), BOEM will send a letter to the Governor of Alaska providing the reasons the Department rejected the Governor's recommendations included in the letter dated November 22, 2022, if that is your choice as designated below.

As additional background, the State of Alaska has consistently supported holding OCS lease sales in the Cook Inlet Planning Area. Comments received from Alaska in response to the Cook Inlet Sale 258 Call for Information and Nominations (85 FR 55859, September 10, 2020) strongly encouraged the Department of the Interior (DOI) to hold the Cook Inlet Sale 258 as an areawide sale. The comments noted, "with the increased exploration of State submerged lands in the Cook Inlet, conducting lease sales in the adjacent federal OCS lands in the Cook Inlet would allow interested parties to consider exploratory programs to assess the resource prospectively on both State submerged and adjacent federal OCS lands." On December 6, 2021, the Governor of Alaska wrote to Secretary Haaland expressing Alaska's strong support for holding Cook Inlet Sale 258, citing both onshore and offshore oil and gas leasing activity as critically important to Alaska's continued economic recovery and energy supply.

**Additional Comments on the Proposed Notice of Sale**

In addition to the comment letter on the Proposed NOS submitted by the State of Alaska pursuant to section 19 of OCSLA, BOEM received two additional comment letters on the Proposed NOS — one from a group of four environmental organizations[12] on November 9, 2022 ("NGO letter"), and one from the Center for Biological Diversity on November 22, 2022 ("CBD letter"). The NGO letter recommended: excluding from the sale the 17 lease blocks overlapping with beluga whale and northern sea otter critical habitat; further limiting exploratory drilling, seismic surveys, and other oil and gas-related activities via lease stipulations to protect listed species; developing an additional lease stipulation reiterating BOEM's existing authority to

[12] The signatories to the letter are Natural Resources Defense Council, Cook Inletkeeper, Earthjustice, and Oceana.

regulate OCS activities; setting a higher minimum bonus bid amount; and requiring additional bonding from certain lessees. The CBD letter purports to provide new information concerning climate change and beluga whale populations, and recommends that BOEM adopt additional measures to limit potential development-related activities and exclude all 156 lease blocks located within 10 miles of anadromous streams to protect nearshore beluga feeding areas. After evaluating these comments, BOEM has determined that the letters do not provide significant new circumstances or information relevant to the environmental concerns already considered and bearing on the agency action or its impacts. BOEM, nevertheless, considered these comments and proposals in making its recommendations herein for the Final NOS.

**Coastal Zone Management Consistency Determinations**

Pursuant to the Coastal Zone Management Act (CZMA) and the Coastal Zone Reauthorization Amendments of 1990, all Federal activities, including OCS oil and gas lease sales, must be consistent to the maximum extent practicable with the enforceable policies of an affected State's coastal zone management program pursuant to 16 U.S.C. § 1456(c)(1) and (2). The federally approved Alaska Coastal Management Program expired on June 30, 2011, and the Federal consistency provision no longer applies in Alaska. Consequently, Federal agencies are not required to provide the State of Alaska with CZMA Consistency Determinations pursuant to 15 CFR part 930, subpart C (76 FR 39857, July 7, 2011).

**Government-to-Government Tribal Consultations**

E.O. 13175 established requirements for regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, in order to strengthen United States government-to-government relationships with Indian tribes (including Alaska Native tribes and communities) and reduce the imposition of unfunded mandates upon tribes when developing Federal policies with tribal implications. The order requires the head of each agency to designate an official "with principal responsibility for implementation" of the order.

The DOI has an established Tribal consultation policy. Secretary's Order (S.O.) 3317 updated DOI's policy on consultation with Indian tribes in compliance with E.O. 13175. In summary, S.O. 3317 states that DOI officials must demonstrate a meaningful commitment to consultation "by identifying and involving Tribal representatives early in the planning process," and that consultation aims to create effective collaboration emphasizing "trust, respect, and shared responsibility."

To fulfill its consultation obligations, BOEM has initiated and remains available for government-to-government tribal consultations through letters and follow-up contact with Tribes whose members could be affected by activities related to Cook Inlet Sale 258, including: Native Village of Nanwalek, Native Village of Port Graham, Seldovia Village Tribe, Ninilchik Traditional Council, Kenaitze Indian Tribe (Indian Reorganization Act (IRA)), Salamatof Tribal Council, Knik Tribal Council, Chickaloon Traditional Village Council, Native Village of Tyonek (IRA), Native Village of Eklutna, and the Cook Inlet Tribal Council.

As the result of a separate 2-day Cook Inlet Tribal Information Sharing Session held in November 2021, co-hosted by the Environmental Protection Agency (EPA) and BOEM, the Kenaitze Indian Tribe Traditional Council requested government-to-government consultation

with the BOEM Alaska Regional Office regarding both the Bureau's mission and a closer look and understanding of the proposed Cook Inlet Sale 258. The consultation session was held on Wednesday, December 1, 2021. In addition, outreach was extended and consultation offered to the Tribes located on Kodiak Island, including the Alutiiq Tribe of Old Harbor, Native Village of Afognak, Native Village of Akhiok, Native Village of Karluk, Native Village of Larsen Bay, Native Village of Ouzinkie, Native Village of Port Lions, Sun'aq Tribe of Kodiak, and Tangirnaq Native Village. Six of the nine aforementioned Tribes expressed interest in remaining actively informed of any activities relating to the Cook Inlet Planning Area. BOEM also hosted an Alaska regional tribal update on April 20, 2022, to provide an overview of recent activities and hold a listening session for Tribal members. BOEM answered general questions from Tribal members about the oil and gas leasing and permitting process and discussed the importance of consultation to inform future decision-making associated with lease sales and other agency actions.

**Government-to-Alaska Native Claims Settlement Act (ANCSA) Corporations**

On August 10, 2012, the DOI issued the policy on consultation with ANCSA corporations. In this policy, DOI restated a provision of ANCSA requiring "[t]he Director of the Office of Management and Budget [and all Federal agencies] shall hereafter consult with Alaska Native corporations on the same basis as Indian tribes under E.O. 13175." The policy "distinguishes the Federal relationship to ANCSA corporations from the government-to-government relationship between the Federal Government and federally recognized Indian Tribes... and [states that] this Policy will not diminish in any way that relationship...."

To fulfill its consultation obligations, BOEM has offered and remains available for government-to-ANCSA corporation consultations through letters and follow-up contacts to ANCSA corporations potentially affected by activities related to the proposed Cook Inlet Sale 258, including the village corporations: English Bay Corporation, Port Graham Corporation, Kenai Native Association, Incorporated, Ninilchik Natives Association, Incorporated, Chickaloon-Moose Creek Native Association, Salamatof Native Association, Incorporated, Eklutna, Incorporated, Seldovia Native Association, Incorporated, Tyonek Native Corporation; and regional corporations, including Cook Inlet Region, Incorporated, Koniag, Incorporated, and the ANCSA Regional Association.

**Biological Consultations**

The following paragraphs summarize the biological resources consultations that relate to Cook Inlet Sale 258.

***Endangered Species Act of 1973*:** The Endangered Species Act of 1973 (ESA, 16 U.S.C. §§ 1531 *et seq.*, as amended) concerns the conservation of threatened and endangered plants and animals and the ecosystems on which they depend. Section 7(a)(2) of the ESA requires each Federal agency to ensure that any action that they authorize, fund, or carry out is not likely to jeopardize the continued existence of a listed species or result in the adverse modification of designated critical habitat. The IRA requires that the Department hold Cook Inlet Sale 258 and non-discretionary actions do not normally require ESA consultation. Nevertheless, BOEM is initiating consultations to address post-lease activities. With respect to the post-lease activities that may result from Cook Inlet Sale 258, BOEM is consulting with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (NMFS) (collectively, the "Services") concerning

potential impacts to listed species and their designated critical habitat. For these ESA consultations on impacts from post-lease activities, BOEM specifically requests incremental step section 7 consultations. Regulations at 50 CFR 402.14(k) allow consultation on part of the entire action, as long as that step does not violate section 7(a)(2), there is a reasonable likelihood that the entire action will not violate section 7(a)(2), and the agency continues consultation with respect to the entire action, obtaining a Biological Opinion for each step. Accordingly, BOEM evaluates the early post-lease activities (e.g., seismic surveying and exploration drilling) to ensure that activities under any leases issued will not result in jeopardy to a listed species or cause adverse modification of designated critical habitat. BOEM will complete section 7 consultation with the Services for exploration activities that may result from Cook Inlet Sale 258 and will reinitiate consultation for any proposed development and production activities.

***Essential Fish Habitat (EFH)*:** Pursuant to section 305(b) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. § 1855(b)), Federal agencies are required to consult with NMFS regarding actions that may adversely affect designated Essential Fish Habitat (EFH). BOEM prepared an EFH assessment that identified potential effects to designated EFH from oil and gas exploration activities in the Cook Inlet Sale 258 Area. This assessment was provided to NMFS on January 20, 2022, and NMFS responded on February 24, 2022. BOEM reviewed and responded to NMFS' recommendations prior to releasing the Final EIS.

### Compliance with National Historic Preservation Act (NHPA), Section 106

Section 106 of the National Historic Preservation Act (NHPA) (54 U.S.C. § 306108) and regulations at 36 CFR part 800 require Federal agencies to take into consideration the effects of their undertakings on historic properties and afford the Advisory Council on Historic Preservation an opportunity to comment.

Consultation under section 106 would include the Alaska State Historic Preservation Officer (SHPO), as well as Tribes and other interested parties. In a letter dated September 23, 2020, BOEM informed the SHPO of its intent to develop an EIS analyzing the effects of a potential lease sale in Cook Inlet. In the letter, BOEM recognized that the proposed administrative action of offering a lease sale is not the type of activity that has the potential to cause effects on historic properties, and thus would not require formal consultation under section 106 of the NHPA per 36 CFR 800.3(a)(1). The SHPO provided a response to BOEM on November 16, 2021, that acknowledged a formal consultation with their office under section 106 was not necessary for this lease sale. BOEM will consult with the SHPO and other interested parties on subsequent project- and site-specific activities if they are a type of activity that has the potential to cause effects on historic properties. No current exploration, development, or production plans are under review or would be authorized as part of the lease sale.

## IV. POTENTIAL ENVIRONMENTAL EFFECTS OF COOK INLET SALE 258 ACTIVITIES

### Analyses related to the National Environmental Policy Act (NEPA, 42 U.S.C. §§ 4321-4370)

On September 10, 2020, BOEM published in the *Federal Register* a Notice of Intent (NOI) to Prepare an Environmental Impact Statement (EIS) for the proposed Cook Inlet Sale 258 (85 FR 55861). A 30-day scoping period was provided for in the NOI; the scoping period closed on

October 13, 2020. BOEM solicited comments from Federal, State, and local government agencies; tribes; ANCSA corporations; interest groups; industry; businesses; and the general public.

On January 15, 2021, BOEM published in the *Federal Register* the Notice of Availability (NOA) of the Cook Inlet Sale 258 Draft EIS (86 FR 4117). On February 4, 2021, BOEM canceled the public comment period and virtual public hearings in response to E.O. 14008 and subsequently published the notice of the cancellation in the *Federal Register* on February 23, 2021 (86 FR 10994). On October 29, 2021, BOEM published the updated Cook Inlet Sale 258 Draft EIS in the *Federal Register* (86 FR 60068), which initiated a 45-day public comment period that closed on December 13, 2021. All comments relevant to the Cook Inlet Sale 258 Draft EIS were considered and addressed in the Final EIS. While the IRA requires that the Department hold Cook Inlet Sale 258 by December 31, 2022, BOEM followed its normal leasing process to the fullest extent practicable and published the Final EIS on October 28, 2022 (87 FR 65247), even though non-discretionary actions do not normally require NEPA analysis.

The Cook Inlet Sale 258 Final EIS details the potential impacts associated with the proposed Cook Inlet lease sale. A copy of the Cook Inlet Sale 258 Final EIS Executive Summary is attached for reference.

## DECISION ACTION

Pursuant to my authority to exercise the delegable functions and duties of the Assistant Secretary for Land and Minerals Management, I have reached the following decision:

X I concur with these recommendations. Please continue with preparations for Cook Inlet Sale 258.

_____ I have made edits and/or included attachments to indicate changes. Otherwise, I concur with the remainder of the recommendations; please continue with preparations for Cook Inlet Sale 258.

_____ Please stop preparations for Cook Inlet Sale 258.

This decision rescinds and replaces the Decision Memorandum for this sale of November 21, 2022, which did not consider timely comments on the proposed sale received after that date.

LAURA DANIEL-DAVIS

Digitally signed by LAURA DANIEL-DAVIS
Date: 2022.11.26 20:15:26 -05'00'

Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Minerals Management

Date