Erik Grafe
Carole Holley
Hannah M. Payne
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: egrafe@earthjustice.org
E: cholley@earthjustice.org
E: hpayne@earthjustice.org

*Attorneys for Plaintiffs Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, and Kachemak Bay Conservation Society.*

Kristen Monsell (*pro hac vice)*
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway St. #800
Oakland, CA 94612
T: 510.844.7100
E: kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity.*

Julia Forgie (*pro hac vice)*
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second Street
Santa Monica, CA 90401
T: 310.434.2300
E: jforgie@nrdc.org

Irene Gutierrez (*pro hac vice)*
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st floor
San Francisco, CA 94104
T: 415.875.6100
E: igutierrez@nrdc.org

Thomas Zimpleman (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6244
E: tzimpleman@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

COOK INLETKEEPER *et al.*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF THE INTERIOR *et al.*,

*Defendants,*

and

STATE OF ALASKA

*Intervenor-Defendant.*

Case No. 3:22-cv-00279-SLG

**PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1)**

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................ 2

I. Statutory Background ........................................................................................ 2

A. National Environmental Policy Act ........................................................................................ 2

B. Outer Continental Shelf Lands Act ........................................................................................ 3

II. Factual Background ........................................................................................ 4

A. Cook Inlet and impacts of oil and gas leasing ........................................................................................ 4

1. Cook Inlet beluga whale ........................................................................................ 5

2. Oil spills ........................................................................................ 6

B. Oil and gas production and climate change ........................................................................................ 7

C. Lease Sale 258 and NEPA process ........................................................................................ 8

1. NEPA review and lease sale cancellation ........................................................................................ 8

2. The Inflation Reduction Act's reinstatement of Lease Sale 258 ........................................................................................ 10

3. Final EIS and Lease Sale 258 outcome ........................................................................................ 10

STANDING ........................................................................................ 11

STANDARD OF REVIEW ........................................................................................ 12

ARGUMENT ........................................................................................ 13

I. The Bureau failed to consider a reasonable range of alternatives. ........................................................................................ 13

II. The Bureau failed to take a hard look at Lease Sale 258's impacts on the critically endangered Cook Inlet beluga whale. ........................................................................................ 20

A. The Bureau arbitrarily discounted the impacts of vessel noise pollution from Lease Sale 258 on belugas. ........................................................................................ 21

B. The Bureau's cumulative impact analysis ignores scientific information regarding threats to the Cook Inlet beluga whale.................... 26

C. The Bureau failed to take a hard look at the impacts of oil spills from Lease Sale 258 on the Cook Inlet beluga whale.......................................... 30

III. Vacatur is the appropriate remedy here................................................................ 33

CONCLUSION ........................................................................................................... 36

## TABLE OF AUTHORITIES

## CASES

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) ........ 20

*Alaska Wilderness League v. Kempthorne*,
548 F.3d 815 (9th Cir. 2008) ........ 26

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ........ 34

*Bark v. U.S. Forest Serv.*,
958 F.3d 865 (9th Cir. 2020) ........ 25, 26, 28, 33

*California v. BLM*,
277 F.Supp.3d 1106 (N.D. Cal. 2017) ........ 34

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001) ........ 12

*Cook Inletkeeper v. Raimondo*,
533 F.Supp.3d 739 (D. Alaska 2021) ........ 25

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
623 F.3d 633 (9th Cir. 2010) ........ 14

*DHX, Inc. v. Allianz AGF MAT, Ltd.*,
425 F.3d 1169 (9th Cir. 2005) ........ 26

*Earth Island Inst. v. U.S. Forest Serv.*,
442 F.3d 1147 (9th Cir. 2006) ........ 33

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ........ 33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 11

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ........ 14

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 11

*Louisiana v. Biden*,
543 F.Supp.3d 388 (W.D. La. 2021) .......... 9

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 12, 22, 24, 26

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) .......... 3, 16

*Nat. Res. Def. Council v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .......... 30

*Nat'l Family Farm Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020) .......... 34, 35

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) .......... 13, 25

*Native Vill. of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) .......... 21

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
947 F.Supp.2d 1031 (D. Alaska 2013) .......... 12

*New York v. Nuclear Regul. Comm'n*,
681 F.3d 471 (D.C. Cir. 2012) .......... 33

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) .......... 13

*Or. Envtl. Council v. Kunzman*,
817 F.2d 484 (9th Cir. 1987) .......... 33

*Or. Nat. Res. Council Fund v. Goodman*,
505 F.3d 884 (9th Cir. 2007) .......... 21, 33

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 34

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 13

*Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050 (9th Cir. 2011) ..... 14, 20

*Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152 (10th Cir. 2002) ..... 30

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ..... 16

**STATUTES**

5 U.S.C. § 704 ..... 12

5 U.S.C. § 706 ..... 12, 34

42 U.S.C. § 4321 *et seq.* ..... 2, 3

42 U.S.C. § 4331(a) ..... 3

42 U.S.C. § 4332(b) ..... 3

42 U.S.C. § 4332(2)(C) ..... 3, 13, 19

42 U.S.C. § 4332(2)(E) ..... 13, 20

43 U.S.C. § 1331 *et seq.* ..... 3

43 U.S.C. § 1332(3) ..... 4

43 U.S.C. § 1334(a) ..... 3

43 U.S.C. § 1337 ..... 4

43 U.S.C. § 1340 ..... 4

43 U.S.C. § 1344 ..... 3, 4, 18

43 U.S.C. § 1351 ..... 4

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ..... 10

## REGULATIONS

30 C.F.R. § 550.101 .... 3

30 C.F.R. § 550.105 .... 4

30 C.F.R. § 550.207 .... 4

30 C.F.R. § 550.208 .... 4

30 C.F.R. § 550.209 .... 4

40 C.F.R. § 1500.1 (2019) .... 2

40 C.F.R. § 1500.1(b) .... 3, 20

40 C.F.R. § 1500.2(e) .... 14, 20

40 C.F.R. §1500.3(a) .... 3

40 C.F.R. § 1502.14 .... 3, 13, 20

40 C.F.R. § 1502.20 .... 4

40 C.F.R. § 1502.22(b)(4) .... 31

40 C.F.R. § 1502.24 .... 3, 22

40 C.F.R. § 1508.25(c) .... 3

## FEDERAL REGISTER NOTICES

76 Fed. Reg. 20,180 (Apr. 11, 2011) .... 22, 28, 29

81 Fed. Reg. 84,612 (Nov. 23, 2016) .... 8

85 Fed. Reg. 55,861 (Sept. 10, 2020) .... 8

86 Fed. Reg. 4117 (Jan. 15, 2021) .... 8

86 Fed. Reg. 7619 (Jan. 27, 2021) .... 8

86 Fed. Reg. 10,994 (Feb. 23, 2021) .... 9

86 Fed. Reg. 60,068 (Oct. 29, 2021) ........................................................................ 2, 9

87 Fed. Reg. 58,130 (Sept. 23, 2022)........................................................................ 10

87 Fed. Reg. 65,247 (Oct. 28, 2022) ........................................................................ 10

## INTRODUCTION

In December 2022, the Bureau of Ocean Energy Management (Bureau) held Lease Sale 258, offering nearly one million acres of the biologically rich federal waters of Cook Inlet for oil and gas development. The Bureau estimated that the sale could lead to the production of nearly 200 million barrels of oil and over 300 billion cubic feet of natural gas. That production would result in greenhouse gas pollution that exacerbates the climate crisis, at a time when the country needs to dramatically *cut back* its emissions. The sale also offered for lease an important feeding area for the critically endangered Cook Inlet beluga whale. Nevertheless, the Bureau went forward with Lease Sale 258 without properly considering its environmental harm or evaluating alternatives that would pose less harm.

The Bureau's environmental review of Lease Sale 258 fell far short of its obligations under the National Environmental Policy Act (NEPA). In its Final Environmental Impact Statement (EIS), the Bureau considered only alternatives that would result in nearly identical oil production and environmental impacts. In doing so, the Bureau failed to meaningfully consider a reasonable range of alternatives and arbitrarily rejected other reasonable alternatives that could have reduced the sale's impacts. Although the Inflation Reduction Act of 2022 (IRA) directed the Bureau to hold a lease sale of some kind, it did not permit the Bureau to arbitrarily reject less harmful alternatives. Additionally, the Bureau failed to take a hard look at the sale's impacts on the Cook Inlet beluga whale population, which already faces serious threats from oil and

gas exploration, development, and production activities.

The oil industry ultimately showed little interest in Lease Sale 258—only Hilcorp Alaska, LLC (Hilcorp) bid and received a lease for one block within the sale area. But that lackluster industry response does not excuse the Bureau's failure to comply with NEPA. The block that Hilcorp leased is in the feeding territory of the Cook Inlet beluga whale. Had the Bureau properly analyzed the sale's impacts, it may have offered a smaller area for lease that did not include beluga feeding territory or raise as many other risks to these endangered whales and the environment. Plaintiffs therefore ask this Court to vacate the lease sale, issued lease, record of decision (ROD), and Final EIS for Lease Sale 258, and remand the ROD and Final EIS to the agency to fully analyze the environmental impacts.

## BACKGROUND

### I. Statutory Background

#### A. National Environmental Policy Act

NEPA is this country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (2019);[1] *see* 42 U.S.C. § 4321 *et seq*. Its purposes include "promo[ting] efforts which will prevent or eliminate damage to the environment," 42

---

[1] The Bureau noted in its notice of availability of the Draft EIS for Lease Sale 258 that "[b]ecause the NEPA process for this action began prior to September 14, 2020, the D[raft] EIS was prepared in conformance with the NEPA regulations in effect immediately prior to September 14, 2020." 86 Fed. Reg. 60,068, 60,068 n.1 (Oct. 29, 2021); *see also* AR020930. Unless otherwise noted, this brief only references the NEPA regulations in effect prior to September 14, 2020.

U.S.C. § 4321, and ensuring that federal agencies consider the environment when making decisions, *see id.* § 4331(a)-(b). The Council on Environmental Quality has promulgated regulations implementing NEPA, which are "binding on all Federal agencies." 40 C.F.R. §1500.3(a).

NEPA requires federal agencies to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This EIS must analyze the direct, indirect, and cumulative effects of the proposed action, 40 C.F.R. § 1508.25(c), using high-quality, accurate scientific information. *Id.* §§ 1500.1(b), 1502.24. NEPA requires agencies to "take a 'hard look' at the environmental consequences of their actions," *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (per curiam) (citation omitted), and "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action, 40 C.F.R. § 1502.14(a).

**B. Outer Continental Shelf Lands Act**

The Outer Continental Shelf Lands Act (OCSLA) governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. *See* 43 U.S.C. § 1331 *et seq.*

The Secretary of the Interior manages oil and gas activities on the Outer Continental Shelf. *Id.* §§ 1334(a), 1344(a).[2] This management "shall be conducted in a

[2] The Secretary has delegated authority to the Bureau to manage oil and gas leasing, exploration, development, and production. 30 C.F.R. § 550.101.

manner which considers economic, social, and environmental values of the . . . [O]uter Continental Shelf," and "the potential impact of oil and gas exploration on . . . the marine, coastal, and human environments." *Id.* § 1344(a)(1). OCSLA also requires that oil and gas activity on the Outer Continental Shelf be "subject to environmental safeguards." *Id.* § 1332(3).

OCSLA prescribes four tiered stages for the development of offshore oil and gas deposits: (1) five-year leasing programs, *id.* § 1344; (2) lease sales, *id.* § 1337; (3) exploration plans, *id.* § 1340; and (4) development and production plans, *id.* § 1351. NEPA applies at each stage, although the Secretary may "tier" later analyses to earlier reviews. *See* 40 C.F.R. § 1502.20.

At the lease sale stage, the Secretary identifies blocks within the five-year leasing program's designated planning areas in which to offer leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. 43 U.S.C. § 1337(b)(4). Once a lease is issued, a lessee may conduct geological and geophysical exploration, such as seismic surveys, without further approval under OCSLA. 30 C.F.R. §§ 550.105, 550.207-.209.

## II. Factual Background

### A. Cook Inlet and impacts of oil and gas leasing

Cook Inlet, a biologically rich tidal estuary bounded by the Kenai Peninsula, underpins the ecology, culture, and economy of southcentral Alaska. The inlet hosts unique wildlife and provides crucial habitat for species protected under the Endangered

Species Act (ESA), like the Cook Inlet beluga whale. AR021045. Cook Inlet is a central pillar of subsistence and culture for many Alaska Native communities. AR021073. The inlet also supports tourism, recreation, and sport fishing, AR021066-67, by providing habitat for fish and opportunities for viewing wildlife and stunning scenery.

**1. Cook Inlet beluga whale**

The critically endangered Cook Inlet beluga whale plays a vital role in the regional ecosystem, culture, and economy. AR001896; AR002102. Yet Cook Inlet beluga whales are struggling to survive. Scientists estimated in 2020 that only 279 individuals remained, and that the species had been losing roughly two percent of its population each year. AR021045. The whale's small population size, lack of genetic diversity, and geographic isolation to the waters of Cook Inlet "mak[e] them particularly vulnerable to anthropogenic impacts." AR045708; *see also* AR131998 (noting "belugas in Cook Inlet do not migrate out of Cook Inlet"). The beluga's dire status has led the National Marine Fisheries Service (NMFS) to assign the species a "recovery priority #1," meaning that its extinction is "almost certain in the immediate future" absent intervention to facilitate recovery. AR131952-53; *see also* AR068832 (NMFS concluding that "it is likely the Cook Inlet beluga population will continue to decline or go extinct unless factors determining its growth and survival are ameliorated"). NMFS considers oil spills, noise pollution, and the cumulative effects of multiple stressors as the threats of highest relative concern to the species. AR068782.

### 2. Oil spills

An oil spill could have devastating impacts on Cook Inlet and its wildlife and local communities. Oil exposure harms marine wildlife in myriad ways. Direct exposure to oil can sicken or kill animals. AR021165; AR021174-75. Oil contamination can also reduce prey availability and impact reproduction and immune response. AR021165; AR021174-75. Further, oil spills harm wildlife by degrading marine and coastal habitat. The Bureau estimated, for example, that a large oil spill of 3,800 barrels in Cook Inlet would oil 26 to 35 kilometers of coastline depending on the season. AR021161. An oil spill may also cause significant harm to the communities of Cook Inlet by diminishing tourism and the local economy. AR021190, AR021193.

Southcentral Alaska is no stranger to oil spills. In 1989, the *Exxon Valdez* oil tanker ran aground and spilled 11 million gallons of oil in Prince William Sound. AR102100. The *Exxon Valdez* spill devastated marine wildlife, killing nearly 4,000 sea otters statewide. AR122713. The spill also harmed commercially important fish species in Prince William Sound, increasing mortality in pink salmon for several years after the spill and contributing to the collapse of the Prince William Sound herring fishery. AR002406; AR102100. Economic impacts to commercial fishing in 1989 and 1990 totaled nearly $155 million. AR102100. Likewise, the spill had a severe impact on local subsistence communities by cutting off access to food, and cultural and spiritual resources. AR102101-02, AR102104.

### B. Oil and gas production and climate change

Lease Sale 258 coincides with an increasingly urgent global climate crisis. Producing and consuming fossil fuels emits greenhouse gases that are causing climate change and widespread and intensifying harms. *See* AR140626. In the 2017 Fourth National Climate Assessment, the federal government concluded that evidence for human-caused climate change is "overwhelming," that the impacts of climate change will continue to intensify, and that threats to Americans' social, physical, and economic well-being from climate change are rising. AR129879.

Cook Inlet and the rest of Alaska are already experiencing severe impacts from climate change. AR126344-45. Alaska is warming faster than any other U.S. state, AR131033, and is experiencing more extreme weather events, such as record-setting warmth during the 2015-2016 cold season, AR139340, changes in rain patterns, and the melting of sea ice and permafrost. In parts of the state, decreasing seasonal sea ice is likely causing stronger fall storms and increased flooding and erosion. AR123455. These effects are expected to worsen as time goes on. AR126344. Climatic shifts and extreme weather events in Alaska are already having profound effects on the economy and local communities. In 2020, fisheries managers took the unprecedented step of closing the federal Pacific cod fishery in Lower Cook Inlet/Gulf of Alaska, citing low stock numbers from climate change. AR123782. Impacts to wildlife are expected to become only more severe. For instance, scientists predict that warming water temperatures in Cook Inlet could deplete the prey species and harm the health and

reproduction rates of the critically endangered Cook Inlet beluga whale. AR132253.

In 2018, the Intergovernmental Panel on Climate Change demonstrated that an average global temperature increase of 2°C would result in catastrophic environmental damage and that many harms can be lessened by holding the increase to 1.5°C. AR125448-52. As a signatory to the international Paris Agreement, the United States has committed to holding global average temperature increases to "well below" 2°C and "pursu[ing] efforts" to hold increases to 1.5°C. AR133679. New oil and gas leasing is inconsistent with meeting Paris Agreement goals and averting the worst impacts of climate change. A 2021 United Nations report found that countries must steadily *decrease* annual production rates of fossil fuels from 2020 to 2030 to meet emissions cuts consistent with the 1.5°C pathway. AR134080.

### C. Lease Sale 258 and NEPA process

#### 1. NEPA review and lease sale cancellation

In November 2016, the Bureau announced its final 2017-2022 National Outer Continental Shelf Oil and Gas Leasing Program ("2017-2022 Program"), which included a lease sale in Cook Inlet. *See* 81 Fed. Reg. 84,612 (Nov. 23, 2016).

In September 2020, the Bureau announced its intent to prepare an EIS for Lease Sale 258. 85 Fed. Reg. 55,861 (Sept. 10, 2020). The Bureau issued a draft EIS in January 2021. 86 Fed. Reg. 4117 (Jan. 15, 2021). However, in February 2021, after President Biden issued Executive Order 14,008 directing a pause on new oil and gas leasing on public offshore waters, 86 Fed. Reg. 7619 (Jan. 27, 2021), the Bureau ended

the public review period and postponed further environmental review for Lease Sale 258. 86 Fed. Reg. 10,994 (Feb. 23, 2021).

Following *Louisiana v. Biden*, 543 F.Supp.3d 388 (W.D. La. 2021), in which the court preliminarily enjoined the Administration's leasing pause, the Bureau issued a new Draft EIS for Lease Sale 258 in October 2021, 86 Fed. Reg. 60,068. The Draft EIS's preferred alternative would offer for lease over one million acres in Cook Inlet federal waters. The Draft EIS examined seven alternatives, three of which provided small variations on the area offered for lease to protect ESA-listed species, in addition to various area-based mitigation measures for the Cook Inlet beluga whale, sea otters, and the Cook Inlet gillnet fishery. AR042716-21. The Draft EIS presumed the same amount of oil and gas activity under all alternatives except the no-action alternative. AR042742.

Plaintiffs and many others submitted detailed comments identifying flaws in the Draft EIS, including the Bureau's failure to fully analyze the sale's impacts to protected species or its contributions to climate change. AR017619; AR017643-56. Plaintiffs also highlighted shortcomings in the alternatives analysis and urged the Bureau to consider alternatives that would provide greater protection to the environment and reduce impacts to the critically endangered Cook Inlet beluga whale. AR017691-96; AR018438; AR018445; AR019019.

In May 2022, the Bureau canceled Lease Sale 258, citing a lack of industry interest in the area. AR020799. The 2017-2022 Program expired on June 30, 2022.

### 2. The Inflation Reduction Act's reinstatement of Lease Sale 258

On August 16, 2022, President Biden signed the IRA. Pub. L. No. 117-169, 136 Stat. 1818 (2022). The IRA invests in clean energy, cuts greenhouse gas emissions, and reduces the national deficit to curb inflation. *See, e.g.*, *id.* §§ 10101, 13701, 60103. However, it also mandated that the Bureau "conduct Lease Sale 258" in accordance with the ROD for the 2017-2022 Program and no later than December 31, 2022. *Id.* § 50264(c). The IRA did not dictate the size or location of Lease Sale 258 or provide any other conditions regarding how to conduct the sale.

### 3. Final EIS and Lease Sale 258 outcome

Following the IRA's directive, the Bureau published a Proposed Notice of Sale for Lease Sale 258 on September 23, 2022, 87 Fed. Reg. 58,130, and released a list of proposed lease stipulations it might apply to the sale, AR020871.

On October 22, 2022, the Bureau issued its Final EIS. 87 Fed. Reg. 65,247 (Oct. 28, 2022). The Final EIS developed a new alternative, designated as the "Preferred Alternative," that combined the critical habitat exclusions for beluga whales and northern sea otters with seasonal seismic surveying limitations and other mitigation intended to help protect these species. AR020952-56. Under its Preferred Alternative, the Bureau would offer nearly one million acres for leasing in the sale. AR020952. The Bureau estimated that Lease Sale 258 could lead to the production of 192.3 million barrels of oil and 301.9 billion cubic feet of natural gas. AR020980.

The Final EIS concluded that impacts from oil and gas activities on marine

mammals, including the critically endangered Cook Inlet beluga whale, would be "negligible to minor." AR021054. And, aside from its Preferred Alternative, the Final EIS did not expand the range of examined alternatives or explain or alter the presumption that all action alternatives would involve the same amount of oil and gas production. AR021255-57; AR020979.

On November 26, 2022, Defendants released the ROD for Lease Sale 258. In the ROD, the Bureau adopted the Preferred Alternative, comprising a sale area of nearly one million acres but excluding certain blocks containing Cook Inlet beluga whale and northern sea otter critical habitat. AR021776. The ROD also adopted fishery mitigation measures. AR021776-78.

**STANDING**

Plaintiffs have standing. Plaintiffs are member-based non-profit organizations committed to protecting the Cook Inlet region. *See* Ex. 1, ¶¶ 4-15; Ex. 2, ¶¶ 4-6; Ex. 3, ¶¶ 3-5, 9-11, 13; Ex. 4, ¶¶ 5-8; Ex. 7, ¶¶ 3-9. Plaintiffs bring this lawsuit on behalf of their members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Members of the Plaintiff organizations recreate in Cook Inlet and enjoy viewing Cook Inlet wildlife like belugas, sandhill cranes, bald eagles, and other birds, and injuries to these recreational interests support their standing to sue. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-84 (2000); Ex. 1, ¶¶ 16-17; Ex. 2, ¶¶ 7-9; Ex. 3, ¶¶ 6-15; Ex. 4, ¶¶ 7-10; Ex. 5, ¶¶ 4-8; Ex. 6, ¶¶ 4-7. In addition to viewing wildlife, some of Plaintiffs' members enjoy recreational fishing in the inlet. *See* Ex. 2, ¶

7; Ex. 3, ¶ 15; Ex. 4, ¶ 10; Ex. 6, ¶ 7.

The Bureau's decision to hold Lease Sale 258 in violation of NEPA harms Plaintiffs' members' recreational, aesthetic, and commercial interests in Cook Inlet. The sale will increase threats like noise pollution and oil spill risks to belugas and other marine mammals that Plaintiffs' members enjoy viewing, will cause more vessel traffic that disturbs members' fishing interests, and will result in more infrastructure that will impair members' views and could harm their commercial tourism interests. *See* Ex. 1, ¶¶ 16-17; Ex. 2, ¶¶ 7-9; Ex. 3, ¶¶ 12-15; Ex. 4, ¶¶ 9-10; Ex. 5, ¶¶ 9-11; Ex. 6, ¶¶ 5-10; *see also Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F.Supp.2d 1031, 1048 (D. Alaska 2013) (finding aesthetic and recreational interests in Cook Inlet sufficient to support standing). An order vacating and remanding the ROD and Final EIS, and vacating the lease sale and the issued lease would redress these harms. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001).

## STANDARD OF REVIEW

Plaintiffs' NEPA claims are governed by the Administrative Procedure Act's standard of review. *See* 5 U.S.C. §§ 704, 706. Accordingly, the Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

(citation omitted). In reviewing an agency's decision, the Court must "engage in a substantial inquiry," consisting of "a thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation omitted). It cannot "'rubber-stamp' . . . administrative decisions . . . inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (first alteration in the original, citation omitted).

## ARGUMENT

### I. The Bureau failed to consider a reasonable range of alternatives

The Bureau violated NEPA by failing to consider a reasonable range of alternatives in its Final EIS. The agency analyzed a set of nearly identical action alternatives and arbitrarily rejected other reasonable alternatives that would have reduced the sale's environmental impacts.

NEPA requires agencies to study a reasonable range of alternatives to their proposed actions. 42 U.S.C. § 4332(2)(C)(iii), (2)(E); *see also* 40 C.F.R. § 1502.14. An agency's consideration of alternatives serves NEPA's goals "in two important respects" by fostering (1) informed decisionmaking by the agency and (2) informed participation by the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (citations omitted). In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives . . . ." 40 C.F.R. § 1502.14(a). These must, to the "fullest extent possible," include "reasonable alternatives to proposed actions that will

avoid or minimize adverse effects of these actions upon the quality of the human environment." *Id.* § 1500.2(e). Alternatives must be "varied enough to allow for a real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008) (citation omitted). The Ninth Circuit has "repeatedly recognized that if the agency fails to consider a viable or reasonable alternative, the EIS is inadequate." *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056 (9th Cir. 2011) (citations omitted); *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) ("The existence of reasonable but unexamined alternatives renders an EIS inadequate." (citation omitted)).

The Bureau analyzed seven action alternatives, three of which included small reductions in the lease sale area. AR020931-32. Between those three, the agency considered excluding just 17 of the 210 blocks (58,715 out of 1,016,917 acres) available under the Proposed Action—or approximately six percent of the available planning area. *See* AR021756-57.[3] The alternatives also considered limited mitigation measures: seasonal seismic survey and exploration drilling limitations, and a 14-block prohibition on drilling discharge and seafloor-disturbing activities. *See* AR020931-32. In assessing the alternatives, the Bureau concluded that there would be no difference in impacts

[3] At AR021756, the Bureau noted that the excluded blocks comprise approximately 29,350 acres (10 blocks) and 29,365 acres (7 blocks): 29,350 + 29,365 = 58,715 acres. At AR021757, the total area available under the preferred alternative is stated as 958,202 acres. The total area available before excluding the blocks is therefore 58,715 + 958,202 = 1,016,917 acres. And 58,715/1,016,917 = .0577, meaning that 58,715 acres is ~5.8 percent of the 1,016,917 acres available for leasing under the governing five-year plan.

between action alternatives, except for "slight[]" variations of effects on commercial fishing, in part because "all action alternatives are presumed to entail the same amount of oil and gas activity." AR020961-62; AR020934-35; AR021256. The Bureau also rejected alternatives that had been suggested during Lease Sale 244, such as the Northern Area Exclusion, AR040236, which would have excluded from leasing "all whole or partial O[uter] C[ontinental] S[helf] blocks north of Anchor Point," thus decreasing the lease sale area by 46 percent. AR020958.

The U.S. Environmental Protection Agency expressed concern about the similarity of impacts across alternatives. AR018437. Plaintiffs and others also shared concerns about the limited alternatives analysis and suggested that the Bureau consider alternatives that would reduce the sale's impacts and/or size. AR017691-96. For example, Plaintiffs urged the Bureau to look at "an alternative that would include year-round restrictions on all seismic surveys and exploratory drilling operations north of Anchor Point," AR017695, and "an alternative that would limit the scope of development activities," AR017692. Plaintiffs also specifically requested that the Bureau explore "leasing a smaller amount of acreage and thus reduc[ing] the overall harmful environmental impacts" of the sale. AR017694.[4]

---

[4] *See also, e.g.*, AR007385 (the Bureau's Draft EIS "did not consider or eliminated from detailed analysis other alternatives . . . . [the Bureau] should have considered alternatives that would reduce the affected area and/or the amount of oil and gas activity, such as by limiting the lease sale to a substantially smaller area, or by limiting the number of wells that could be drilled.").

Despite these recommendations, the Bureau refused to consider those alternatives or otherwise meaningfully widen its alternatives analysis. Instead, as noted above, the Bureau considered only alternatives that offered 94 to 100 percent of the Proposed Action area. For those alternatives, the only mitigation measures that covered more than a small handful of blocks were seasonal limitations. Because they were so similar, the alternatives led to identical impact levels in 12 of 13 categories, with a slight reduction in only one category. The Bureau also presumed, without justification or explanation, that the alternatives would enable identical levels of oil and gas development. But in doing so, the Bureau considered only action alternatives that essentially "authorize[d] the same underlying action" and thus presented "no meaningful difference" for consideration by the agency and the public. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013); *see also Muckleshoot Indian Tribe,* 177 F.3d at 813. It would have been "reasonable to analyze in detail the environmental impacts of an alternative that authorized something less" than the full scope of activity under the Proposed Action. *W. Watersheds Project*, 719 F.3d at 1052; *see id.* 1051-54 (rejecting a site-specific Environmental Assessment of a grazing plan because it failed to consider authorizing a lower level of grazing under any alternative). By failing to consider any reasonable alternative that meaningfully limited the leasing area and/or scope of development, the Bureau violated NEPA.

Indeed, the Bureau had available reasonable alternatives that would have meaningfully limited the leasing area or scope of development. But it arbitrarily rejected

those alternatives because it determined they would somehow violate the lease sale's purpose and need, OCLSA, and the 2017-2022 Program by "overly" or "unduly" restricting oil and gas development. *See* AR021248 (responding to calls to better protect belugas by stating that "[a]lternatives . . . which would overly restrict oil and gas [activity] in Lease Sale 258 (Alternative 2, No Action) would not meet the purpose and need of the Proposed Action as directed under OCSLA and the 2017-2022 . . . Program"); *see also* AR020958; AR021250; AR021255. Other than by rejecting proffered alternatives, the Bureau did not clarify at what point an alternative becomes "overly restrict[ive]" of oil and gas activity. It simply continued to claim that it was legally unable to select such alternatives. However, the Bureau's three "limiting" sources do not impose such restrictions.

The Bureau claimed that the sale's purpose and need prevented it from examining a wider range of alternatives, including the Northern Area Exclusion, "because of the large percentage of the lease sale area that would be excluded." AR020958.[5] But the lease sale's purpose and need statement contains nothing limiting the Bureau's ability to

---

[5] Tellingly, the Bureau dropped the two additional reasons it provided for rejecting the Northern Area Exclusion alternative for Lease Sale 244. *See* AR20958; AR040236. It no longer argues that the Northern Area Exclusion would not meet the lease sale's purpose and need "due to the relatively high industry interest in this area," as that is no longer true. *See* AR040236. It also dropped the justification that the goals of the alternative were "addressed" by other considered stipulations and actions, *id.*, acknowledging, as it had to, that the goals of the alternative were only "partially addressed" by the other analyzed scenarios, AR020958.

analyze an alternative like the Northern Area Exclusion. *See* AR020930. Consistent with the purpose and need, the Northern Area Exclusion would "offer for lease certain O[uter] C[ontinental] S[helf] blocks" in Cook Inlet federal waters with potentially recoverable oil and gas, AR020930—approximately 100 such blocks, in the area which has thus far drawn the most federal leasing activity, *see* AR020958; AR021787 (showing that 11 of the current 14 federal leases are south of Anchor Point). It would thus "support development of domestic energy resources" in a more environmentally responsible way than the proposed action. AR020930.[6] The sale's purpose and need does not mandate the exclusion of alternatives such as the Northern Area Exclusion.

Further, the incorporation of OCSLA into the purpose and need statement does nothing to strengthen the Bureau's conclusion that it cannot consider more restrictive alternatives. OCSLA does not limit the Bureau's ability, let alone its duty, to consider such alternatives—it instead grants the Bureau wide authority to reduce sale areas, especially in consideration of environmental factors. *See* 43 U.S.C. § 1344(a) (directing the Secretary to consider "relevant environmental and predictive information" in determining the size, timing, and location of leasing activity); *see also* AR020797-802 (recommending and approving cancellation of Lease Sale 258 and noting that the Secretary/delegee "retains substantial discretion regarding individual lease sale

[6] *See* AR21250 (acknowledging that the analyzed alternatives only "partially" provided the protections offered by the Northern Area Exclusion alternative, which could have been more protective of endangered fin whales and endangered humpback whales).

decisions" at the lease sale stage).

To the extent it relies on the 2017-2022 Program to limit its alternatives analysis, the Bureau is again mistaken. In the 2017-2022 Program, the Bureau repeatedly asserted that it would continue to "consider[] reasonable alternative lease sale configurations, reductions, and/or restrictions within [the area identified in the 2017-2022 Program]." AR000978; *see also* AR000997 (the Bureau "will *continue* to use scientific information and stakeholder and partner feedback to proactively determine . . . which *specific* areas offer the greatest resource potential while minimizing potential conflicts . . . *lease sales will be tailored* to offer areas that have significant resource potential while appropriately weighing environmental protection, subsistence use needs, and other considerations." (emphasis added)); AR001036 ("[T]hroughout the implementation of the Five-Year Program, the Secretary has flexibility to re-evaluate the nation's energy needs and current market developments and can reduce or cancel lease offerings.").[7] The 2017-2022 Program did not foreclose the Bureau's ability to undertake a thorough NEPA analysis here.

By hiding behind its imagined limitations, the Bureau considered an unreasonably narrow range of alternatives in violation of NEPA. *See* 42 U.S.C. § 4332(2)(C)(iii),

---

[7] Any reliance on the IRA as limiting the consideration of action alternatives is similarly misplaced. The IRA required the Bureau to hold Lease Sale 258 "in accordance with the [ROD] approved by the Secretary of the Interior on January 17, 2017." AR021783. That 2017 ROD document is the ROD that incorporated and approved the 2017-2022 Program. *See* AR001208.

(2)(E); 40 C.F.R. § 1502.14; 40 C.F.R. § 1500.2(e); *see also Se. Alaska Conservation Council*, 649 F.3d at 1056.

## II. The Bureau failed to take a hard look at Lease Sale 258's impacts on the critically endangered Cook Inlet beluga whale

Oil and gas exploration, development, and production activities represent a serious threat to the Cook Inlet beluga whale. Lease Sale 258 will expand these activities in the inlet, increasing threats to this critically endangered species in the process. Specifically, Lease Sale 258 will increase harmful noise pollution, add to the cumulative stressors already impeding the recovery of belugas, and increase the risk of oil spills. NMFS, the expert agency charged with protecting the Cook Inlet beluga whale, has identified these stressors as the threats of highest concern to belugas. *See* AR068782. Yet the Bureau arbitrarily failed to take a hard look at each of these impacts.

Instead, the Bureau relied on flawed and outdated scientific information—an approach that not only obscures the significant threat that Lease Sale 258 poses to these highly imperiled whales, but also frustrates NEPA's core purposes of ensuring informed agency decisionmaking and public participation. *See, e.g.*, *350 Montana v. Haaland*, 50 F.4th 1254, 1269-70 (9th Cir. 2022) (holding that by providing an "opaque" analysis of an impact of a project that ignored relevant information, the agency "hid the ball and frustrated NEPA's purpose"); *see also* 40 C.F.R. § 1500.1(b) ("accurate scientific analysis . . . [is] essential to implementing NEPA"). Indeed, the Bureau's conclusion that the noise pollution, cumulative impacts, and oil spills caused by Lease Sale 258 will have

only negligible or minor impacts on belugas contradicts the scientific evidence demonstrating the substantial risks each of these stressors poses to the whales.

The Bureau's failure to adequately analyze the primary threats to the Cook Inlet beluga whale from Lease Sale 258 is especially glaring as "[i]t is only at the lease sale stage that the agency can adequately consider cumulative effects" of the sale on this highly imperiled whale. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 504 (9th Cir. 2014). "It is also only at the lease sale stage that the agency can take into account the effects of oil production in deciding which parcels to offer for lease." *Id.* Because it failed to take a "hard look" at the full effects of oil and gas development on belugas, the Bureau's Final EIS is therefore arbitrary and unlawful. *See Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding a NEPA analysis unlawful for failing to take a hard look at the impacts of a project on the Pacific fisher).

### A. The Bureau arbitrarily discounted the impacts of vessel noise pollution from Lease Sale 258 on belugas

Despite recognizing that "[i]ncreases in anthropogenic noise is one of the most potentially impacting effects stemming from [Lease Sale] 258," AR021054, that "[v]essels produce the loudest regularly occurring man-made noises in Cook Inlet," AR021051, and that "[v]essel traffic resulting from [Lease Sale] 258 would increase in Cook Inlet," AR021071, the Bureau failed to take a hard look at the impacts of vessel noise pollution on the Cook Inlet beluga whale—the species most likely to be adversely affected by it. Instead, the agency relied on generalized assertions about vessel noise that

contradict the relevant science regarding its effects on belugas to conclude that noise pollution would have "little to none . . . i.e., negligible to minor" impacts. AR021054. That approach flouts the Bureau's obligation to "insure the professional integrity, including scientific integrity, of [its] discussions and analyses in [its Final EIS]." 40 C.F.R. § 1502.24; *see also State Farm*, 463 U.S. at 43 (agency cannot reach conclusion that "runs counter to the evidence").

The science demonstrates that "[b]eluga whales are known to be among the most adept users of sound of all marine mammals, using sound rather than sight for many important functions, especially in the highly turbid waters of upper Cook Inlet." 76 Fed. Reg. 20,180, 20,203 (Apr. 11, 2011). "Beluga whales use sound to communicate . . . . [and] produce high frequency sounds which they use as a type of sonar for finding and pursuing prey, and likely for navigating through ice-laden waters." *Id.* Human-caused noise above background levels can mask these vital beluga signals, interfere with their feeding, and lead to temporary or permanent hearing loss. *See id.* Due to the importance of quiet areas for the whales' survival and recovery, NMFS designated "[w]aters with in-water noise below levels resulting in the abandonment of critical habitat areas by Cook Inlet beluga whales" as essential to the conservation of this species. *Id.*

The Cook Inlet environment also "enhances the potential for negative effects when anthropogenic sources of noise are introduced into [Cook Inlet] beluga habitat." AR068857. Moreover, in contrast to other marine mammals like gray and humpback whales with expansive ranges, Cook Inlet beluga whales spend their entire lives in the

inlet and are forced to endure all the noise generated in and around these waters. *See* AR132629-30 (scientific study noting concerns from "repeat exposures of animals that display a strong fidelity to a particular habitat" and "cumulative, synergistic, and chronic effects of elevated noise levels"); AR045715 (study finding that "[e]ven if belugas could potentially be displaced towards the western side of [one part of the Inlet] they would still be exposed to substantial ship noise levels"); AR132259 (study noting that "[c]hronic noise may affect developmental, reproductive, or immune functions" of the Cook Inlet beluga whale).

NMFS has concluded that reducing human-caused noise pollution in Cook Inlet is a key priority for stabilizing the beluga's population decline and promoting the species' recovery. AR002764-65; *see also* AR132629 (2015 study noting that "[s]ome animals may have limited abilities to move elsewhere, and their decision to remain in an area may likely reflect tolerance (ie persisting in an important area despite the cost) rather than habituation"). The species' Recovery Plan notes the various harmful effects from noise pollution and concludes that "[i]n the long term, anthropogenic noise may induce chronic effects altering the health of individual [Cook Inlet] belugas, which in turn have consequences at the population level." AR068859. The plan considers "[t]ug boat noise" (caused by propeller cavitation and engines) as the most important anthropogenic noise stressor affecting the species' recovery. AR068857. And it considers "[c]argo/tanker noise" and "[s]mall vessel noise" as the second and third most important noise stressors affecting the species' recovery. *Id.* The agency reached this conclusion based on various

characteristics of these vessels' acoustic footprints, including volume and duration of sound. *Id.*

The available science indicates that "[n]oise from human sources," including vessel traffic, "appears to be increasing" in Cook Inlet. AR132258-59. Moreover, a 2019 study led by a NMFS scientist showed that noise from current vessel activity "exceed[s] behavioral harassment levels on a daily basis in a significant portion of the critical habitat," is "potentially mask[ing] beluga hearing and interfer[ing] with their communication[s]," and has the "potential for the acute masking of beluga communication over a wide temporal and spatial scale within their critical habitat." AR045708; AR045715. The study identifies vessel noise "as the top priority focus for noise mitigation management actions." AR045708; *see also* AR066364 (2020 scientific study noting that "[p]ermanent sources of noise in some areas of [Cook Inlet beluga whale] critical habitat, such as shipping . . . introduce significant noise with the potential for negative effects due to chronic exposure."). Yet vessel noise remains "non-regulated." AR045730.

The Bureau did not consider the findings in these studies, or even address the unique threat that vessel noise pollution poses to the Cook Inlet beluga whale. This is the very definition of a "fail[ure] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, particularly where vessels associated with Lease Sale 258 would traverse through and propagate noise in beluga critical habitat and other areas considered important feeding grounds. *See* AR021038; AR021070 (noting vessels would travel from

Homer, Kenai, or Nikiski).

Instead of taking a hard look at vessel noise, the Final EIS relies on arbitrary assumptions and outdated information. For example, in mentioning the impacts of vessel noise, the Final EIS states that "[t]he response of belugas to vessels is thought to be partly a function of habituation." AR021053. But, as described above, the science demonstrates that belugas are *not* habituated to human-caused noise in Cook Inlet, including vessel noise. Indeed, the science shows that such noise is one of the primary threats to the beluga's recovery. *See, e.g.*, AR068782.

As the Ninth Circuit has made clear, "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council*, 418 F.3d at 964 (citation omitted); *see also Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (rejecting a NEPA analysis that "did not engage with the considerable contrary scientific and expert opinion" in evaluating a project's impacts). That is just what the Bureau has arbitrarily done here.

By relying on inaccurate information, the "EIS did not provide a 'full and fair' discussion of the potential effects of" Lease Sale 258 and "did not 'inform [] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts'" on the Cook Inlet beluga whale. *Native Ecosystems Council,* 418 F.3d at 965 (citations omitted, alterations in original); *see also Cook Inletkeeper v. Raimondo*, 533 F.Supp.3d 739, 767-68 (D. Alaska 2021) (holding NEPA analysis unlawful where it failed to properly address the risk of noise pollution from tugboats on

Cook Inlet beluga whales); *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 825 (9th Cir. 2008) (holding a NEPA document unlawful where it "lack[ed] sufficient analysis on the consequences of underwater noise and its impact on bowheads' migratory routes"), *vacated as moot sub. nom. Alaska Wilderness League v. Salazar*, 571 F.3d 859 (9th Cir. 2009).[8] The Final EIS is thus unlawful.

### B. The Bureau's cumulative impact analysis ignores scientific information regarding threats to the Cook Inlet beluga whale

The Bureau's analysis of the cumulative impacts of Lease Sale 258 is also deficient. A "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Bark*, 958 F.3d at 872 (citation omitted). A proper analysis "must be more than perfunctory" and include "some quantified or detailed information." *Id.* (cleaned up). A cumulative impact analysis that fails to consider "relevant" information is unlawful. *See id.*; *State Farm*, 463 U.S. at 43. Here, the Bureau again obscured the impacts of the sale on the Cook Inlet beluga whale by ignoring key information and reaching conclusions contrary to the available scientific information.

First, the cumulative impacts discussion fails to disclose or analyze the unique

[8] Opinions vacated as moot can still be cited for their persuasive value. *DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005) (Beezer, J., concurring).

threat that the cumulative effects of multiple stressors have on the Cook Inlet beluga whale. Indeed, apart from noting that the beluga population is declining, the Bureau's cumulative impact analysis for marine mammals does not separately mention belugas *at all*. *See* AR021057-60. By lumping belugas together with other marine mammal species in the inlet, the Bureau's analysis fails to disclose how significant the threat of cumulative impacts is to these whales.

NMFS has stated, for example, that "[s]mall populations, such as the [Cook Inlet] beluga population, may face inherent risks that large populations do not, simply as a result of their small population size." AR068829; *see also* AR068847 (noting that "effects of threats on small populations may be greater than on large populations due to [] inherent risks . . . such as loss of genetic or behavioral diversity); AR045708 (scientific study noting species' vulnerability in part due to small population size).

NMFS has also noted that while "individual activities might be deemed insignificant" by themselves, "creeping normality (e.g., death by a thousand cuts) can cause substantial adverse effects to [Cook Inlet] belugas, *at both individual and population levels*." AR068920 (emphasis added); *see also* AR068853 ("Exposure to any given stressor at a sub-lethal level may predispose individual belugas to greater susceptibility to mortality or long-term effects (e.g., reproductive failure) from other stressors."); AR068917 (NMFS stating cumulative impacts are "considered to be a high concern" for the beluga's recovery). By failing to consider the unique threat that cumulative impacts pose to belugas, "there is nothing in the [Final EIS] that could

constitute 'quantified or detailed information' about the cumulative effects of the [Lease Sale]" on these critically endangered whales. *Bark*, 958 F.3d at 873 (citation omitted).

Second, despite recognizing that Lease Sale 258 would cause localized water pollution, AR021015-16, the Bureau's cumulative impact analysis wholly ignores information demonstrating the threat water pollution poses to the Cook Inlet beluga whale. In fact, apart from a passing reference to discharges from oil and gas activity, the Final EIS does not even mention this threat to belugas from sewage discharges, runoff from roads, airports, and agricultural sites, and other sources in the cumulative impacts section on marine mammals. *See* AR021057-60.

Water pollution occurs throughout the Cook Inlet beluga whale's range, "with localized hotspots." AR068869. Both point and non-point sources of pollution can have "either local or widespread effects," depending on various factors including the location, size, and characteristics of the pollutants. *Id.* Cook Inlet beluga whales are predisposed to adverse effects of pollution because of various factors, including their "sensitivity . . . to certain pollutants, trophic position and biomagnifications, . . . and [the fact] that their range includes the most populated and industrialized area of the state." 76 Fed. Reg. at 20,203.

Water pollution is an increasing concern as new studies reveal the harms to the whales from such pollution. For example, studies indicate that Cook Inlet beluga whales can accumulate high levels of contaminants that can have toxic effects and interfere with reproduction and resistance to disease; and that these toxins can be transferred from

mothers to their calves through nursing. *Id.*; AR118383-407; AR140101; *cf.* AR135039-49; AR140701. Additionally, a new study documented congenital defects in two Cook Inlet beluga whales for the first time, which could be due to exposure to pollution. AR140105-11. This and other new information has led scientists to conclude that contaminants should be treated as a more significant threat to the survival and recovery of the Cook Inlet beluga whale than federal officials currently do. AR140701-02; *cf. also* AR068869 (noting that "[t]he amount of pollution entering Cook Inlet is likely increasing . . . a trend that is likely to continue").

Moreover, scientists have stated that "[t]he synergistic effect between certain chemical pollutants and noise is of increasing concern in the marine environment . . . ." AR068854. While the specific effects on marine mammals are not well known, the species' Recovery Plan warns that because beluga habitat is noisy and "is surrounded by many human activities that generate chemicals known to impact hearing (e.g., jet fuel from the airplane activity around the Inlet)," this "raises the concern" of harmful synergistic effects on belugas. AR068854-55.

The Bureau's failure to consider such impacts is perplexing given its insistence in responding to public comments that "[a]t no point does [the EIS] state that 'no cumulative' impact would occur" from wastewater discharges. AR021298. The fact that the Bureau believes the impacts of pollution discharges are "localized," *see id.*, cannot provide the answer given that Cook Inlet beluga whales move between the lower and upper inlet and thus will be exposed to such discharges throughout their range. *See, e.g.*,

AR045748-49 (noting seasonal movements of belugas from "the upper inlet" to "throughout the mid inlet" and offshore waters). Courts have long held the failure to consider cumulative impacts to species that face multiple threats throughout their range unlawful. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1179-80 (10th Cir. 2002) (holding EIS inadequate where it evaluated impacts only within 1,000 feet of proposed project because it limited analysis to smaller, less mobile species and ignored impacts to migratory species); *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 298-300 (D.C. Cir. 1988) (holding an EIS on an offshore oil and gas leasing plan inadequate because it failed to evaluate impacts to whales and other species exposed to oil and gas activity in multiple regions).

### C. The Bureau failed to take a hard look at the impacts of oil spills from Lease Sale 258 on the Cook Inlet beluga whale

The Bureau failed to take a hard look at the impacts of a large oil spill on the Cook Inlet beluga whale. Specifically, the Final EIS concludes that a large oil spill "could affect individuals but would not affect marine mammal populations due to the assumed volume of a large spill" and its dispersal behavior. AR021054; *see also id.* (noting a large oil spill "would likely produce temporary behavioral and physiological responses among nearby individual marine mammals, but would be unlikely to impact marine mammal populations"). This generalized conclusion is arbitrary because it is contrary to the record evidence indicating the devastating impact an oil spill could have on the beluga population in particular.

The Bureau's analysis assumes a large oil spill will occur from Lease Sale 258, AR021149, and NEPA requires the agency to analyze all reasonably foreseeable impacts of such a spill. "Reasonably foreseeable" impacts include "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b)(4).

Here, disclosing and analyzing the potentially catastrophic impacts of an oil spill on Cook Inlet beluga whales is certainly within the rule of reason. Indeed, the available information demonstrates that a large oil spill from Lease Sale 258 could have devastating impacts on the Cook Inlet beluga whale. For example, NMFS's Recovery Plan for belugas considers catastrophic events such as oil spills a threat "of high concern." AR068875-76. It acknowledges that an oil spill could result in "[a] mass stranding resulting in numerous mortalities" that would be "catastrophic to the [whale's] recovery," AR068851, and "increase the likelihood of [the whale's] extinction." AR068852. An oil spill could also affect belugas indirectly through effects on their prey "whether through changes to spawning or migration patterns, direct mortality, or potential long-term sub-lethal impacts." AR068851.[9] It further notes that "[w]hile the effects of catastrophic events are variable, population modeling indicates that any additive mortality of [Cook Inlet] belugas will have a significant negative effect to the

[9] New scientific information indicates that prey availability (or rather the lack thereof) is an increasing concern for the recovery of the Cook Inlet beluga whale. *See* AR140701.

recovery potential of these whales." AR068915.

And the available information also indicates that belugas are known to aggregate in and around the sale area. *See, e.g.*, AR045741-42 (recent study showing belugas' presence in Tuxedni Bay and the Kenai River from November through April); AR126627 (noting an estimated 33 individuals—nearly 12 percent of the population estimated in 2020—were detected near Drift River in Redoubt Bay during March and April 2011); AR061745-52 (noting an estimated 20 belugas were recorded near the Kenai River and Kasilof in April 2014); AR051057-58 (noting that in 2019, two beluga carcasses were reported in the lease sale area). Indeed, the Bureau itself acknowledged elsewhere in the record that "[n]ew information . . . indicate[s] that belugas are consistently using the Tuxedni Bay and Kalgin Island areas in spring," that their "use of this area is higher than previously observed," and that the area "appears to be an important feeding area because the belugas are feeding on herring as they move up the west coast of Cook Inlet." AR021421.

Yet nowhere does the Bureau adequately consider or analyze the possibility of such impacts from a large oil spill. The closest the Bureau comes is acknowledging, in an appendix to the Final EIS, that "[i]f a large oil spill impacts an area where beluga[s] . . . are aggregated and they are subsequently injured, their populations could be

adversely affected." AR021185. But such a generalized assertion is insufficient.[10]

That is because an adequate NEPA analysis "should involve *a discussion of* adverse impacts that does not improperly minimize negative side effects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006) (emphasis added), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). Simply "acknowledg[ing]" an important impact without a "significant discussion" of the issue is insufficient. *Or. Nat. Res. Council Fund*, 505 F.3d at 892 (citation omitted); *see also Bark*, 958 F.3d at 871 (rejecting NEPA analysis that drew on "general conclusions"); *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478-79 (D.C. Cir. 2012) ("Under NEPA, an agency must look at both the probabilities of potentially harmful events and the consequences if those events come to pass."). The failure to discuss the potentially catastrophic impacts of an oil spill on the Cook Inlet beluga whale leaves both decisionmakers and the public uninformed about the sale's true impact on these whales. The Bureau's analysis of oil spills on belugas is therefore arbitrary.

## III. Vacatur is the appropriate remedy here

Vacatur is the standard remedy for agency decisions found unlawful under the

---

[10] This is particularly true considering the statement was made in an appendix to an EIS. *See Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 494 (9th Cir. 1987) (instructing that "an agency may not circumvent its obligation to provide a clear assessment of environmental impacts simply by placing a worst case analysis in an appendix"). It is also especially true as the Bureau failed to resolve this conflicting information in its Final EIS. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 873-74 (9th Cir. 2022) (holding NEPA analysis unlawful where it reached conclusions that conflicted with statements elsewhere in the record and the NEPA document itself).

Administrative Procedure Act. 5 U.S.C. § 706(2)(A) (courts "*shall* . . . set aside" unlawful agency action (emphasis added)); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (vacatur "normally accompanies a remand"). Conversely, remand without vacatur is appropriate only in "limited circumstances." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted). To evaluate the appropriate remedy, courts consider whether vacatur risks environmental harm. *See id.* Courts also "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020) (citation omitted). These factors warrant vacatur here. Defendants cannot carry their burden of proving otherwise. *See All. for the Wild Rockies*, 907 F.3d at 1122 (burden is on defendants to "overcome" the presumption of vacatur).

First, vacatur would not cause any environmental harm. Rather, vacatur would simply restore the parties to the status quo ante—as if no lease sale had occurred. *See California v. BLM*, 277 F.Supp.3d 1106, 1126 (N.D. Cal. 2017) (vacatur warranted where it would "merely put the . . . parties back in the position" they were previously in).

Second, the Bureau's errors are serious and frustrate NEPA's goal of informed public participation and agency decisionmaking. Given the "fundamental flaws," vacatur is appropriate because it is "unlikely that the same [decision] would be adopted on remand." *Pollinator*, 806 F.3d at 532.

Finally, economic harms, even if significant, do not by themselves present the

"limited" circumstances in which remand without vacatur might be appropriate. *See, e.g.*, *Nat'l Family Farm Coal.*, 960 F.3d at 1144-45 (vacating pesticide registrations despite financial impact on farmers). Here, there would be no significant economic harms: one company bid on one block and received one lease, which it has not yet acted on. Vacatur is therefore the proper remedy here.

Practically, vacating the decision pending a proper alternatives analysis and assessment of Cook Inlet beluga whale impacts could lead to a different lease sale that meaningfully reduces or avoids harming Plaintiffs. The only lease block that received a bid in the lease sale was Block 6255, AR022030, which is partially in the beluga nearshore feeding area north of Anchor Point and would have been excluded, at least partially, in proposed alternatives the Bureau failed to consider. *See* AR021787; AR020956. Were the Bureau properly to consider impacts to beluga whales or consider reasonable alternatives on remand, it may decide to exclude Block 6255 from any future sale. *See, e.g.*, AR017695 (urging the Bureau to consider year-round restrictions on seismic and exploratory drilling north of Anchor Point). Additionally, were the Bureau to consider meaningfully different lease sale areas, it may consider and select a less development- and greenhouse gas-intensive alternative. These choices might lead to a lease sale that reduces (by eliminating Block 6255 and other environmentally sensitive areas from the sale) or eliminates altogether (if the newly configured sale results in no bids) harm to Plaintiffs.

## CONCLUSION

The Court should declare the Bureau's actions unlawful, vacate and remand the Final EIS and ROD, and vacate the lease sale and lease previously issued to Hilcorp.

Respectfully submitted this 24th day of October, 2023,

*s/ Hannah M. Payne*

Hannah M. Payne (Alaska Bar No. 2105045)
Carole A. Holley (Alaska Bar No. 0611076)
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE

*Attorneys for Plaintiffs Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, and Kachemak Bay Conservation Society.*

*s/ Kristen Monsell*

Kristen Monsell (*pro hac vice*)
CENTER FOR BIOLGICAL DIVERSITY

*Attorney for Plaintiff Center for Biological Diversity.*

*s/ Julia Forgie*

Julia Forgie (*pro hac vice*)
Irene Gutierrez (*pro hac vice*)
Thomas Zimpleman (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiff Natural Resources Defense Council.*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,099 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 24th day of October, 2023.

*s/ Hannah M. Payne*
Hannah M. Payne (Alaska Bar No. 2105045)
EARTHJUSTICE

## CERTIFICATE OF SERVICE

I certify that on October 24, 2023, a copy of the foregoing PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1) was served electronically on Luther L. Hajek and Mary Hunter Gramling.

*s/ Hannah M. Payne*
Hannah M. Payne (Alaska Bar No. 2105045)
EARTHJUSTICE

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Declaration of Brendan Cummings |
| 2 | Declaration of Roberta Highland |
| 3 | Declaration of Sue Mauger |
| 4 | Declaration of Pamela K. Miller |
| 5 | Declaration of Terri Pauls |
| 6 | Declaration of John Sanborn |
| 7 | Declaration of Gina Trujillo |