Erik Grafe
Carole Holley
Hannah Payne Foster
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: egrafe@earthjustice.org
E: cholley@earthjustice.org
E: hpayne@earthjustice.org

*Attorneys for Plaintiffs Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, and Kachemak Bay Conservation Society.*

Kristen Monsell (*pro hac vice)*
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway St. #800
Oakland, CA 94612
T: 510.844.7100
E: kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity.*

Julia Forgie (*pro hac vice)*
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second Street
Santa Monica, CA 90401
T: 310.434.2300
E: jforgie@nrdc.org

Irene Gutierrez (*pro hac vice)*
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st floor
San Francisco, CA 94104
T: 415.875.6100
E: igutierrez@nrdc.org

Thomas Zimpleman (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6244
E: tzimpleman@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR *et al.*,<br><br>*Defendants,*<br><br>and<br><br>STATE OF ALASKA<br><br>*Intervenor-Defendant.* | Case No. 3:22-cv-00279-SLG |

**PLAINTIFFS' REPLY BRIEF UNDER LOCAL RULE 16.3(c)(3)**

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

ARGUMENT.............................................................................................................. 1

I. BOEM was required to comply with NEPA. ......................................................... 1

II. BOEM failed to consider a reasonable range of alternatives. ................................. 5

- A. BOEM was required to comply fully with NEPA's alternatives requirement. ........................................................................................ 5
- B. BOEM failed to analyze a reasonable range of meaningfully different alternatives or adequately justify not analyzing alternatives proposed by commenters. ........................................................................ 7

III. The FEIS does not support its conclusion that impacts to the critically endangered Cook Inlet beluga whale will be negligible to minor......................... 11

- A. BOEM failed to reasonably analyze the impacts of vessel noise............... 11
- B. BOEM failed to reasonably analyze the cumulative impacts. .................... 15
- C. BOEM failed to reasonably analyze the impacts of oil spills. .................... 18

IV. Vacatur is the appropriate remedy........................................................................ 20

CONCLUSION ........................................................................................................ 22

## TABLE OF AUTHORITIES

### CASES

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ..................... 20

*Am. Rivers v. FERC*,
895 F.3d 32 (D.C. Cir. 2018) ..................... 14

*City of Angoon v. Hodel*,
803 F.2d 1016 (9th Cir. 1986) ..................... 6, 10

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
508 F.3d 508 (9th Cir. 2007) ..................... 4

*Department of Transportation v. Public Citizen*,
541 U.S. 752 (2004) ..................... 4

*Eagle County, Colo. v. Surface Transp. Bd.*,
82 F.4th 1152 (D.C. Cir. 2023) ..................... 14

*Ecology Ctr. v. Castaneda*,
574 F.3d 652 (9th Cir. 2009) ..................... 15, 16

*Env'l Def. Ctr. v. BOEM*,
36 F.4th 850 (9th Cir. 2022) ..................... 21

*Forelaws on Bd. v. Johnson*,
743 F.2d 677 (9th Cir. 1984) ..................... 2

*Friends of Wild Swan v. Kehr*,
No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ..................... 5

*Friends of Wild Swan v. Kehr*,
321 F.Supp.3d 1179 (D. Mont. 2018) ..................... 16

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ..................... 8

*Great Basin Resource Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) ..................... 17

*Izaak Walton League of Am. v. Marsh*,
655 F.2d 346 (D.C. Cir. 1981) .......... 5

*Jones v. Gordon*,
792 F.2d 821 (9th Cir. 1986) .......... 3

*Kern v. BLM*,
284 F.3d 1062 (9th Cir. 2002) .......... 14, 17, 19

*Me. Cmty. Health Options v. United States*,
140 S.Ct. 1308 (2020) .......... 3

*Morongo Band of Mission Indians v. F.A.A.*,
161 F.3d 569 (9th Cir. 1998) .......... 7

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
177 F.3d 800 (9th Cir. 1999) .......... 8

*N. Alaska Env't Ctr. v. Norton*,
361 F.Supp.2d 1069 (D. Alaska 2005) .......... 8

*Native Vill. of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) .......... 14

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .......... 12, 19

*Or. Nat. Desert Ass'n v. Rose*,
921 F.3d 1185 (9th Cir. 2019) .......... 12

*Or. Nat. Res. Council, Inc. v. Bureau of Reclamation*,
37 F.3d 1414 (9th Cir. 1994) .......... 2

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of the Navy*,
898 F.2d 1410 (9th Cir. 1990) .......... 13

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 21

*Sierra Club v. Adams*,
578 F.2d 389 (D.C. Cir. 1978) .......... 6

*Solar Energy Indus. Ass'n v. FERC*,
80 F.4th 956 (9th Cir. 2023) .......... 20, 21

*Sovereign Iñupiat for a Living Arctic (SILA) v. BLM*,
No. 3:23-CV-00058-SLG, 2023 WL 7410730 (D. Alaska Nov. 9, 2023) .................... 7

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
951 F.3d 1142 (9th Cir. 2020) .......................................................................... 3

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ..................................................................... 12, 15

*W. Watersheds Project v. Bernhardt*,
543 F.Supp.3d 958 (D. Idaho 2021) ............................................................ 7, 9

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .......................................................................... 8

*WildEarth Guardians v. Zinke*,
368 F. Supp. 3d 41 (D.D.C. 2019) ..................................................................... 2

## STATUTES

43 U.S.C. § 1332(3) ........................................................................................ 10

Pub. L. No. 117-169, § 50264(c), 136 Stat. 1818 ........................................... 2, 3

## REGULATIONS

40 C.F.R. § 1502.14 .......................................................................................... 6

40 C.F.R. § 1508.1(g) ...................................................................................... 15

## FEDERAL REGISTER NOTICES

76 Fed. Reg. 20,180 (Apr. 11, 2011) ............................................................... 14

## INTRODUCTION

The Bureau of Ocean Energy Management (BOEM) did not satisfy its National Environmental Policy Act (NEPA) obligations for Lease Sale 258. It did not consider a reasonable range of alternatives to the sale and failed to take a hard look at the sale's impacts on the highly endangered Cook Inlet beluga whale. Neither Defendants nor Intervenor-Defendant Alaska show that the agency adequately evaluated the sale's environmental impacts. And contrary to Alaska's claim, the Inflation Reduction Act (IRA) did not remove BOEM's discretion over the sale or otherwise exempt BOEM from NEPA compliance.

Vacatur is the default remedy when an agency violates NEPA, and neither Defendants nor Alaska have shown the circumstances here warrant anything less. This Court should vacate the lease sale, issued lease, record of decision (ROD), and Final Environmental Impact Statement (FEIS) for Lease Sale 258, and remand the ROD and FEIS to the agency to fully analyze the environmental impacts.

## ARGUMENT

### I. BOEM was required to comply with NEPA.

Alaska—but not Defendants—argues BOEM did not violate NEPA because the IRA exempts this lease sale from NEPA. *See* Dkt. 44 at 14-17. Not so. The IRA instructed BOEM to hold Lease Sale 258 but did not eliminate BOEM's usual discretion over the scope and conditions of the sale. Nor did it expressly or impliedly release BOEM from its NEPA obligations.

The IRA directed BOEM to conduct Lease Sale 258, in accordance with the ROD for the 2017-2022 National Outer Continental Shelf Oil and Gas Leasing Program ("2017-2022 Program"), no later than December 31, 2022. Pub. L. No. 117-169, § 50264(c), 136 Stat. 1818, 2060. Section 50264(c) says nothing about NEPA's applicability to this sale. *Id*. It also does not constrain BOEM's ordinary discretion over the sale. *See id*. Section 50264(c) does not dictate the size, location, or any conditions, such as mitigation measures, of Lease Sale 258. *Id. Contra* Dkt. 44 at 16. Instead, Congress left these important determinations to BOEM, and BOEM must comply with NEPA when exercising its discretion on them. *See Forelaws on Board v. Johnson*, 743 F.2d 677, 680-81, 685 (9th Cir. 1984) (holding NEPA analysis required for time-limited action mandated by statute where "administrator possesse[d] a great deal of discretion" over terms of action, including terms that "directly aimed at environmental concerns"); *accord WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 51-52 (D.D.C. 2019) (where statute requires oil and gas leasing but agency retains "discretion to determine where" and "under what terms and conditions oil and gas development should occur," agency must "consider" environmental impacts "when making [leasing] decisions").[1]

Section 50264(c)'s directive to hold Lease Sale 258 does not exempt the sale from

---

[1] Alaska quotes *Oregon Natural Resources Council, Inc. v. Bureau of Reclamation*, 37 F.3d 1414, 1417 n.6 (9th Cir. 1994), *withdrawn*, 49 F.3d 1441 (9th Cir. 1995), *superseded on other grounds*, 52 F.3d 334 (9th Cir. 1995). *See* Dkt. 44 at 18. But that case, which concluded NEPA did not apply where an incidental take statement required the agency to follow certain non-discretionary measures to salvage stranded endangered fish, does not undermine NEPA's applicability here.

NEPA. Congress expressly exempted otherwise applicable statutory requirements in other sections of the IRA. *See, e.g.*, § 22002(a) (exempting compliance with the Farm Security and Rural Investment Act of 2002 in appropriating funds). That Congress did not do so in section 50264(c) is significant. *Cf. Me. Cmty. Health Options v. United States*, 140 S.Ct. 1308, 1323 (2020). Alaska does not argue Congress impliedly waived BOEM's NEPA obligations. For good reason. Nothing in the plain language or legislative history of the IRA reflects a "clear and manifest" intent to exempt Lease Sale 258 from NEPA. *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1156 (9th Cir. 2020) (citation omitted); *accord Jones v. Gordon*, 792 F.2d 821, 825-26 (9th Cir. 1986) (statutes should be read liberally to "accommodate the application of NEPA").

The IRA did not eliminate BOEM's discretion by requiring that the lease sale be held in accordance with the 2017-2022 Program ROD. *Contra* Dkt. 44 at 15-16. The ROD defined the sale's scope broadly, affording BOEM flexibility to shape Lease Sale 258. AR001208-10. The ROD stated the sale would be within the northern portion of the Cook Inlet Planning Area, but BOEM was free to choose where and how many acres to include (or exclude) from the region and what conditions to apply to the lease sale. AR001210; *see also* Dkt. 37 at 27. Moreover, the 2017-2022 Program ROD noted BOEM "recognizes the seasonal importance of [beluga] critical habitat," and, though BOEM did not recommend excluding the habitat "at [that] time," called for "develop[ment] and appli[cation]" of "[a]dditional specific mitigation measures … as

appropriate." AR001209. And in conducting the NEPA analysis challenged here, BOEM considered multiple—albeit overly-similar—options, undermining Alaska's suggestion that the 2017-2022 Program ROD deprived BOEM of its discretion over the sale's scope. AR020952-55.

Nor did the IRA's "shortened timeframe" for completing Lease Sale 258 place the sale "outside of the scope of NEPA…." *Contra* Dkt. 44 at 16. After the IRA became law, BOEM had time to issue its FEIS before holding Lease Sale 258. AR020924-25.

Alaska's reliance on *Department of Transportation v. Public Citizen*, Dkt. 44 at 14-15, 18, is unavailing. There, the Court held an agency is not required to consider an environmental effect when it "has no ability to prevent [that] effect due to its limited statutory authority over the relevant actions." *Public Citizen,* 541 U.S. 752, 770 (2004). But here, BOEM had the ability to prevent or limit environmental effects considered in its NEPA analysis for Lease Sale 258, illustrated by its attempt to establish environmental protections by selecting an alternative that excluded a few blocks from the sale. AR021776-77; *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508, 546 (9th Cir. 2007) (*Public Citizen* "is inapposite" when agency can address the environmental impacts of action), *vacated and superseded on denial of reh'g on other grounds*, 538 F.3d 1172 (9th Cir. 2008).

Finally, the IRA's directive regarding Lease Sale 257, held before the IRA passed, differs in meaningful ways from its instruction for Lease Sale 258 and does not establish that BOEM had equally limited discretion over both sales. Dkt. 44 at 15, 17. Section

50264(b), regarding Lease Sale 257, mandated that BOEM "accept the highest valid bid for each tract or bidding … for which a valid bid was received," and then "promptly issue to the high bidder a fully executed lease." In *Friends of the Earth v. Haaland*, the D.C. Circuit determined this language imposed a nondiscretionary duty on BOEM to *issue leases* for Lease Sale 257 and so the issuance of these leases was no longer subject to NEPA. No. 22-5036, 2023 WL 3144203, at *1-2 (D.C. Cir. Apr. 28, 2023). For Lease Sale 258, by contrast, the IRA only directs BOEM to hold a sale described in the 2017-2022 Program ROD by a specific date, but otherwise leaves the scope and conditions of the sale to BOEM. BOEM retained authority to address environmental impacts, although its alternatives analysis fell short of NEPA's requirements, *infra* Arg. II.

## II. BOEM failed to consider a reasonable range of alternatives.

### A. BOEM was required to comply fully with NEPA's alternatives requirement.

Defendants argue BOEM need not consider a full range of alternatives because the IRA required it to hold Lease Sale 258, and that it can rely on the alternatives it considered when creating the Cook Inlet planning area. Defendants are wrong in both respects.

First, the cases Defendants cite, Dkt. 40 at 24-25, stand only for the proposition that when Congress approves a specific project, agencies need not consider alternatives that would result in *entirely different projects* from what Congress approved. *See Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 372-74 (D.C. Cir. 1981) (rejecting the

need for further consideration of three alternatives to specific, congressionally-approved new lock and dam project, when those alternatives would have resulted in new lock and dam not being built); *Sierra Club v. Adams*, 578 F.2d 389, 395-96 (D.C. Cir. 1978) (because Congress had authorized U.S. assistance in constructing international highway, "somewhat brief" discussions of "non-highway" and "no action" alternatives were reasonable); *City of Angoon v. Hodel*, 803 F.2d 1016, 1018, 1020-22 (9th Cir. 1986) (in considering alternatives to building specific log transfer facility, agency "properly eschewed development of a detailed [land] exchange alternative" when Congress had already conveyed land for facility).

Unlike in those cases, the issue here is BOEM's failure to consider alternative versions of the mandated lease sale. *Accord Sierra Club*, 578 F.2d at 396 (distinguishing the review needed for "no action" and "non-highway" alternatives from review required regarding "the relative merits of both the chosen and alternative [highway] routes").

Second, that BOEM modified the leasing area during a separate planning process, *see* AR040221, does not diminish its responsibility to consider alternatives for this lease sale, a distinct Proposed Action under NEPA. *See* 40 C.F.R. § 1502.14 (requiring agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" to Proposed Action). The 2017-2022 Program recognizes that the lease sale stage has independent NEPA requirements. *See* Dkt. 37 at 27. And Defendants acknowledge in their brief that the *lease sale stage* is when BOEM "decid[es] on the lease sale area," Dkt. 40 at 13, including "which lease blocks to offer in the sale," *id.* at 11. In preparing the

Lease Sale 258 EIS, BOEM was required to fulfill its NEPA responsibilities for *this* specific sale. *See W. Watersheds Project v. Bernhardt*, 543 F.Supp.3d 958, 984 (D. Idaho 2021) ("If the … *planning* alternatives simultaneously represented *leasing* alternatives moving forward, there would be no requirement to conduct the analysis which is the 'heart' of NEPA, to-wit, to analyze *alternatives* for any project undertaken pursuant to a land use plan, including the oil and gas lease sales at play here.").

**B. BOEM failed to analyze a reasonable range of meaningfully different alternatives or adequately justify not analyzing alternatives proposed by commenters.**

Defendants argue that, despite the identical impact ratings, BOEM's alternatives were "meaningfully different" because they "provided varying ranges of protection for the beluga whale and other environmental resources." Dkt. 40 at 28. But Defendants fail to explain how this "additional measure of protection" is meaningful when they also admit that "marine mammals, including beluga whales, could be affected by activities outside of excluded blocks and during times when restrictions on seismic activity did not apply" and that "overall impacts to marine mammals would be similar to the proposed action" nevertheless. *Id.* at 25-26 (citing AR021056).[2] The key inquiry here is not whether a small handful of blocks is afforded extra protection, but whether the valued

[2] Defendants' reliance on *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) and *Sovereign Iñupiat for a Living Arctic (SILA) v. Bureau of Land Mgmt.*, No. 3:23-CV-00058-SLG, 2023 WL 7410730, at *5-7 (D. Alaska Nov. 9, 2023), is ill-conceived. *Morongo* involved a full alternatives analysis, including two alternatives that would have accomplished the plaintiff tribe's goal, and *SILA* turned on another statute's interpretation.

resources as a whole are meaningfully protected as compared to other alternatives. *See Friends of Yosemite Valley v. Kempthorne,* 520 F.3d 1024, 1039 (9th Cir. 2008) (alternatives must be "varied enough to allow for a real, informed choice") (citation omitted). BOEM failed to show that is the case.

Defendants also claim BOEM "did not determine that the same oil and gas development-related activities or impacts would occur under each alternative." Dkt. 40 at 26 (citing AR020961). Defendants point to statements in the FEIS about forgone economic benefits under the alternatives, *id.*, but do not assert that the overall expected level of development would decrease under any alternative in the FEIS. If BOEM's alternatives meaningfully altered the expected level of activity overall, then it would have been unreasonable to presume that all action alternatives "entail the same amount of oil and gas activity." *See, e.g.*, AR020979.

Finally, Defendants argue *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050-51 (9th Cir. 2013), and *Muckleshoot Indian Tribe v. U.S. Forest Service,* 177 F.3d 800, 813 (9th Cir. 1999), do not apply here because BOEM "considered meaningfully different alternatives." Dkt. 40 at 27-28. However, as demonstrated above and in Plaintiffs' opening brief, that is not so. BOEM's alternatives were nearly identical in overall development and impact levels and failed to offer the meaningful range of options NEPA requires. *See* Dkt. 37 at 24; *see also N. Alaska Env't Ctr. v. Norton*, 361 F.Supp.2d 1069, 1073-76 (D. Alaska 2005) (discussing "middle ground" alternatives), *aff'd sub nom. N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006); *see also*

*W. Watersheds Project*, 543 F.Supp.3d at 983 (noting "the existence of an alternative in between an all-or-nothing approach").

BOEM also arbitrarily rejected meaningfully different alternatives, including the Northern Area Exclusion (NAE). BOEM is wrong in arguing that Plaintiffs waived their ability to advocate for other alternatives; regardless, the agency should not be excused for arbitrarily rejecting the reasonable alternatives presented to it. *See* Dkt. 37 at 23-24.

First, Defendants argue BOEM properly rejected the NAE. But in doing so, they notably misstate BOEM's position. Defendants' brief claims BOEM found the goals of the NAE "would be met" by the other alternatives. Dkt. 40 at 28. However, the FEIS states that the goals of the NAE would only be "*partially* addressed" by these other protections. AR020958 (emphasis added); *see also* Dkt. 37 at 25, n.5. Without the analysis demanded by NEPA, it seems that BOEM rejected the NAE to offer the greatest amount of acreage possible while giving the appearance that the NAE's benefits were provided by other alternatives. But an agency cannot reject an alternative simply because it offers up a smaller total acreage. *See* Dkt. 37 at 24-28. In fact, variation in project-size and resulting effects is precisely the sort of meaningful difference NEPA requires the agency to study. *See, e.g.*, *W. Watersheds Project*, 543 F.Supp.3d at 983-84. The NAE could have been more protective of whales and likely would have reduced the amount of expected oil and gas development from the sale. *See* Dkt. 37 at 26 & n.6. By refusing to consider alternatives it claimed would "overly" or "unduly" limit such development, *see* AR021248, AR02120, the agency arbitrarily refused to consider a full range of

alternatives. Defendants' argument that "potential restriction of oil and gas development is *an* appropriate consideration under OCSLA," Dkt. 40 at 31 (citing 43 U.S.C. § 1332(3)) (emphasis added), misses the point. NEPA requires agencies to consider a meaningful range of alternatives so the agency and public can compare the environmental consequences of each. *See City of Angoon*, 803 F.2d at 1020 ("The touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." (cleaned up)). The agency cannot elevate fears about "potential restriction" of oil and gas development, *see* Dkt. 40 at 31, above all other considerations and prematurely avoid its NEPA obligation to consider alternatives that might result in, for example, less leasing but better environmental protection, *see* Dkt. 37 at 25-28.

Second, Plaintiffs did not waive the argument that BOEM should have considered alternatives other than the NAE and those specifically raised in their DEIS comments. *Contra* Dkt. 40 at 27. The idea of shrinking the sale size, along with several specific recommendations, was meaningfully before the agency—in comments on the DEIS, *see* Dkt. 37 at 23, and in comments submitted after the FEIS but considered by BOEM in developing its recommendations for the Final Notice of Sale.[3]

[3] AR021779; AR021364 ("to minimize impacts to protected species, the agency could offer for lease only blocks for which potential lease sale bidders have affirmatively indicated an interest and only outside of critical habitat areas"); AR140032 ("BOEM should exclude all lease blocks within Cook Inlet beluga whale critical habitat as well as all lease blocks within 10 miles of anadromous streams …. This would mean excluding 156 blocks from the sale….") (citations omitted); *see also* AR021729; AR021725-27.

Regardless, whether comments addressed the protection of particular blocks is irrelevant. From the beginning, many urged BOEM to study significantly reducing the lease sale area. And the agency had before it alternatives, such as the NAE, that would have accomplished that aim. It nonetheless arbitrarily rejected those alternatives and in doing so, failed to study a reasonable range of alternatives. *See* Dkt. 37 at 24-28.

## III. The FEIS does not support its conclusion that impacts to the critically endangered Cook Inlet beluga whale will be negligible to minor.

### A. BOEM failed to reasonably analyze the impacts of vessel noise.

The FEIS nowhere analyzes the unique threat vessel noise poses to Cook Inlet belugas or how Lease Sale 258 will exacerbate such impacts. Defendants' various attempts to defend this failure are unavailing.

First, Defendants point to BOEM's measures to mitigate the impacts of seismic surveys and vessel strikes, such as turning off airguns if marine mammals are observed. Dkt. 40 at 33, 35. But they say nothing about mitigating the impacts of vessel noise and ignore the conclusion from scientists that mitigating ship noise should be "the top priority focus for noise mitigation management actions." AR045708.

Next, Defendants cite a few sentences from the FEIS that generally describe potential impacts to all marine mammals from human-caused noise, Dkt. 40 at 35 (citing AR021048-49), broadly acknowledge that vessel noise can disturb marine mammals, *id.* (citing AR021054-55), and for belugas generally state that belugas may avoid vessels or alter their call types or frequency in response to vessels, *id.* at 36 (citing AR021053).

However, "these snippets do not constitute real analysis." *NRDC v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988). Such "general statements" are insufficient to satisfy NEPA. *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (citation omitted).

These sentences *do not describe or analyze* what the impacts of avoiding vessels could be on belugas, such as increased stress, lost access to important feeding grounds near the lease sale area or being pushed into even noisier areas. *See* AR045730 (noting displacement can cause belugas to lose access to feeding grounds and identifying "sub-lethal noise exposure," including from shipping, as "main concern" for Cook Inlet belugas); AR066363, AR066369 (increasing background noise from shipping and other activities "will unavoidably alter [Cook Inlet beluga] hearing abilities"); *see also* AR021421 ("[n]ew information" indicates Tuxedni Bay "appears to be an important feeding area"). Without this or other "detailed information," "neither the courts nor the public … can be assured that [BOEM] provided the [requisite] hard look," *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (citation omitted), on the impacts of this unique threat to belugas from Lease Sale 258.

Instead, the FEIS states, "[t]he response of belugas to vessels is thought to be partly a function of habituation." AR021053. Plaintiffs explained why this assumption is inconsistent with the relevant science. Dkt. 37 at 29-33. Defendants claim the National Marine Fisheries Service (NMFS) concluded in its Cook Inlet Beluga Recovery Plan "that beluga whales may habituate to anthropogenic noise." Dkt. 40 at 37 (citing AR068859). But the Plan then states, "[i]n the long term," such noise can "induce

chronic effects altering the health of individual [Cook Inlet] belugas, which in turn have consequences at the population level," AR068859; concludes noise is a threat "of high relative concern" for beluga recovery, *id.*; and lists noise from vessels (tugboats, tankers, and small vessels) as the most important stressor among all sources of human-caused noise in the inlet, AR068857; *see also* AR002764-65 (NMFS's conclusion that "Reduc[ing] the Threat of Anthropogenic Noise in Cook Inlet Beluga Whale Habitat" is a key recovery action); AR066363 ("[a]nthropogenic noise is a primary threat to" Cook Inlet belugas).

Defendants also maintain that a 2017 NMFS biological opinion on an earlier lease sale in Cook Inlet supports BOEM's statement that belugas may be habituated to vessel noise. Dkt. 40 at 36. However, that analysis pre-dates newer information demonstrating the substantial negative impacts that vessel noise is likely having on belugas. *See* AR045708, AR045715; *see also* AR066364 (2020 study noting shipping "introduce[s] significant noise" in Cook Inlet beluga critical habitat "with the potential for negative effects due to chronic exposure"). BOEM's adherence to NMFS's 2017 biological opinion, without addressing this new information in its FEIS, is arbitrary.[4]

---

[4] *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of the Navy*—where Endangered Species Act (ESA) consultation occurred contemporaneously with the action under review, 898 F.2d 1410, 1415 (9th Cir. 1990)—is therefore inapposite. *Contra* Dkt. 40 at 37. Here, BOEM determined that Lease Sale 258 was likely to adversely affect belugas, AR021383, but held the sale prior to the completion of new ESA consultation with NMFS. AR021782.

Defendants imply that the FEIS relied on Castellote 2019 in analyzing vessel noise impacts, Dkt. No. 40 at 38; but it did not. BOEM did not cite this study in mentioning vessel noise. *See* AR021053-54. Indeed, the FEIS cites Castellote 2019 only in its discussion of pile driving. *See* AR021050; *see also Eagle County, Colo. v. Surface Transp. Bd.*, 82 F.4th 1152, 1184 (D.C. Cir. 2023) ("Merely stating that a factor was considered is not a substitute for considering it." (cleaned up)).

Defendants dismiss the import of Castellote 2019, claiming it looks at impacts to belugas further north in the inlet. Dkt. 40 at 38-39. But Plaintiffs cited the study to illustrate why BOEM's "breezy dismissal," *Am. Rivers v. FERC*, 895 F.3d 32, 50-51 (D.C. Cir. 2018), of the threat of vessel noise from Lease Sale 258 was improper. The study also shows the dangers of introducing new vessel noise in new areas of beluga habitat, given that "'quiet' areas in which noise levels do not interfere with important life history functions and behavior of [Cook Inlet beluga] whales" are "a necessity" for their survival and recovery. 76 Fed. Reg. 20,180, 20,203 (Apr. 11, 2011); *see also* AR068812 ("[I]mportant uses of habitat by [Cook Inlet] belugas may include … refuge from human activities….").

Defendants' promises of future NEPA evaluation cannot excuse these omissions. *Contra* Dkt. 40 at 41. "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment," *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002), and requires an agency to evaluate impacts *before* acting, *see Native Vill. of Point*

*Hope v. Jewell*, 740 F.3d 489, 504 (9th Cir. 2014) (noting importance of conducting proper NEPA evaluation at lease sale stage).

**B. BOEM failed to reasonably analyze the cumulative impacts.**

The FEIS belies Defendants' assertion that BOEM adequately analyzed Lease Sale 258's cumulative impacts on Cook Inlet belugas. *See* Dkt. 40 at 47-50. Defendants do not deny that BOEM failed to address the science demonstrating the unique risk cumulative impacts pose to belugas. *See id*. Nor could they, as the agency unequivocally did not consider this information. AR021057-60. Instead, Defendants erroneously claim that BOEM did not have to do so because it noted the whale's small population in other parts of the FEIS, and analyzed noise, disturbance, and oil spills in assessing Lease Sale 258's direct and indirect impacts. *See* Dkt. 40 at 48.[5]

BOEM's duty to analyze cumulative impacts is distinct from its obligation to analyze direct and indirect effects. *See* 40 C.F.R. § 1508.1(g) (separately defining these terms); *Te-Moak Tribe*, 608 F.3d at 604 (holding a NEPA evaluation's "discussion of the [action's] direct effects in lieu of a discussion of cumulative impacts is inadequate"); *see also* AR020929 (describing obligation to consider both effects of each alternative and cumulative effects of the proposed action).

*Ecology Center v. Castaneda*, 574 F.3d 652 (9th Cir. 2009), is not to the contrary. There, the court found an agency need not repeat specific "past and proposed activities"

[5] Defendants also point to the analysis of "multiple stressors." Dkt. 40 at 48. This is the cumulative impacts analysis that Plaintiffs challenge.

in its cumulative impacts analysis where the EIS elsewhere provided "extensive history about past actions in the area, dating all the way back to the early 1990s." *Id.* at 667. Here, the FEIS nowhere provides any discussion—let alone an "extensive" one—of the threat that cumulative impacts pose to Cook Inlet belugas.

*Friends of Wild Swan v. Kehr*, 321 F.Supp.3d 1179 (D. Mont. 2018) is likewise inapposite. There, the court upheld a NEPA evaluation where there were no direct or indirect effects anticipated from a particular impact. *Id.* at 1190-91. And it upheld the agency's analysis of cumulative impacts to the Canada lynx where the agency specifically discussed both direct and cumulative impacts of the action on that particular species. *Id.* at 1191-92.

Here, BOEM did not specifically examine cumulative risks to belugas; nor did it determine there would be no direct or indirect effects of Lease Sale 258 on belugas. Rather, BOEM admitted the sale will impact the whale. While BOEM characterized such impacts as no more than minor, *see, e.g.*, AR021055, NMFS and other scientists have warned that "creeping normality (e.g., death by a thousand cuts) can cause substantial adverse effects to … [Cook Inlet] belugas, at both individual and population levels." AR068920.

Defendants' attempt to bolster BOEM's analysis of the cumulative impacts of water pollution on belugas also fails. Defendants point to the FEIS's analysis of wastewater discharges "from anticipated post-lease activities." Dkt. 40 at 48 (citing AR021014-18). But as Plaintiffs explained, belugas are threatened by other pollution

sources including sewage discharges and runoff from roads, airports, and agricultural sites. Dkt. 37 at 36. The FEIS's marine mammal cumulative impacts analysis does not mention these pollution sources, let alone analyze the potential impacts of pollution from Lease Sale 258 in combination with these other sources. *See* AR021057-60. Such failure is unlawful. *See Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1104-06 (9th Cir. 2016).[6]

It is irrelevant that some of the studies Plaintiffs cited regarding harms to belugas from water pollution involve belugas in the St. Lawrence Estuary. *See* Dkt. 40 at 49. NMFS and other scientists regularly rely on studies of these whales—the only other beluga population to live close to a city, AR068787—to evaluate the potential impacts to Cook Inlet belugas, *see generally* AR068767-9050 (Cook Inlet Beluga Recovery Plan repeatedly referencing studies on St. Lawrence Estuary). While BOEM may not be able to quantify water pollution's precise cumulative effects on belugas, that does not absolve the agency of its obligation to evaluate potential effects based on the available information. *See Kern*, 284 F.3d at 1072 ("Reasonable forecasting and speculation is implicit in NEPA" (cleaned up)); *see also* AR140110 (recent study noting pollutants detected in Cook Inlet belugas and their potential exposure to pollutants from "airports,

[6] Contrary to Defendants' characterization, Plaintiffs are not challenging BOEM's conclusion that Lease Sale 258's direct water quality impacts would be "localized." Dkt. 40 at 49 (citation omitted). Rather, Plaintiffs challenge BOEM's failure to consider the cumulative impacts of those localized impacts with the other sources of water pollution on belugas given the whales move throughout the inlet and are thus exposed to different sources of pollution throughout their habitat.

military bases, oil and gas development, and a wastewater treatment facility").

### C. BOEM failed to reasonably analyze the impacts of oil spills.

The record does not support Defendants' assertions that BOEM properly considered oil spill impacts on belugas. Plaintiffs' challenge is not about "the volume of oil likely to be produced or the probable location of oil wells." *Contra* Dkt. 40 at 44 (citation omitted). Rather, it is about BOEM's failure to take a hard look at the potential impacts to belugas considering the agency's own assumptions. BOEM assumed a large oil spill will occur from Lease Sale 258, AR021149, and NEPA required the agency to carefully examine impacts to belugas from such a spill. It did not.

Defendants' suggestion that the agency need not do so because "belugas spend most of the year in the upper inlet," Dkt. 40 at 45 (citing AR021176), overlooks the best available science and BOEM's acknowledgment elsewhere in the record that belugas "are consistently using the Tuxedni Bay and Kalgin Island areas in spring," AR021421, as well as Defendants' own admission that "a significant number of beluga whales are in lower Cook Inlet" in the winter, Dkt. 40 at 41; *see also* AR068802 ("Generally, [Cook Inlet] belugas spend the ice-free months in the upper Inlet … then expand their distribution south and into more offshore waters of the middle Inlet in winter … although they may be found throughout the Inlet at any time of year.").

Defendants claim the agency determined an oil spill in winter is unlikely. *See* Dkt. 40 at 41. But BOEM's analysis shows that, if a large spill occurs in winter, the oil "has the highest chance of contacting (≥50%) Cook Inlet beluga [critical habitat]" on the

western side, including areas where belugas are known to congregate in significant numbers. *See* AR021177-78 (depicting areas where a large oil spill in summer or winter could affect and probabilities of oil reaching these various locations).[7] When various probabilities are combined, BOEM estimated an 11 percent chance beluga critical habitat on the inlet's western side would be affected—the highest of any area. *See* AR021178.[8] NEPA requires the agency to analyze the impacts of such a spill. *See* Dkt. 37 at 39, 41.

While an appendix notes that adverse population effects could occur in the event a large oil spill impacts an aggregation of belugas, Dkt. 40 at 45, this "merely state[s] … the obvious," *Hodel*, 865 F.2d at 299. It does not disclose or analyze how this could be "catastrophic to the [whale's] recovery," AR068851, and "increase the likelihood of [the whale's] extinction," AR068852; *see also* AR124753 ("With such a small population in a relatively restricted area, a substantial portion of the population could rapidly be exposed to … toxic spills.").

Finally, Defendants' suggestion that the Court should excuse BOEM's failure because it will conduct additional analysis in the future, Dkt. 40 at 44, 46-47, is unavailing. *See Kern*, 284 F.3d at 1072. A proper evaluation of these impacts could have informed the parameters of the lease sale.

---

[7] Defendants' suggestion that an oil spill in winter is unlikely is inconsistent with recent spills and leaks in Cook Inlet which occurred in winter. *See, e.g.*, AR124591, AR126905.

[8] Defendants' suggestion that the available information indicates oil spills may not harm belugas, Dkt. 40 at 44-45, is inconsistent with scientific information indicating the numerous harmful impacts from "[a]cute exposure to petroleum products," AR132255.

## IV. Vacatur is the appropriate remedy.

Vacatur is the presumed remedy, and Defendants and Alaska have failed to show it is unwarranted here. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). BOEM's NEPA violations are serious and, because vacatur would not risk environmental harm or create disruptive consequences, this Court should vacate the ROD, FEIS, Lease Sale 258, and the issued lease. *See id.*[9]

Defendants propose suspension of leasing activities pending further NEPA analysis to avoid the environmental harm that would occur should those activities go forward. Dkt. 40 at 52-53. Plaintiffs agree that any leasing activity during BOEM's further NEPA analysis would pose serious environmental risks, but that is why vacatur of the sale and issued lease—which would preclude any activity—is the most appropriate remedy.[10]

Second, Defendants and Alaska argue BOEM's NEPA errors are not serious. Dkt. 40 at 51; Dkt. 44 at 21. But as Plaintiffs have demonstrated, *supra* Arg. II, III; Dkt. 37 at Arg. I, II, BOEM's errors undermine NEPA's fundamental purposes. Citing *Solar Energy Industry Association v. FERC*, 80 F.4th 956, 997-98 (9th Cir. 2023), Defendants broadly assert that no NEPA errors can warrant vacatur because they are, by nature,

---

[9] Plaintiffs are amenable to Alaska's suggestion of separate remedy briefing, but do not see any need for other non-parties to participate. *See* Dkt. 44 at 20.

[10] If the Court is disinclined to grant vacatur, a remedy short of that suspending leasing activity pending NEPA review would be more appropriate than remand without vacatur that allows leasing activity to continue.

potentially correctable. Dkt. 40 at 51. But that runs counter to countless cases vacating agency decisions due to NEPA errors. *See, e.g.*, *Env'l Def. Ctr. v. BOEM*, 36 F.4th 850, 882 (9th Cir. 2022) (vacating inadequate NEPA analysis and noting that is "the presumptive remedy for agency action that violates the NEPA"). Indeed, even *Solar Energy Industry* recognized vacatur is the "presumptive remedy." 80 F.4th at 997.

Alaska's argument that the IRA shields Lease Sale 258 from any conclusion that NEPA errors are serious, Dkt. 44 at 21, is equally unavailing. As explained, *supra* Arg. I, the IRA did not relieve BOEM of its obligation to comply with NEPA.

Third, contrary to Defendants' and Alaska's contentions, vacating the sale would not "disturb Congress's judgment that the sale should proceed," Dkt. 40 at 52, or disrupt a "direct set of public policies for expeditious leasing," Dkt. 44 at 22. Vacating and remanding for BOEM to properly conduct its NEPA analysis before holding Lease Sale 258 ensures the sale may proceed consistent with BOEM's statutory obligations. Alaska also suggests vacatur would disrupt the state's economy and planning, and create a "cloud of disruption and uncertainty" for industry. Dkt. 44 at 22. The facts belie this hyperbole. BOEM previously canceled Lease Sale 258, citing a lack of industry interest, AR020799, and the sale ultimately resulted in one bid on one block by one company, AR22030.

Lastly, Defendants' suggested remedy of only declaratory relief, Dkt. 40 at 53, would vitiate NEPA. Among NEPA's purposes is to inform decisionmakers and the public of environmental impacts *before* an action is taken. *See Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989). And as Plaintiffs explained, Dkt. 37 at 43, a proper NEPA analysis could lead to a different lease sale that meaningfully reduces or even eliminates Plaintiffs' harms.

## CONCLUSION

The Court should declare BOEM's actions unlawful, vacate and remand the FEIS and ROD, and vacate the lease sale and lease previously issued to Hilcorp.

Respectfully submitted this 22nd day of January, 2024,

*s/ Hannah Payne Foster*
Hannah Payne Foster (Alaska Bar No. 2105045)
Carole A. Holley (Alaska Bar No. 0611076)
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE

*Attorneys for Plaintiffs Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, and Kachemak Bay Conservation Society.*

*s/ Kristen Monsell*
Kristen Monsell (*pro hac vice*)
CENTER FOR BIOLGICAL DIVERSITY

*Attorney for Plaintiff Center for Biological Diversity.*

*s/ Julia Forgie*
Julia Forgie (*pro hac vice*)
Irene Gutierrez (*pro hac vice*)
Thomas Zimpleman (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiff Natural Resources Defense Council.*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 5,700 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 22nd day of January, 2024.

*s/ Hannah Payne Foster*
Hannah Payne Foster (Alaska Bar No. 2105045)
EARTHJUSTICE

## CERTIFICATE OF SERVICE

I certify that on January 22, 2024, a copy of the foregoing PLAINTIFFS' REPLY BRIEF UNDER LOCAL RULE 16.3(c)(3) was served electronically on Luther L. Hajek and Mary Hunter Gramling.

*s/ Hannah Payne Foster*
Hannah Payne Foster (Alaska Bar No. 2105045)
EARTHJUSTICE