# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

COOK INLETKEEPER, *et al.*,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF THE
INTERIOR, *et al.*,

        Defendants,

    and

STATE OF ALASKA,

        Intervenor-Defendant.

Case No. 3:22-cv-00279-SLG

## DECISION AND ORDER

Before the Court at Docket 37 is Plaintiffs' Opening Brief.[1] Federal Defendants responded in opposition at Docket 40, and Intervenor-Defendant State of Alaska (the "State") responded in opposition at Docket 44.[2] Plaintiffs filed a reply at Docket 46. No party requested oral argument, and oral argument was not necessary to the Court's determination.

---

[1] Plaintiffs are Cook Inletkeeper, Alaska Community Action on Toxics, Center for Biological Diversity, Kachemak Bay Conservation Society, and Natural Resources Defense Council, Inc. Docket 1 at ¶¶ 14-20.

[2] Federal Defendants are the United States Department of the Interior; the Bureau of Ocean Energy Management ("BOEM"); Amanda Lefton, in her official capacity as Director of BOEM; Deb Haaland, in her official capacity as Secretary of the Interior; and Laura Daniel-Davis, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management. Docket 1 at ¶¶ 24-28.

# BACKGROUND

This case is about a lease sale held in December 2022 of blocks of offshore tracts for oil and gas development in the Cook Inlet of Alaska. "The Cook Inlet is a large estuary in the northern Gulf of Alaska and stretches from the Gulf of Alaska to Anchorage."[3] The lease sale at issue was conducted pursuant to the Outer Continental Shelf Lands Act of 1953 ("OCSLA"), 43 U.S.C. §§ 1331-1356c, which was enacted to establish an offshore oil and gas leasing regime. OCSLA prescribes a multistage process for the development of offshore oil and gas resources.[4] "The first stage of [Outer Continental Shelf ("OCS")] planning is the creation of a leasing program. [The Department of the Interior ("Interior")] is required to prepare a 5-year schedule of proposed OCS lease sales."[5] "The second stage of OCS planning—the stage in dispute here—involves the solicitation of bids and the issuance of offshore leases."[6] At this lease sale stage, "[r]equirements of the National Environmental Policy Act . . . must be met first."[7]

---

[3] AR001058.

[4] *Sec'y of the Interior v. California*, 464 U.S. 312, 337-40 (1984), *superseded by statute in part*, Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 6208, 104 Stat. 1388-307. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 887-88 (9th Cir. 2022) (noting that Congress amended the Coastal Zone Management Act to overturn *Secretary of the Interior*, 464 U.S. 312, which held that original sales of leases to oil companies were not subject to consistency review under that Act). *See also* AR020947.

[5] *Sec'y of the Interior*, 464 U.S. at 337 (citing 43 U.S.C. § 1344).

[6] *Id.* at 338 (citing 43 U.S.C. § 1337(a)).

[7] *Id.*

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 2 of 49

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., "requires that each agency assess the environmental consequences of major [f]ederal actions by following certain procedures during the decision-making process."[8]  "Before an agency may approve a particular project, it must prepare a 'detailed statement . . . [on, *inter alia*,] the environmental impact of the proposed action,' 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' and 'alternatives to the proposed action.'"[9]  The Council on Environmental Quality's regulations implementing NEPA describe the process that an agency must follow when issuing the required statement, called an Environmental Impact Statement ("EIS"); the regulations describe the contents of an EIS.[10]  The regulations further provide that, "[a]t the time of [an agency's]

---

[8] *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 474 (D.C. Cir. 2009) (internal quotation marks omitted); *see also* 42 U.S.C. § 4332(C).

[9] *Ctr. for Biological Diversity*, 563 F.3d at 474 (alteration in original) (quoting 42 U.S.C. § 4332(C)(i)-(iii)).

[10] *See* 40 C.F.R. pt. 1502 (2019); Docket 40-1 (the Council on Environmental Quality's 2018 regulations that were identical to those in effect in 2019.  The Council on Environmental Quality published a new rule, effective September 14, 2020, that substantially revised the regulations implementing NEPA.  However, citations in this case are to the 2019 Code of Federal Regulations, reflecting the regulations originally promulgated in 1978, with a minor substantive amendment in 1986.  *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55978 (Nov. 29, 1978); National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15618 (Apr. 25, 1986).  This is because the 2020 NEPA regulations only apply to NEPA processes begun after September 14, 2020, although agencies have the option to apply the 2020 NEPA regulations to ongoing activities begun before that date.  40 C.F.R. § 1506.13 (2020).  BOEM prepared the EIS for Lease Sale 258 pursuant to the 2019 regulations because the NEPA process for Lease Sale 258 began prior to the effective date of the 2020 regulations.  *See* AR020930 n.1.

decision," it "shall prepare a concise public record of decision" that identifies "all alternatives considered by the agency in reaching its decision."[11]

In March 2016, the Secretary of the Department of Interior (the "Secretary") announced a proposed 2017-2022 OCS Oil and Gas Leasing Program ("2017-2022 Program" or "Program"), which included a lease sale in Cook Inlet.[12] In November 2016, the Bureau of Ocean Energy Management ("BOEM") issued a Final Programmatic Environmental Impact Statement ("FPEIS") for the Program.[13] Also in November 2016, BOEM announced the 2017-2022 OCS Oil and Gas Leasing Proposed Final Program ("PFP"), which analyzed three options for a lease sale in Cook Inlet: (1) Targeted Leasing Option; (2) Cook Inlet Beluga Whale Critical Habitat Exclusion Option; and (3) No Sale Option.[14] "Targeted leasing identifies areas considered for leasing that have high resource potential and clear indications of industry interest, while appropriately weighing environmental protection and subsistence use needs."[15] The PFP selected the targeted leasing

---

[11] 40 C.F.R. § 1505.2.

[12] Notice of Availability (NOA) of and Request for Comments on the 2017-2022 Outer Continental Shelf (OCS) Oil and Gas Leasing Proposed Program MAA104000, 81 Fed. Reg. 14881-02, 14882 (Mar. 18, 2016).

[13] Final Programmatic Environmental Impact Statement for the 2017-2022 Outer Continental Shelf (OCS) Oil and Gas Leasing Program, 81 Fed. Reg. 83870-01 (Nov. 22, 2016); AR000001-938.

[14] AR000995, AR001121.

[15] AR021255.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 4 of 49
Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 4 of 49

option, which would hold Lease Sale 258 in the northern portion of the Cook Inlet Planning Area.[16]

The Cook Inlet Planning Area comprises 5.3 million acres, with the northern portion identified in the 2017-2022 Program for Lease Sale 258 comprising 1.09 million acres of the larger planning area.[17] The PFP described that the lease sale process—applicable to lease sales approved in the PFP—"examines the proposed lease sale . . . , starting with the area identified as available for leasing consideration in the Program, and considers reasonable alternative lease sale configurations, reductions, and/or restrictions within that area."[18]

In the January 2017 Record of Decision for the PFP ("2017 ROD" or "Program ROD"), the Secretary "deci[ded] to proceed as described in the PFP" and authorized that the "Cook Inlet sale would include the northern portion of the Cook Inlet Planning Area, which is adjacent to areas of oil and gas development in State waters."[19] The ROD also "direct[ed] BOEM to analyze a seasonal restriction on seismic surveys and exploration drilling for Cook Inlet Lease Sale 258."[20]

In September 2020, BOEM sought input from industry stakeholders as to which lease blocks within the 1.09 million acres should be included in Lease Sale

---

[16] AR001120-21.

[17] AR020946.

[18] AR000978.

[19] AR001210.

[20] AR001210.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 5 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 5 of 49

258 and sought input from other interested parties as to the geological, environmental, or other conditions that could affect leasing and development of particular areas.[21]  From the responses, BOEM developed an Area Identification ("Area ID") to "focus oil and gas leasing on the most promising OCS blocks, while protecting important habitats and critical subsistence activities."[22]  BOEM then prepared a draft EIS and sought public comment.[23]  In May 2022, before a final EIS was prepared, the Secretary canceled Lease Sale 258 due to a lack of industry interest.[24]  However, in August 2022, Congress passed the Inflation Reduction Act ("IRA"), which provided in part: "Notwithstanding the expiration of the 2017–2022 leasing program, not later than December 31, 2022, the Secretary shall conduct Lease Sale 258 in accordance with the Record of Decision approved by the Secretary on January 17, 2017 . . . ."[25]

---

[21] Outer Continental Shelf, Alaska Region, Cook Inlet, Proposed Oil and Gas Lease Sale 258, 85 Fed. Reg. 55859-01, 55860 (Sept. 10, 2020).

[22] AR020950; AR005411 (Area ID map).

[23] Draft Environmental Impact Statement on the Cook Inlet Lease Sale 258, 86 Fed. Reg. 4117-01 (Jan. 15, 2021); AR005715-979.  In January 2021, President Biden issued an executive order pausing new oil and gas leasing on public lands or in offshore waters pending further review.  Exec. Order No. 14008, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021).  In accordance with the executive order, BOEM halted the Lease Sale 258 review process.  Withdrawal of the Public Review Period for Cook Inlet Lease Sale 258, 86 Fed. Reg. 10994-01 (Feb. 23, 2021).  After "updat[ing] its assessment of undiscovered oil and gas resources of the Nation's OCS" and "reviewing additional information made available since the January 2021 publication of the [draft EIS]," BOEM again sought public comment on a draft EIS.  Draft Environmental Impact Statement on the Cook Inlet Lease Sale 258, 86 Fed. Reg. 60068-01 (Oct. 29, 2021).

[24] AR020947.

[25] Inflation Reduction Act, Pub. L. No. 117-169, § 50264(c), 136 Stat. 1818, 2060 (2022).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 6 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 6 of 49

To comply with the IRA, BOEM subsequently issued a proposed notice of sale and, shortly thereafter, issued a Final EIS ("FEIS").[26]  In November 2022, the Secretary signed the Record of Decision for Lease Sale 258 ("Lease Sale 258 ROD").[27]  BOEM held Lease Sale 258 on December 30, 2022, and received a single bid from Hilcorp Alaska, LLC ("Hilcorp"), of $63,983 for lease block 6255.[28]

Plaintiffs then initiated this action pursuant to the Administrative Procedure Act ("APA"), asserting that BOEM's environmental review of Lease Sale 258 and the resulting ROD violated NEPA.[29]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[30]

---

[26] Notice of Availability of the Proposed Notice of Sale for Cook Inlet Oil and Gas Lease Sale 258, 87 Fed. Reg. 58130-01 (Sept. 23, 2022); AR020857-70; Final Environmental Impact Statement on the Cook Inlet Lease Sale 258, 87 Fed. Reg. 65247-01 (Oct. 28, 2022); AR020926-1353.

[27] AR021776-84.

[28] AR022030-31.

[29] Docket 1 at ¶¶ 1, 101-30 (Compl.).  While the complaint also alleges that BOEM "failed to take a hard look at greenhouse gas emissions resulting from Lease Sale 258" and that Defendants failed to adequately respond to comments during the NEPA process, Plaintiffs failed to raise these arguments in their opening brief.  *See, e.g.*, Docket 1 at ¶¶ 107, 125-30; *see generally* Docket 37.  Accordingly, the Court does not consider these arguments because "[a]rguments not raised in opening brief are waived."  *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999).

[30] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

## LEGAL STANDARD

Pursuant to the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[31]  Agency action is arbitrary and capricious if it:

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[32]

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[33]  "[D]eference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise."[34]  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[35]  "Whether agency

---

[31] 5 U.S.C. § 706(2)(A).

[32] *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

[33] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

[34] *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks and citation omitted).

[35] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks and citation omitted).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 8 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 8 of 49

action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[36]

## DISCUSSION

### I. National Environmental Policy Act

Plaintiffs bring two NEPA claims: First, that BOEM, in the FEIS for Lease Sale 258, "analyzed a set of nearly identical action alternatives and arbitrarily rejected other reasonable alternatives that would have reduced the sale's environmental impacts."[37] Second, that BOEM failed to take a hard look at the sale's impacts on Cook Inlet beluga whales.[38]

#### a. Applicability of NEPA

As a threshold matter, the State argues that "BOEM cannot be in violation of NEPA because the challenged FEIS and ROD were not required under NEPA."[39] That is so, the State claims, because, "[b]y its mandatory language and references to the 2017 ROD, the IRA effectively declared the information gathering and public role purposes of NEPA satisfied such that any remaining discretion for BOEM was not a major Federal action to trigger a FEIS."[40]

---

[36] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

[37] Docket 37 at 21.

[38] Docket 37 at 28.

[39] Docket 44 at 14.

[40] Docket 44 at 18.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 9 of 49

The State relies on *Friends of the Earth v. Haaland*, in which the D.C. Circuit Court of Appeals held that environmental groups' challenge to Lease Sale 257 for tracts in the Gulf of Mexico, which had already occurred, was moot because the IRA "required issuance of the leases won in Lease Sale 257."[41]  The IRA

> instruct[ed] the Secretary of the Interior—who oversees the Bureau—to "accept the highest valid bid for each tract or bidding unit of Lease Sale 257 . . . and . . . provide the appropriate lease form to the winning bidder" within 30 days of the Act's enactment.  After then receiving an executed lease form and payment from the highest bidder, the Secretary must "promptly issue to the high bidder a fully executed lease."[42]

As such, "[e]ven if [the court] agreed with the environmental groups that the sale failed to comply with the National Environmental Policy Act, the result will be the same: The highest bidders will receive their leases."[43]

In their reply, Plaintiffs respond that "[t]he IRA instructed BOEM to hold Lease Sale 258 but did not eliminate BOEM's usual discretion over the scope and conditions of the sale.  Nor did it expressly or impliedly release BOEM from its NEPA obligations."[44]  "[B]y requiring that the lease sale be held in accordance with the 2017-2022 Program ROD," Plaintiffs assert that the "IRA did not eliminate BOEM's discretion" because the "ROD defined the sale's scope broadly, affording

---

[41] Docket 44 at 15, 17; *Friends of the Earth v. Haaland*, Case No. 22-5036, 2023 WL 3144203, at *1 (D.C. Cir. Apr. 28, 2023).

[42] *Friends of the Earth*, 2023 WL 3144203, at *1 (alterations in original) (quoting Inflation Reduction Act § 50264(b)(1), (b)(1)(A), (b)(1)(B), (b)(2)).

[43] *Id.*

[44] Docket 46 at 6.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 10 of 49

BOEM flexibility to shape Lease Sale 258."[45]  Plaintiffs also distinguish the lease

sale at issue in *Friends of the Earth*, which had already occurred before the IRA

became law, from Lease Sale 258, for which, "by contrast, the IRA only directs

BOEM to hold a sale described in the 2017-2022 Program ROD by a specific date,

but otherwise leaves the scope and conditions of the sale to BOEM."[46]

The Court agrees with Plaintiffs and finds that the IRA, by directing BOEM

to conduct Lease Sale 258 in accordance with the 2017-2022 Program and ROD,

did not limit BOEM's discretion so as to render NEPA inapplicable.[47]  The ROD

"constitute[d] the decision to proceed as described in the PFP."[48]  The PFP, in turn,

explained that:

> Each lease sale that is scheduled in the approved 2017–2022
> Program will be subject to an established prelease evaluation and
> decision process whereby interested and affected parties will have
> multiple opportunities to participate.  That process examines the
> proposed lease sale . . . starting with the area identified as available
> for leasing consideration in the Program, and considers reasonable
> alternative lease sale configurations, reductions, and/or restrictions
> within that area.  No lease sale area can be offered that is not included
> in the area identified in the approved Program.  The pre-lease process

---

[45] Docket 46 at 8 (citing AR001208-10).

[46] Docket 46 at 10.

[47] Inflation Reduction Act § 50264(c) ("Notwithstanding the expiration of the 2017–2022 leasing program, not later than December 31, 2022, the Secretary shall conduct Lease Sale 258 in accordance with the Record of Decision approved by the Secretary on January 17, 2017, described in the notice of availability entitled 'Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000' issued on January 17, 2017 (82 Fed. Reg. 6643 (January 19, 2017)).").

[48] AR001210.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 11 of 49

leads to the final decision on the terms and conditions of each OCS lease sale.[49]

The Program explained that the prelease process also includes the preparation of draft and final NEPA-required documents.[50]   Nothing in the IRA or the Program ROD limited BOEM's use of its standard procedures as outlined in the Program. Further, the language in the IRA applicable to Lease Sale 258 is wholly different from the language at issue in *Friends of the Earth* regarding Lease Sale 257. Accordingly, that case is inapposite.   The Court finds that the IRA did not render NEPA inapplicable.[51]

### b.  Reasonable Range of Alternatives

Plaintiffs claim that BOEM violated NEPA by failing to consider an adequate range of alternatives in the FEIS.[52]   In preparing an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action, "and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."[53]   "NEPA does not

---

[49] AR000978 (internal citations omitted).

[50] AR000978-79.  *See also* AR001120 ("In the Cook Inlet, the area considered in the PFP is the same as the Proposed Program, and includes the northern portion of the planning area, which balances the need to protect endangered species against the areas with highest resource potential and industry interest.  Exclusions related to the protection of beluga whale and sea otter critical habitat will be further considered in the subsequent lease sale process.").

[51] *See N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006) (holding "[a]n EIS is undeniably required" at the leasing stage of non-no-surface-occupancy leases).

[52] Docket 37 at 21-28.

[53] 40 C.F.R. § 1502.14(a) (2019).  *See supra* note 10.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 12 of 49

force agencies to 'review remote and speculative alternatives,' 'only reasonable or feasible ones.'"[54]  However, an EIS must consider alternatives "varied enough to allow for a real, informed choice."[55]  But an agency need not "discuss alternatives similar to alternatives actually considered, or alternatives which are 'infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area.'"[56]

"The range of alternatives that an agency must consider is based on the purpose and need of the proposed agency action," so a court must "begin by determining whether or not the purpose and need statement was reasonable."[57]  A court then "determine[s] whether the agency considered a reasonable range of alternatives based on its purpose and need."[58]  "The existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate."[59]  The "touchstone for [a court's] inquiry is whether an EIS's selection

---

[54] *City of Los Angeles v. FAA*, 63 F.4th 835, 843 (9th Cir. 2023) (first quoting *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 580 (9th Cir. 2016); and then quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Cir. 2004)).

[55] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008) (citation omitted).

[56] *N. Alaska Env't Ctr.*, 457 F.3d at 978 (quoting *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180-81 (9th Cir. 1990)).

[57] *City of Los Angeles*, 63 F.4th at 843 (alterations omitted) (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022)).

[58] *Id.* (citing *Audubon Soc'y of Portland*, 40 F.4th at 982).

[59] *Id.* at 844-45 (alteration omitted) (quoting *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023)).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 13 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 13 of 49

and discussion of alternatives fosters informed decision-making and informed public participation."[60]

As described in the FEIS, the purpose of Lease Sale 258 was

> to offer for lease certain OCS blocks located within the federally owned portion of Cook Inlet that may contain economically recoverable oil and gas resources. The need for the Proposed Action is to meet the purposes of the Outer Continental Shelf Lands Act . . . and support development of domestic energy resources in an environmentally and economically responsible way. Lease Sale 258 may lead to oil and gas exploration, development, and production. Oil and gas from the Cook Inlet OCS could help meet regional and national energy needs and lessen the need for imports.[61]

In OCSLA, Congress declared that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."[62] Plaintiffs do not dispute the reasonableness of the purpose and need statement, and the Court finds that the statement is reasonable in light of the directives in OCSLA and BOEM's responsibility to implement those directives.[63] The Court thus turns to an analysis

---

[60] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

[61] AR020930; *see also* AR020946-47.

[62] 43 U.S.C. § 1332(3).

[63] *See Westlands Water Dist.*, 376 F.3d at 866 ("Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS."); 30 C.F.R. § 550.101 ("The Secretary of the Interior (Secretary) authorized the Bureau of Ocean Energy Management (BOEM) to regulate oil, gas, and sulfur exploration, development, and production operations on the Outer

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 14 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 14 of 49

of whether BOEM considered a reasonable range of alternatives based on this purpose and need.

The Proposed Action for Lease Sale 258 consists of 210 OCS blocks totaling approximately 1.013 million acres that could potentially be leased.[64] The FEIS examined eight alternatives for the Proposed Action.[65] Alternative 2 is a no action alternative.[66] Alternative 3A excludes from the lease sale 10 blocks that are within the Cook Inlet beluga whale's critical habitat.[67] Alternative 3B offers all 210 blocks for lease but prohibits on-lease seismic surveys and exploration drilling between November 1 and April 30 on the 10 blocks that are within the Cook Inlet beluga whale's critical habitat.[68] Alternative 3C offers all 210 blocks for lease but prohibits on-lease seismic surveys between November 1 and April 1 on all 210 blocks and on-lease seismic surveys on 146 blocks that are within 10 miles of major

---

Continental Shelf (OCS).").

[64] While the FEIS stated that the lease sale area included 224 OCS blocks covering approximately 1.09 million acres, BOEM noted that 14 of those blocks—encompassing 76,615 acres—were currently leased, leaving 210 unleased blocks. Thus, only 210 OCS blocks, totaling approximately 1.013 million acres (1,090,000 acres – 76,615 acres = 1,013,385 acres), were available for leasing. AR020951; Outer Continental Shelf (OCS), Alaska Region (AK), Cook Inlet Planning Area, Proposed Oil and Gas Lease Sale 258, 85 Fed. Reg. 55861-01 (Sept. 10, 2020); AR021752-53; AR020956.

[65] AR020931. BOEM noted that, "[b]ecause many of the areas of environmental concern have already been removed or addressed through targeted leasing, BOEM has developed alternatives for this EIS that are targeted at a very specific set of important resources in Cook Inlet." AR020950.

[66] AR020952.

[67] AR020952.

[68] AR020952; AR021041.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 15 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 15 of 49

anadromous streams from July 1 to September 30.[69]  Alternative 4A excludes from

the lease sale 7 blocks that fall within the northern sea otter's critical habitat.[70]

Alternative 4B offers all 210 blocks for lease but prohibits the discharge of drilling

fluids and cuttings and seafloor-disturbing activities on the 14 blocks that are within

1,000 meters of the northern sea otter's critical habitat.[71]  Alternative 5 offers all

210 blocks for lease, prohibits on-lease seismic surveys during drift gillnetting

season on all blocks north of Anchor Point (46% of the lease sale area), and

requires that lessees notify the United Cook Inlet Drift Association of any structures

planned during the drift gillnetting season.[72]  Finally, Alternative 6—BOEM's

Preferred Alternative—offers 193 OCS blocks for lease, excluding from the lease

sale the 17 blocks that overlap with beluga whale and northern sea otter critical

habitat, and incorporates the mitigation measures of Alternatives 3C, 4B, and 5.[73]

According to Plaintiffs' calculation of the acreage represented by the excluded

blocks, which Federal Defendants do not dispute, the Preferred Alternative

reduces the acreage offered for lease by 6%.[74]  The FEIS determined that "[t]he

---

[69] AR020952.

[70] AR020953.

[71] AR020954.

[72] AR020954-55.

[73] AR020956.

[74] Docket 37 at 22 & n.3.

overall impact ratings . . . did not differ among action alternatives for any resource, except for commercial fishing."[75]

BOEM also considered additional alternatives but eliminated them from detailed analysis.[76] These include prohibiting the marine discharge of all exploration drilling fluids and cuttings, using directional drilling from shore, prohibiting seismic surveys during salmon migration, and prohibiting exploration or drilling from June to September based on considerations for North Pacific right whales.[77]

BOEM further considered, but declined to examine in detail, the Northern Area Exclusion ("NAE").[78] The NAE would exclude from the lease sale 117 blocks north of Anchor Point, reducing the lease sale area by 46%.[79] BOEM acknowledged that the NAE would "reduce the potential for interactions with the drift gillnet fishery that operates seasonally in this area, and reduce the possibility of interactions and impacts with beluga whales, which are more likely to be found

---

[75] AR020961.

[76] AR020957-59.

[77] AR020957-58.

[78] AR020958. BOEM also considered, but did not examine in detail, the Lower Kenai Peninsula Exclusion, involving 9 blocks within the lease sale area; the exclusion "was not evaluated in detail for this EIS" because "[s]ubsistence uses in OCS waters offshore of the lower Kenai Peninsula are inherently seasonal and BOEM expects that potential conflicts can be avoided through other mitigation included in the Proposed Action." AR020958-59.

[79] AR020958.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 17 of 49

in the northern part of the lease sale area."[80]  But "BOEM determined that this alternative would not meet the purpose and need of [Lease Sale] 258 because of the large percentage of the lease sale area that would be excluded" and because "the goals of this alternative are partially addressed by the Proposed Action," including Alternatives 3A, 3B, 3C, and 5.[81]

Plaintiffs' arguments fall into two categories: (1) BOEM improperly interpreted the lease sale's purpose and need statement, the Program, and OCSLA as a legal constraint on the alternatives that BOEM could consider; and (2) BOEM failed to consider the NAE or another meaningfully reduced leasing area as a reasonable alternative.

First, Plaintiffs maintain that BOEM incorrectly determined that it was "legally unable to select such alternatives" because they would "violate the lease sale's purpose and need, OCSLA, and the 2017-2022 Program by 'overly' or 'unduly' restricting oil and gas development."[82]  Plaintiffs assert that BOEM's authority is not so constrained.  The lease sale's purpose and need, Plaintiffs argue, does not limit BOEM's "ability to analyze an alternative like the Northern Area Exclusion."[83]  As such, Plaintiffs maintain that the NAE was a viable alternative that BOEM

---

[80] AR020958 (citations omitted).

[81] AR020958.

[82] Docket 37 at 24-25 (first quoting AR021248; and then citing AR020958, AR021250, AR021255).

[83] Docket 37 at 25-26 (citing AR020930).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 18 of 49

should have considered because it would offer blocks for lease in Cook Inlet with potentially recoverable oil and gas, support the development of domestic energy resources, and would do so "in a more environmentally responsible way than the proposed action."[84] And Plaintiffs assert "the incorporation of OCSLA into the purpose and need statement" "does not limit the Bureau's ability . . . to consider such alternatives," as the OCSLA grants BOEM "wide authority to reduce sale areas, especially in consideration of environmental factors."[85] Plaintiffs further maintain that the 2017-2022 Program does not cabin BOEM's authority to consider other reasonable alternatives because, in the Program, BOEM "repeatedly asserted that it would continue to 'consider[] reasonable alternative lease sale configurations, reductions, and/or restrictions within [the area identified in the 2017-2022 Program].'"[86] In a footnote, Plaintiffs argue that the IRA also does not limit BOEM's consideration of alternatives, as it required BOEM to hold Lease Sale 258 in accordance with the 2017 ROD approved by the Secretary, and that ROD incorporated and approved the 2017-2022 Program.[87]

Second, Plaintiffs assert that BOEM "considered only alternatives that offered 94 to 100 percent of the Proposed Action area" and "arbitrarily rejected"

---

[84] Docket 37 at 26 (citing AR020930, AR020958, AR021787). *See* AR020958.

[85] Docket 37 at 26 (first citing 43 U.S.C. § 1344(a); and then citing AR020797-802).

[86] Docket 37 at 27 (alterations in original) (first quoting AR000978; and then citing AR000997, AR001036).

[87] Docket 37 at 27 n.7.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 19 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 19 of 49

"available reasonable alternatives that would have meaningfully limited the leasing area or scope of development," and that "the only mitigation measures that covered more than a small handful of blocks were seasonal limitations."[88]  Plaintiffs also contend that BOEM "presumed, without justification or explanation, that the alternatives would enable identical levels of oil and gas development," demonstrating that BOEM improperly considered "only action alternatives that essentially 'authorize[d] the same underlying action' and thus presented 'no meaningful difference' for consideration by the agency and the public."[89]  Because BOEM failed "to consider any reasonable alternative that meaningfully limited the leasing area and/or scope of development, [Plaintiffs claim] the Bureau violated NEPA."[90]

In response, Federal Defendants maintain that BOEM satisfied NEPA because it appropriately concluded that the NAE "would frustrate BOEM's purpose and need of holding Lease Sale 258" by "excluding nearly half of the area identified in the Cook Inlet Program Area" and explained that it was not analyzing the alternative for that reason.[91]  Federal Defendants further assert that BOEM did not rely on the 2017-2022 Program to limit the alternatives analysis, as the Program

---

[88] Docket 37 at 24-25.

[89] Docket 37 at 24 (alteration in original) (first quoting *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013); and then citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999)).

[90] Docket 37 at 24.

[91] Docket 40 at 28 (citing AR020958; AR01121).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 20 of 49

established the Program Area and the FEIS "analyzed a range of alternative areas and mitigation within that area."[92]  And Federal Defendants stress that the IRA required the Secretary of the Interior to hold Lease Sale 258.[93]

Federal Defendants also maintain that "BOEM analyzed a reasonable range of alternatives that would meet the purpose and need of holding Lease Sale 258, including eight action alternatives," which "varied in terms of the parcels offered and the protections required," and "the no action alternative."[94]  Federal Defendants maintain that "the alternative exclusions and mitigation analyzed in the FEIS made a difference in the potential environmental impacts, particularly to the beluga whale," and that, while "the overall impacts to marine mammals" of the various alternatives were "similar to the proposed action," "the FEIS was clear that Alternatives 3A, 3B, and 3C 'would provide an additional measure of protection to beluga whales by limiting activities in or near beluga whale critical habitat and their feeding areas in Cook Inlet.'"[95]  According to Federal Defendants, consideration of these alternatives "complied with NEPA," as "BOEM's stated purpose and need was to hold an oil and gas lease sale in the northern portion of the Cook Inlet

---

[92] Docket 40 at 31-32 (citing AR01121; AR020950-56).

[93] Docket 40 at 31.

[94] Docket 40 at 24 (citing AR020950-56).

[95] Docket 40 at 25-26 (quoting AR021056).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 21 of 49

Planning Area, in keeping with its statutory duties under OCSLA and its obligation to hold Lease Sale 258 pursuant to the IRA."[96]

As to whether BOEM only considered nearly identical levels of oil and gas development, Federal Defendants assert that "the alternatives varied in terms of where leasing could occur and what restrictions would apply," and they point to the FEIS's analysis of the alternative excluding beluga whale critical habitat from the lease sale where the "[p]otential for resource development would be lost on 10 OCS blocks along with associated economic benefits."[97] And Federal Defendants maintain that BOEM was not required to consider alternatives that would reduce the overall acreage of the lease sale, as BOEM's "targeted leasing model . . . already reduced the planning area to a smaller Program Area by balancing the need for economically viable energy extraction with environmental protection"[98] by selecting a Program Area that was "roughly 20% of the larger Cook Inlet Planning Area."[99] Federal Defendants claim that, "[t]o meet its obligations under OCSLA to offer lease parcels for oil and gas exploration, development, and production,

---

[96] Docket 40 at 23-24.

[97] Docket 40 at 26 (alteration in original) (quoting AR020961).

[98] Docket 40 at 27 (citing AR021255-56 (BOEM's response to comments on the draft EIS explaining that the 2017-2022 Program used a targeted leasing approach, called the Area ID process, to "identif[y] areas considered for leasing that have high resource potential and clear indications of industry interest, while appropriately weighing environmental protection and subsistence use needs")).

[99] Docket 40 at 27 (citing AR021256; AR020951).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 22 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 22 of 49

BOEM reasonably chose not to analyze an even smaller sale."[100]   And "the potential restriction of oil and gas development is an appropriate consideration under OCSLA."[101]

The Court first discusses Plaintiffs' argument that BOEM relied on the purpose and need statement, OCSLA, and the Program to improperly constrain its legal authority.[102]   Plaintiffs first point to the FEIS's statement that "[a]lternatives or mitigation measures which would overly restrict oil and gas exploration, development, and operation in Lease Sale 258 (Alternative 2, No Action) would not meet the purpose and need of the Proposed Action as directed under OSCLA and the 2017-2022 OCS Oil and Gas Leasing Proposed Final Program."[103]   Plaintiffs assert that BOEM "did not clarify at what point an alternative becomes 'overly restrict[ive]' of oil and gas activity" and yet "continued to claim that it was legally unable to select such alternatives."[104]

But the statement that Plaintiffs identify was made in the FEIS regarding the no action alternative.   BOEM was required to hold Lease Sale 258 by the IRA; as such, BOEM reasonably determined that the no action alternative would overly

---

[100] Docket 40 at 27 (citing AR021256; AR020946-47).

[101] Docket 40 at 31 (citing 43 U.S.C. § 1332(3) (providing that "the Outer Continental Shelf is a vital natural resource . . . which should be made available for expeditious and orderly development, subject to environmental safeguards")).

[102] Docket 37 at 24-25 (first quoting AR021248; and then citing AR020958, AR021250, AR021255).

[103] AR021248 (emphasis omitted); Docket 37 at 25.

[104] Docket 37 at 25 (alteration in original).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 23 of 49

restrict oil and gas exploration, and hence was not a viable alternative. When read in context, the statement does not indicate that BOEM improperly constrained its legal authority to consider alternatives.

Plaintiffs also cite to the FEIS's discussion of the Northern Area Exclusion that declines to further analyze that alternative, explaining that the NAE "would not meet the purpose and need" of the lease sale "because of the large percentage of the lease sale area that would be excluded."[105] Further, Plaintiffs point to BOEM's responses to several comments urging BOEM to consider alternatives that would reduce oil and gas development by limiting the lease sale area or the number of wells that could be drilled.[106] In its responses, BOEM noted that the purpose and need of Lease Sale 258 is to offer for lease certain OCS blocks and to meet the requirements of OCSLA.[107] BOEM also explained that the Program already implemented a targeted leasing model to identify areas with high resources potential and industry interest, while adequately considering environmental protection and subsistence needs.[108]

BOEM appears to have interpreted the purpose and need statement, together with the OCSLA and the Program, to require, or at least warrant, that all or nearly all of the northern portion of the Cook Inlet Program Area should be

---

[105] AR020958.

[106] Docket 37 at 25; AR021255.

[107] AR021255.

[108] AR021255.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 24 of 49

included in the lease sale, and BOEM restricted its alternatives analysis accordingly.

The Court agrees with Plaintiffs that BOEM's restrictive interpretation of those provisions violated NEPA. The purpose of the lease sale was "to offer for lease certain OCS blocks."[109] The statement does not identify which blocks are to be offered. Nor does OCSLA direct BOEM to maximize the amount of the OCS that is leased. Rather, it simply directs that the OCS "should be made available for expeditious and orderly development, subject to environmental safeguards."[110] And BOEM's reliance on the Program to warrant leasing nearly all of the entire northern area is at odds with the terms of the Program, as that document expressly indicates that in evaluating proposed lease sales, BOEM would "start[] with the area identified as available for leasing consideration in the Program, and consider[] reasonable alternative lease sale configurations, reductions, and/or restrictions within that area."[111] The Program did not state the evaluation would start and end with offering to lease nearly all of the area identified as available. BOEM appears to have determined that the planning decision controls such that only a modest additional alternatives analysis within the planning area is warranted. But "[i]f the

---

[109] AR020930.

[110] 43 U.S.C. § 1332(3). *See* 43 U.S.C. § 1344(a) (directing the Secretary to maintain an oil and gas leasing program consistent with certain principles).

[111] AR000978. *See also* AR000997 ("[L]ease sales will be tailored to offer areas that have significant resource potential while appropriately weighing environmental protection, subsistence use needs, and other considerations.").

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 25 of 49

. . . *planning* alternatives simultaneously represented *leasing* alternatives moving forward, there would be no requirement to conduct the analysis which is the 'heart' of NEPA, to-wit, to analyze *alternatives* for any project undertaken pursuant to a land use plan, including the oil and gas lease sales at play here." [112]

The Ninth Circuit's decision in *Western Watersheds Project v. Abbey* is instructive. [113]  In that case, plaintiffs challenged the sufficiency of an environmental assessment ("EA") prepared for the renewal of a ten-year grazing permit on an allotment of land in Montana. [114]  The EA considered four alternatives, including a no action alternative; all the action alternatives would authorize the same level of grazing as the previous permit, but they varied regarding the applicable management practices. [115]  The EA explained that it "considered but did not analyze in detail alternatives that would reduce or eliminate grazing" because "BLM determined that they did not meet the purpose of the proposed permit renewal." [116]  The purpose and need of the allotment permit renewal was "to evaluate rangeland health standards and modify current grazing practices on the

---

[112] *See W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 984 (D. Idaho 2021) (emphasis in original).

[113] 719 F.3d 1035 (9th Cir. 2013).

[114] *Id.* at 1039-40.

[115] *Id.* at 1040, 1050.

[116] *Id.* at 1040-41.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 26 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 26 of 49

allotment so that progress can be made toward meeting [certain environmental] standards."[117]

The Ninth Circuit held that BLM failed to consider a reasonable range of alternatives in the EA because BLM only considered alternatives that would authorize the same amount of grazing, and that BLM's rationale for declining to consider in detail a no-grazing or reduced-grazing alternative—that they were beyond the purpose and need of the project—was belied by the record, as those alternatives could feasibly meet the project's goal, and "[f]easible alternatives should be considered in detail."[118] The Ninth Circuit held that "[i]t would be reasonable to analyze in detail the environmental impacts of an alternative that authorized something less than" what was authorized under the prior permit.[119]

The Court is presented with a comparable situation here. The alternative that BOEM considered that was most restrictive of the lease sale area only reduced the lease sale area by 6%.[120] And "[t]he overall impact ratings . . . did not differ among action alternatives for any resource, except for commercial fishing."[121] BOEM reasoned that, "[b]ecause many of the areas of environmental concern

---

[117] *Id.* at 1052.

[118] *Id.* at 1051-52 (citing *Muckleshoot Indian Tribe*, 177 F.3d at 814 (concluding that the Forest Service violated NEPA by considering but preliminarily dismissing several feasible alternatives)).

[119] *Id.* at 1052.

[120] Docket 37 at 22 & n.3.

[121] AR020961.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 27 of 49

have already been removed or addressed through targeted leasing," the alternatives for this EIS are "targeted at a very specific set of important resources in Cook Inlet."[122] In essence, it appears that BOEM relied on the Program's targeted leasing at the planning stage to delineate the scope of the lease sale in 2022. In so doing, the FEIS failed to consider alternatives at the leasing stage "varied enough to allow for a real, informed choice," in violation of NEPA.[123]

Federal Defendants assert that *Western Watersheds Project* has "no bearing here because [BOEM] considered meaningfully different alternatives that provided varying ranges of protection for the beluga whale and other environmental resources."[124] However, that is belied by BOEM's own conclusion in the FEIS that the overall impacts between the alternatives were not different except for the impact on commercial fishing.

In sum, the Court finds that BOEM failed to consider a reasonable range of alternatives at the leasing stage in violation of NEPA because it failed to consider any alternative that would offer for lease a reduced number of blocks that would meaningfully reduce overall impacts, could feasibly meet the purpose and need of Lease Sale 258, and would better allow for "informed decision-making and informed public participation."[125]

---

[122] AR020950.

[123] *Friends of Yosemite Valley*, 520 F.3d at 1039 (citation omitted).

[124] Docket 40 at 27-28.

[125] *Westlands Water Dist.*, 376 F.3d at 868 (citation omitted). The Court does not reach whether detailed consideration of the NAE would satisfy BOEM's obligations pursuant to NEPA. Rather,

### c. Hard Look at Impacts on the Cook Inlet Beluga Whale

Plaintiffs' second NEPA claim challenges BOEM's conclusion that "noise pollution, cumulative impacts, and oil spills caused by Lease Sale 258 will have only negligible or minor impacts on belugas"; Plaintiffs assert that BOEM's conclusion "contradicts the scientific evidence demonstrating the substantial risks each of these stressors poses to the whales."[126]

"Cook Inlet beluga whales are white, toothed whales found in upper Cook Inlet when sea ice is absent, and farther south into lower Cook Inlet after sea ice formation."[127] Cook Inlet beluga whales were listed as endangered under the Endangered Species Act in 2008, but, despite the protections imposed by that act and the Marine Mammal Protection Act ("MMPA"), belugas continue to decline at a rate of 2.3% annually.[128] Recently, the Cook Inlet beluga whale population was estimated at 279 beluga whales.[129]

"NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."[130] "NEPA requires federal

---

the Court remands to allow BOEM to consider reasonable alternatives varied enough to allow for meaningful, informed decision-making and public participation in determining which blocks should be offered for lease.

[126] Docket 37 at 28-29.

[127] AR021044.

[128] AR021045.

[129] AR021045.

[130] *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 979-80 (9th Cir. 2022) (internal

agencies to prepare an [EIS] for 'major Federal actions significantly affecting the quality of the human environment.'"[131] "The EIS must 'present the environmental impacts of the proposal and alternatives in comparative form' to give a 'clear basis for choice among options by the decisionmaker and the public.'"[132] "This requires disclosure of the environmental impacts of the proposed action and its alternatives, including their direct, indirect, and cumulative effects."[133]

When a court reviews the adequacy of an EIS, it uses a "rule of reason analysis" to decide whether the EIS's discussion of environmental consequences is "sufficiently thorough."[134] The rule of reason analysis is substantially similar to an abuse of discretion analysis.[135] "In determining whether the EIS contains a reasonably thorough discussion, [a court] may not fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies . . . ."[136] And yet "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS."[137] "NEPA requires

---

quotation marks and citation omitted).

[131] *Id.* at 980 (quoting 42 U.S.C. § 4332(C)).

[132] *Id.* (quoting 40 C.F.R. § 1502.14).

[133] *Id.* (citing 40 C.F.R. §§ 1502.16, 1508.7, 1508.8).

[134] *Id.* (internal quotation marks omitted) (quoting *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020)).

[135] *Id.* (citation omitted).

[136] *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (internal quotation marks and citation omitted).

[137] *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40

agencies to consider all important aspects of a problem" and to "engage with [any] considerable contrary scientific and expert opinion."[138] However, "once [a court is] satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [the court's] review is at an end."[139]

### i. Noise Pollution

Plaintiffs maintain that BOEM "relied on generalized assertions about vessel noise that contradict the relevant science regarding its effects on belugas to conclude that noise pollution would have 'little to none . . . i.e., negligible to minor' impacts."[140] Plaintiffs assert that BOEM failed to "address the unique threat that vessel noise pollution poses to the Cook Inlet beluga whale" or to consider studies showing the potentially negative impact of noise from tug boats, cargo ships, or tanker vessels on Cook Inlet beluga whales.[141] Specifically, Plaintiffs assert that BOEM did not address the findings in a study titled *Anthropogenic Noise and the Endangered Cook Inlet Beluga Whale, Delphinapterus leucas: Acoustic Considerations for Management* ("Castellote study") indicating that vessel noise is potentially interfering with beluga communication.[142]

---

C.F.R. § 1500.1(b)).

[138] *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (citation omitted).

[139] *Friends of Se.'s Future*, 153 F.3d at 1063 (internal quotation marks and citation omitted).

[140] Docket 37 at 29-30 (quoting AR021054).

[141] Docket 37 at 31-32.

[142] Docket 37 at 32 (citing AR045708, AR045715).

Plaintiffs also contend that BOEM relied on "arbitrary assumptions and outdated information," as the FEIS states that "[t]he response of belugas to vessels is thought to be partly a function of habituation."[143] Plaintiffs assert "the science demonstrates" that "belugas are *not* habituated to human-caused noise in Cook Inlet, including vessel noise."[144]

Federal Defendants respond that "BOEM conducted a reasonably thorough analysis of the potential impacts of noise, including vessel noise, on beluga whales" and, for support, summarize portions of the FEIS discussing the impact of "noise from seismic surveys, pile-driving, installation of platforms and pipelines, drilling, and vessel traffic."[145] Regarding vessel noise specifically, Federal Defendants maintain that BOEM

> [a]nalyz[ed] scientific studies on vessel noise, . . . acknowledged that vessel noise was the loudest noise that regularly occurs in Cook Inlet, . . . [and] determined, based on research conducted by [the National Marine Fisheries Service ("NMFS")], that such noise is generally below the level of intensity that would cause harm to marine mammals, but BOEM recognized the potential for such noise to interfere with marine mammals, to cause them to avoid the area, and to mask vocalizations and other environmental noise. BOEM also discussed how, in response to vessels, beluga whales may alter their call types and the frequency of their calls and may avoid vessels.[146]

---

[143] Docket 37 at 33 (quoting AR021053).

[144] Docket 37 at 33 (emphasis in original) (citing AR068782); *see also* Docket 37 at 31 (citing AR132629).

[145] Docket 40 at 32-33 (citing AR021048).

[146] Docket 40 at 34 (citing AR021051; AR021053).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 32 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 32 of 49

Federal Defendants contend that BOEM's analysis was "'a reasonably thorough discussion of the significant aspects of the probable environmental consequences' of Lease Sale 258."[147]  In their reply, Plaintiffs counter that the FEIS's discussion of vessel noise "*do[es] not describe or analyze* what the impacts of avoiding vessels could be on belugas," and therefore BOEM did not take the requisite hard look.[148]

Regarding Plaintiffs' claim that BOEM concluded that noise pollution would have "little to none . . . i.e., negligible to minor"[149] impacts, Federal Defendants assert that "Plaintiffs mischaracterize the FEIS by omitting key language."[150]  The entirety of the FEIS's conclusion was "that impacts 'would *range* from little to none, to short-term and localized impacts, i.e., negligible to minor[,]' . . . [and] that same part of the FEIS goes on to state that '[i]ncreases in anthropogenic noise is one of the most potentially impacting effects stemming from [Lease Sale] 258.'"[151]

Federal Defendants also contest Plaintiffs' claim that BOEM relied on outdated research when it stated in the FEIS that "[t]he response of belugas to vessels is thought to be partly a function of habituation."[152]  Federal Defendants

---

[147] Docket 40 at 34 (quoting *City of Carmel-by-the-Sea v. U.S. Dep't of Trans.*, 123 F.3d 1142, 1150 (9th Cir. 1997)).

[148] Docket 46 at 17 (emphasis in original) (citations omitted).

[149] Docket 37 at 30.

[150] Docket 40 at 34.

[151] Docket 40 at 34 (emphasis in original) (quoting AR021054).

[152] Docket 40 at 36 (quoting Docket 37 at 33).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 33 of 49

emphasize that "the FEIS stated that beluga whales may be 'partly' habituated to vessels and . . . [i]n the preceding sentence, BOEM stated, 'Beluga whales have been shown to respond to vessels by altering call types, frequency use, and call rates, and avoiding ships.'"[153]  Federal Defendants maintain that "the statement regarding habituation is a reasonable summary of the findings in" a 2017 Biological Opinion prepared by NMFS for an earlier OCS lease sale in Cook Inlet.[154]  And Federal Defendants maintain that BOEM actually considered the Castellote study in the FEIS, and "the study's finding is based on an area much farther up Cook Inlet near Anchorage."[155]

The Court finds that BOEM failed to take the requisite hard look at the impact of vessel noise on Cook Inlet beluga whales.  In its noise analysis, BOEM focused primarily on the impact of seismic surveys and pile-driving.[156]  And yet, the FEIS noted that beluga whales "exhibit less displacement or behavioral change in response to a stationary sound source (drilling)."[157]  Further, while BOEM generally stated that "[v]essels produce the loudest regularly occurring man-made noises in

---

[153] Docket 40 at 36 (quoting AR021053).

[154] Docket 40 at 36-37 (first quoting AR069249; and then citing AR069256).  *See* AR069051, AR069234-35 (2017 Biological Opinion).

[155] Docket 40 at 38 (citing AR021049-50; AR045709 (map showing only one acoustic mooring selected for study south of Kalgin Island in Cook Inlet, near Tuxedni Bay)).  Kalgin Island is just north of the area selected for Lease Sale 258, and Tuxedni Bay is to the west of Lease Sale 258.  *See* AR020951; AR020956; AR068796.

[156] AR021049 ("Post-lease activities with the greatest potential to harm marine mammals are seismic surveys and pile-driving.").

[157] AR021051.

Cook Inlet," it concluded that "[v]essels used in industrial activities produce sound below the intensity required to cause injury to marine mammals" and that "[t]he most likely response to vessel noise from marine mammals would therefore be brief avoidance of the area around the vessel with temporary changes in vocalizations."[158]

BOEM's conclusion that vessel noise would be below the level required to injure marine mammals is contradicted by several documents in the record. Most notably, NMFS's 2017 biological opinion for a prior, nearly-identical lease sale in Cook Inlet[159] concluded that "noise associated with transiting vessels" would have minimal impacts on beluga whales and were "not likely to result in adverse consequences for the animals."[160] However, regarding noise from towing, anchor handling, and dynamic positioning, the biological opinion concluded that such activities would result in the "take" of 90 Cook Inlet beluga whales.[161] Further, the NMFS Recovery Plan ("Plan") for the Cook Inlet beluga whale listed tug boat noise, cargo/tanker noise, and small vessel noise as more concerning to the recovery of

---

[158] AR021051.

[159] AR069051, AR069069.

[160] AR069257.

[161] AR069258-59. The "take" of marine mammals is a term of art arising from the MMPA, which is not at issue here. 16 U.S.C. §§ 1371(a). However, a "take" means the harassment, hunt, capture, or kill of a marine mammal, and harassment includes conduct that has the potential to injure a marine mammal or to disturb a marine mammal by disrupting its behavioral patterns. *Id.* § 1362(13), (18)(A), (C), (D). As such, the finding of "take" of 90 beluga whales from vessel noise for a nearly identical lease sale undermines BOEM's conclusion that vessels used in industrial activities produce sound below the intensity causing injury to marine mammals.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 35 of 49

the beluga whale than pile-driving or noise from seismic surveys.[162]   As such, BOEM failed to take the requisite hard look at the impact of this vessel noise from Lease Sale 258 on Cook Inlet beluga whales.[163]

## ii. Cumulative Impacts

Plaintiffs maintain that BOEM's "analysis of the cumulative impacts of Lease Sale 258 is also deficient."[164]   They assert that BOEM did not analyze the "threat that the cumulative effects of multiple stressors have on the Cook Inlet beluga whale"; rather, BOEM "lump[ed] belugas together with other marine mammal species in the inlet."[165]   Additionally, Plaintiffs assert that BOEM's cumulative impact analysis is flawed because it "wholly ignores information demonstrating the threat water pollution poses to the Cook Inlet beluga whale" and it "does not even mention this threat to belugas from sewage discharges, runoff from roads, airports, and agricultural sites, and other sources in the cumulative impacts section on marine mammals."[166]

---

[162] AR068857-58.

[163] *See Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739, 767-68 (D. Alaska 2021) (holding that environmental assessment failed to take a look at the effects of tug boat noise on Cook Inlet beluga whales because it "list[ed] tugs as a potential source of noise without explaining why the effects of that noise on Cook Inlet beluga whales will be insignificant" and "fail[ed] to mention tugs towing the drill rig or mitigation measures that apply to tugs towing the drill rig").

[164] Docket 37 at 34.

[165] Docket 37 at 35.

[166] Docket 37 at 36.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 36 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 36 of 49

Federal Defendants respond that, in the FEIS, BOEM noted the small and decreasing size of the Cook Inlet beluga whale population and discussed multiple threats to beluga whales, including noise, disturbance, and oil spills.[167] Federal Defendants also assert that BOEM assessed the impact of discharges from post-lease activities and the potential impact of those discharges on beluga whales.[168]

First, the Court finds that BOEM's consideration of Cook Inlet beluga whales together with all other marine mammals in the cumulative analysis section was arbitrary, because that "decision . . . runs counter to the evidence before the agency."[169] "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions."[170] "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[171] "[S]o long as the agency provides a sufficient explanation, [a court] generally 'defer[s] to an agency's determination of the scope of its cumulative effects review."[172] "While

---

[167] Docket 40 at 48 (citing AR021044-46 (beluga whale population); AR021049-52 (noise); AR021053-54 (disturbance); AR021174-85 (oil spills)).

[168] Docket 40 at 48 (citing AR021014-18; AR021052; AR021057-58).

[169] *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1069-70 (9th Cir. 2014) (citation omitted).

[170] 40 C.F.R. § 1508.7.

[171] *Id.*

[172] *Ctr. for Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633, 646 (9th Cir. 2023) (quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002)).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 37 of 49

the burden on [plaintiffs] to identify potential cumulative impacts is not onerous, [plaintiffs] still bear[] the burden of persuasion."[173] A plaintiff must "show[] that the [agency's] cumulative impact analysis . . . would have been potentially different" had it considered the impacts proffered by the plaintiff.[174]

As BOEM recognized, the cumulative impact of past actions and Lease Sale 258 is not the same for the Cook Inlet beluga whale as compared to the other marine mammals considered in the FEIS.[175] In the cumulative effects section of the FEIS on marine mammals, BOEM observed that, "despite exposure to" "noise, habitat alteration, disturbance, and pollution from oil and gas activities; risk of strikes, noise, and/or pollution from vessel and aircraft traffic; and competition for prey with, potential entanglement from, and potential mortality associated with commercial, recreational, and subsistence harvesting," "most marine mammal populations remain stable to increasing in Cook Inlet."[176] BOEM noted that "[t]his includes the listed populations of fin whales, humpback whales, Steller sea lions, and sea otters," but crucially observed that it did "not include beluga whales whose population has continued to decline at a 2.3 percent annual rate in recent years to

---

[173] *Id.* at 645 (internal quotation marks and citations omitted).

[174] *Id.* at 646 (citing *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010) (holding that, in challenge to cumulative impacts analysis, plaintiffs "must show . . . the potential for cumulative impact")).

[175] AR021045 (table listing marine mammals occurring in Cook Inlet and identifying each species as endangered or not depleted); AR021060.

[176] AR021060.

an estimated 279 individuals."[177]  Therefore, because Cook Inlet beluga whales have been impacted differently than other marine mammals in Cook Inlet by past actions, as suggested by population trends, BOEM should have considered the cumulative impacts on Cook Inlet beluga whales separately.  As such, Plaintiffs have met their burden here to show that BOEM's "cumulative impact analysis . . . would have been potentially different" had it considered the cumulative impacts of Lease Sale 258 on the Cook Inlet beluga whale distinct from other marine mammals.[178]

Next, regarding Plaintiffs' claim that BOEM should have considered water pollution from sewage discharges, runoff from roads, airports, and agricultural sites, and other sources in its cumulative effects analysis, the Court finds that BOEM reasonably did not include such pollution in its cumulative effects analysis. In the FEIS, BOEM determined that the appropriate past, present, and reasonably foreseeable future actions for analysis as cumulative effects were oil and gas related activities; marine transportation, ports, and terminals; mining projects; resource harvest activities; residential and community development in the Kenai Peninsula Borough; scientific research and survey activities; military and homeland security activities; and climate change.[179]  Of these, BOEM determined

---

[177] AR021060.

[178] *Ctr. for Cmty. Action*, 61 F.4th at 646 (citation omitted).

[179] AR020967-72.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 39 of 49

that "oil and gas operations, mining, marine transportation, ports and terminals, vessel traffic, and oil spills" "could cumulatively impact the water quality of Cook Inlet and fresh or estuarine waters on surrounding lands."[180]  Specifically, BOEM assessed that "[p]otential impacts to water quality could result from increases in [total suspended solids], turbidity, and pollutants; increases in vessel discharges; an increased occurrence of large hydrocarbon spills; and climate change."[181]  In the FEIS, BOEM also observed that:

> The quality of water in the Cook Inlet Planning Area meets criteria for the protection of marine life according to Section 403 of the Clean Water Act (CWA).  No waterbodies directly draining into the Proposed Action area are identified by the State of Alaska as impaired per Section 303 of the CWA.  While contaminants have been reported, many are attributed to erosion of the local soils, rocks and ores, and few can be decidedly linked to human activities unlike anthropogenic input of pollutants at urban centers that have deleteriously impacted local streams and lakes.[182]

Plaintiffs point to NMFS's Recovery Plan and four studies as evidence that BOEM should have considered other sources of water pollution in its cumulative effects analysis, yet none help Plaintiffs meet their burden.[183]  First, the Plan recognized that "it is likely that chronic exposure to contaminants may compromise an individual whale's health, with the potential for population-level impacts," but

---

[180] AR021016.

[181] AR021016.

[182] AR021013 (citations omitted).

[183] Docket 37 at 36-37 (citing AR068869; AR118383-407; AR140101; AR135039-49; AR140701).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 40 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 40 of 49

ultimately concluded that "the comparatively low levels of contaminants documented in [Cook Inlet] belugas themselves as well as in the Cook Inlet water and sediment samples analyzed suggest that the relative concern of these known and tested contaminants to [Cook Inlet] belugas is most likely low."[184] The Plan therefore does not show that BOEM's cumulative impacts analysis would have potentially been different had it considered sewage discharges and other runoff, as the threat from contaminants is low, and BOEM noted that the water quality in Cook Inlet satisfies the applicable standards in the Clean Water Act.[185]

Next, Plaintiffs rely on a study that found high levels of cancer in beluga whales in the St. Lawrence Estuary linked to exposure to carcinogens disposed of in the waterway.[186] That study also analyzed tissue taken from four Cook Inlet beluga whales and, while those samples indicated Cook Inlet beluga whales had been exposed to similar carcinogens, there was no evidence of cancer in the sample size.[187] Another study cited by Plaintiffs states that "[i]n some populations or individuals [of Cook Inlet belugas], . . . biological aging is accelerated due to stress and exposure to environmental contaminants," but the study does not say

---

[184] AR068869-70.

[185] See Ctr. for Cmty. Action, 61 F.4th at 646 (rejecting plaintiff's challenge to cumulative impact analysis because plaintiff had "not shown that the FAA's cumulative impact analysis on air quality would have been potentially different if it considered the 80-plus projects" offered by plaintiffs).

[186] AR118384.

[187] AR118394.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 41 of 49

more about water pollution.[188]  The third study cited by Plaintiffs examined concentrations of two pollutants in St. Lawrence Estuary beluga whales, which Plaintiffs suggest informs an analysis of the impacts on water pollutants on Cook Inlet beluga whales.[189]  And the fourth study cited by Plaintiffs simply noted that, while the Recovery Plan listed the threat from pollution as low for Cook Inlet beluga whales, more research should be done on the presence of contaminants in Cook Inlet belugas.[190]  None of these studies help Plaintiffs meet their burden to show the potential that BOEM's cumulative impacts analysis would have been different; they either focus on an entirely different population of beluga whales or their findings are not descriptive as to the impact of certain pollutants on Cook Inlet beluga whales.

Plaintiffs also cite to a study documenting "congenital defects in two Cook Inlet beluga whales for the first time, which could be due to exposure to pollution."[191]  While that study stated that there is a "relationship" between exposure to chemicals or other environmental contaminants to congenital defects, it did not link any particular pollutant to the defects discovered and "suggest[ed] further testing for pollutants is needed."[192]  The study also indicated that the

---

[188] AR140101.

[189] AR135039.

[190] AR140701; AR140711; AR140714.

[191] Docket 37 at 37 (citing AR140105-11).

[192] AR140109-10.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 42 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 42 of 49

defects could be due to a lack of genetic diversity in the Cook Inlet beluga whale population or nutritional factors.[193]  Plaintiffs also rely on a portion of NMFS's Plan that generally discusses the "synergistic effect between certain chemical pollutants and noise."[194]   However, the Plan acknowledges that "these synergistic effects have not yet been described in marine mammals."[195]  These studies therefore also fail to establish that BOEM's cumulative impacts analysis would potentially have been different, as they do not establish that water pollution poses a notable risk to Cook Inlet beluga whales nor do they undermine BOEM's assertion that Cook Inlet water quality is suitable for marine life.

Accordingly, because Plaintiffs fail to show that BOEM's cumulative effects analysis would potentially have been different, the Court finds that BOEM adequately explained the past, present, and reasonably foreseeable future activity that would have a cumulative impact on water quality.  Therefore, the Court defers to BOEM's decision to exclude sewage discharges, runoff from roads, airports, and agricultural sites from the scope of its cumulative effects analysis.[196]

### iii.  Large Oil Spill

Plaintiffs contend that BOEM "failed to take a hard look at the impacts of a large oil spill on the Cook Inlet beluga whale" because the FEIS, arbitrarily and

---

[193] AR140110.

[194] Docket 37 at 37 (citing AR068854-55).

[195] AR068855.

[196] *Ctr. for Cmty. Action*, 61 F.4th at 645-46.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 43 of 49

contrary to the evidence, "concludes that a large oil spill 'could affect individuals but would not affect marine mammal populations due to the assumed volume of a large spill' and its dispersal behavior."[197] Plaintiffs point to NMFS's Recovery Plan, asserting that the Plan "acknowledges that an oil spill could result in '[a] mass stranding resulting in numerous mortalities' that would be 'catastrophic to the [beluga whale's] recovery,' and 'increase the likelihood of [the beluga whale's] extinction.'"[198] Plaintiffs also maintain that BOEM did not sufficiently consider that beluga whales "aggregate in and around the sale area" in assessing the impacts of an oil spill because BOEM only mentioned in an FEIS appendix that "[i]f a large oil spill impacts an area where beluga[s] . . . are aggregated and they are subsequently injured, their populations could be adversely affected."[199]

Federal Defendants respond that BOEM

reasonably concluded that impacts to marine mammals, including beluga whales, would be negligible to minor because small spills would have temporary and localized effects, and although a large spill could have major impacts on beluga whales, such a spill would be unlikely to occur during the winter when a significant number of beluga whales are in lower Cook Inlet.[200]

In Appendix A, BOEM analyzed the impact of a large oil spill on Cook Inlet beluga whales. BOEM noted that "the small population sizes for belugas,

---

[197] Docket 37 at 38 (quoting AR021054).

[198] Docket 37 at 39 (first quoting AR068851; and then quoting AR068852).

[199] Docket 37 at 40-41 (alterations in original) (quoting AR021185).

[200] Docket 40 at 41 (citing AR0021175-79; AR021054; AR021265).

humpback, fin and North Pacific right whales in or near Cook Inlet means adverse impacts to a small number of individuals could lead to a cascade of impacts to their populations."[201] BOEM determined that "[t]he probability of a large spill contacting summer Critical Habitat for Cook Inlet beluga whales, or areas in the upper inlet where they usually occur in summer, remains low so individuals from their population are less likely to be impacted by a large summer spill than individuals of other cetacean species . . . ."[202] But BOEM concluded that "[a] large spill in winter could affect belugas and their winter Critical Habitat areas, and such an event could have major impacts on the stock due to the small population size and their restricted winter range in the inlet."[203] BOEM's Oil Spill Risk Analysis calculated that the "highest chance of a large spill both occurring and contacting [Cook Inlet beluga critical habitat along the western side of Cook Inlet] is 11 percent."[204]

The FEIS then went on to discuss that, while injury would occur to individual whales from a large oil spill, "mortality would be unlikely."[205] BOEM recognized that temporary displacement from feeding grounds could occur depending on the spill's characteristics and whale prey could be impacted, but the effect on food

---

[201] AR021176.

[202] AR021176.

[203] AR021176.

[204] AR021178.

[205] AR021176.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 45 of 49

sources would not have population-level impacts.[206] BOEM observed that because "belugas spend most of the year in the upper inlet areas of Knik and Turnagain Arms, away from the Lease Sale Area[,] . . . population-level impacts to these species would be unlikely."[207] BOEM concluded that "[a]lthough unlikely, a large spill contacting aggregations of Cook Inlet belugas could have permanent and adverse population-level effects due to the small number of individuals in the population."[208]

The Court finds that the FEIS contains an adequate discussion of the impact of a large oil spill on the Cook Inlet beluga whale. BOEM recognized that a large spill could have a major impact on the population of beluga whales because of their small population size but concluded that, because beluga whales spend most of their time outside of the Lease Sale area, it is unlikely that a large oil spill would have population-level impacts. BOEM also assessed the impact of a spill on prey sources and similarly concluded that any impact on prey would not result in population-level effects for the Cook Inlet beluga whale.

Further, the Recovery Plan Plaintiffs rely on does not single out the potential impact of an oil spill on beluga whales; rather, it identifies "[a]nthropogenic events, such as oil spills and natural gas blowouts," as one of several potential

---

[206] AR021176.

[207] AR021176.

[208] AR021179.

"catastrophic event[s]" that "may . . . have detrimental effects on [Cook Inlet] belugas."[209]  The Plan also detailed State of Alaska records of "all spills of harmful substances" and noted that "[t]here are no reports of [Cook Inlet] belugas being directly impacted by any of these events."[210]  Viewing the Plan's statements about catastrophic events as a whole, the Plan does not undermine BOEM's conclusion that a large oil spill is unlikely to have population-level effects on the Cook Inlet beluga whale.  Therefore, the Court finds that BOEM took the requisite hard look at the effects of a large oil spill on Cook Inlet beluga whales.

## II. Remedy

For the foregoing reasons, the Court finds that BOEM violated NEPA in certain respects in its FEIS for Lease Sale 258.  The parties dispute the appropriate remedy.  Plaintiffs ask the Court to vacate and remand the FEIS and the ROD and to vacate the lease sale and the lease issued to Hilcorp.[211]  Federal Defendants respond that, at most, the lease sale and Hilcorp's lease should be suspended pending remand for additional NEPA analysis.[212]  Federal Defendants alternatively ask the Court to consider awarding only declaratory relief.[213]

---

[209] Docket 37 at 39; AR068851.

[210] AR068851-52.

[211] Docket 37 at 44.

[212] Docket 40 at 50.

[213] Docket 40 at 50.

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 47 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 47 of 49

"Although not without exception, vacatur of an unlawful agency action normally accompanies a remand."[214] "When equity demands, however, the [challenged agency action] can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures."[215] "A federal court 'is not required to set aside every unlawful agency action[]' . . . ."[216]

In this case, the Court finds that vacatur would be contrary to the directive of Congress, as set forth in the IRA's mandate that BOEM hold Lease Sale 258 prior to December 2022, and therefore that the equities weigh against vacatur.[217] As such, the Court REMANDS WITHOUT VACATUR Lease Sale 258's Final EIS and the ROD for Federal Defendants to provide a supplemental EIS addressing the deficiencies identified above, and a modified ROD as warranted. The Court SUSPENDS Hilcorp's lease pending a supplemental EIS from Federal Defendants. The Court further retains jurisdiction during the pendency of the supplemental EIS process and directs that Federal Defendants file a status report with the Court within 6 months of the date of this order and every 6 months

---

[214] *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (emphasis omitted).

[215] *Id.* (citations omitted).

[216] *Id.* (quoting *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)).

[217] *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (declining to vacate because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand")).

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 48 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 48 of 49

thereafter until the supplemental NEPA review is complete. Any party may move for a status conference upon a showing of good cause.

This case shall be administratively closed while the matter is on remand.

DATED this16th day of July 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:22-cv-00279-SLG, *Cook Inletkeeper, et al. v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 49 of 49

Case 3:22-cv-00279-SLG   Document 52   Filed 07/16/24   Page 49 of 49